UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------X
UNITED STATES OF AMERICA,

MEMORANDUM AND ORDER

     -against-              04-CR-699 (DRH)(S-2)


RODNEY ARNOLDO MORRISON,

               Defendant.
----------------------------X
A P P E A R A N C E S:

For the Government:
    Roslynn R. Mauskopf
    United States Attorney
    Eastern District of New York
    One Pierrepont Plaza
    Brooklyn, New York  11201
      By: James M. Miskiewicz, A.U.S.A.
          Richard Thomas Lunger, Jr., A.U.S.A

For Defendant:
    Anthony P. Gallo, P.C.
    6080 Jericho Tpke.
    Commack, New York 11725
      By: Anthony P. Gallo, Esq.

    Law Offices of Peter Smith & Associates
    232 East Main Street
    Huntington, New York 11743
      By: Peter Smith, Esq.

    Thomas P. Cleere, Esq.
    3075 Veterans Memorial Hwy.
    Suite 200
    Ronkonkoma, New York 11779

HURLEY, District Judge

      Rodney Arnoldo Morrison ("defendant," or "Morrison") is

charged in a second superseding indictment with Racketeering

(Count One), Racketeering Conspiracy (Count Two), Arson

Conspiracy (Count Three), Arson (Count Four), Conspiracy to Use

Extortionate Means to Punish for Nonrepayment of Credit (Count

Five), Extortionate Punishment for Nonrepayment of Credit, (Count Six), Use of Fire To Commit a Felony (Count Seven), two counts of Illegal Possession of a Firearm (Counts Eight and Nine), Conspiracy to Use Interstate Facilities in the Commission of Murder for Hire (Count Ten), and Use of Interstate Facilities in the Commission of Murder for Hire (Count Eleven). Additionally, the indictment contains an application by the government seeking the criminal forfeiture of certain assets.

Following defendant's arraignment on the initial indictment, a detention hearing was held before me. Upon its conclusion on September 3, 2004, defendant was ordered detained as a risk of flight. Thereafter, he unsuccessfully made applications to Magistrate Judges James Orenstein (February 16, 2006), and A. Kathleen Tomlinson (May 15-16, 2006), to have that status changed to release on bail with conditions.

The subjects of this opinion are (1) defendant's motion claiming that his protracted pretrial detention violates due process, (2) his appeal of Judge Tomlinson's order denying him bail, and (3) the effect of the second superseding indictment upon defendant's custody status.

During the course of a two day bail hearing held before me on July 12th and 13th of this year, I provided a partial bench decision concerning item (1), viz. the due process claim. (July 12, 2006 Transcript ("Tr.") at 119-126; <u>see also</u> July 13, 2006

Tr. at 168-174.)  The purpose of this decision is to complete
that bench decision, and to resolve items (2) and (3).

DUE PROCESS CLAIM

As explained by the Second Circuit in <u>United States v.
Millan</u>, "[t]o determine whether the length of pretrial detention
has become constitutionally excessive, we must weigh three
factors: '(i) the length of detention; (ii) the extent of the
prosecution's responsibility for the delay of the trial; and
(iii) the strength of the evidence upon which the detention was
based,' <u>United States v. Orena</u>, 986 F.2d 628, 630 (2d Cir. 1993);
that is, the evidence concerning risk of flight and danger to the
safety of any other person or to the community."  4 F.3d 1038,
1043 (1993).  Each of the these three factors will be addressed
seriatim.

1.  <u>Length of Detention</u>

The first factor was addressed by the Court during its
partial bench decision on July 12, 2006.  As noted at that time,
while the length of detention will rarely by itself offend due
process, <u>United States v. El-Gabrowny</u>, 35 F.3d 63, 65 (2d Cir.
1994), defendant's pretrial detention of almost two years weighs
in favor of granting his application.

2.  <u>Extent Delay Attributable to Government</u>

The situation is otherwise with respect to the second
factor.  As partially explained in the bench decision, little, if

-3-

any, of the delay in bringing the defendant to trial is attributable to the government. Instead, the overriding reason for the delay was the entry and exit of a series of defense attorneys, compounded by the (1) agreed upon complexity of the case, and (2) the existence of ongoing plea negotiations which involved both state and federal prosecutors. (See, e.g., as to causes of delay: (1) September 22, 2004 Tr. at 2-5 (case adjourned to October 29, 2004 for further status conference; case designated as a complex case, on consent, after then-defense counsel Henry E. Mazurek, Esq. of the Law Office of Gerald L. Shargel explained to Court "given the ongoing investigations and the potential for possible resolution of those issues prior to any further indictments, I think it would be helpful for the parties to have the extra time" (id. at 2-3)); (2) November 12, 2004 Tr. at 2-3 (case called; Mr. Morrison not present due to quarantine in correction facility; counsel advise Court of ongoing plea negotiations and matter adjourned to January 7, 2005; Mr. Mazurek agrees to advise Mr. Morrison of what transpired in his absence, and to inform him that the Court will place the case on the calendar earlier — assuming the quarantine problem is resolved — at his request); (3) April 8, 2005 Tr. at 2-3 (Mr. Mazurek reports that Mr. Morrison is seeking new counsel; Mr. Morrison informs Court that he is "in the process of interviewing new lawyers," that he has "a complex case," and that

he is trying "to find the best lawyer" (id. at 3); control date of May 6, 2005 selected, with the defense advised by the Court that as soon as new counsel files a notice of appearance, the case will be calendared if the notice is filed prior to the control date); (4) May 19, 2005 Tr. at 2-3 (Ephraim Savitt, Esq. appears as new counsel for Mr. Morrison; case adjourned on consent, after counsel confer, to July 8th for a further status conference); (5) October 7, 2005 Tr. at 2-3 (Anthony J. Colleluori, Esq. appears for Mr. Morrison, as co-counsel with Mr. Savitt; case adjourned until November 18, 2005 to permit Mr. Colleluori to be advised by Mr. Savitt about the discovery and other aspects of the case to date); and (6) January 20, 2006 Tr. at 2-3 (Anthony Colon of Cochran Firm joins the defense team; Court advised that plea negotiations continuing and case adjourned on consent to March 17, 2006.)

Mr. Colleluori, by letter dated March 10, 2006, advised the Court that both Mssrs. Savitt and Colon had withdrawn from the case, and requested a six week adjournment "in order to give the new attorneys an opportunity to review the file and be familiarized with the case." (Gov't's Mem. Opp'n to Def.'s Mot. to Dismiss Ex. 2.) That request was granted, with the next court date being set for April 28, 2006.

The Court — and apparently the government — was advised for the first time on June 23, 2006, that the plea negotiations

referenced repeatedly by defendant's prior attorneys, including Mr. Mazurek and Mr. Savitt, were no longer extant, thus leading to the cancellation of the meeting between the government and defense scheduled for noon that day. (<u>See</u> June 23, 2006 Tr. at 11-14.)

In an apparent effort to side-step the obvious, i.e. that the adjournments about which defendant and current counsel now complain were typically granted to permit new counsel to familiarize himself with the case[1] and/or to further pursue plea negotiations (coupled with the fact that defendant and his then-counsel signed speedy waivers throughout the process), defendant proffers:

> In addressing the second factor, the reason
> for the delay, the length of the delay has
> been predicated upon supposed "plea
> negotiations". In this case, the government
> "encouraged" the defendant to sign waivers of
> his speedy trial rights, claiming the need
> for plea negotiations. In fact, the
> government never intended for the defendant
> to plea to the indicted charges. The only
> plea acceptable to the government included
> the defendant pleading guilty to a state
> crime in which he was not, nor may ever be
> charged with. The government breached its
> obligation of good faith and literally lulled
> the defendant into waiving his statutory and
> constitutional rights to a speedy trial, not
> because of plea bargaining, but to extend the

---

[1] Defendant correctly notes that various prosecutors have been assigned to the case since its inception but has failed to demonstrate, by reference to a docket entry or otherwise, that such reassignments caused, in whole or in part, the subject delays.

investigation over two years post indictment.
. . . .

    The time apportioned for plea negotiations
amounts to nothing more than a sham in order
to permit the government to continue its
investigation in the hopes of attempting to
build a case against Mr. Morrison.

(June 26, 2006 Aff. of Thomas P. Cleere, Esq., attached to

"Notice of Pretrial Motions" ¶¶ 6, 8.)

    Significantly absent from Mr. Cleere's affirmation is

any firsthand information regarding the "sham" plea negotiations

and the government "lull[ing] the defendant into waiving his . .

. constitutional right to a speedy trial."  For instance, no

affidavit of Mr. Morrison or of any of his prior, supposedly

hoodwinked attorneys[2] has been furnished.  If Mr. Cleere was

personally involved in recent plea negotiations, he fails to so

state.  Instead, he simply charges the government with grievous

misconduct devoid of specifics.  More is required to call into

question the strong evidence cited by the government as to factor

two.

    In sum, the evidence, as distinct from conclusory

assertions, indicates that the delays are traceable primarily to

_____

    [2] Such prior attorneys include not only those listed <u>supra</u>
in the text, but also Robert Y. Altchiler, Esq., as well as Alan
Levine, Esq., and Steven M. Cohen, Esq., both of Kronish, Lieb,
Weiner & Hellman LLP.

the defendant.[3]

3.   <u>Strength of Detention Evidence</u>

The third <u>Millan</u> factor, though mentioned, was
unresolved by the Court during its partial bench decision.   As
explained <u>infra</u>, the strength of the evidence upon which the
detention was based weighs against defendant's due process-based
application.

4.   <u>Conclusion Re Pretrial Detention Due Process Claim</u>

Factors two and three more than counterbalance factor
one; accordingly, defendant's due process motion is denied.[4]

REVIEW OF MAY 16, 2006 DECISION OF
MAGISTRATE JUDGE TOMLINSON, AND EFFECT
OF THE SECOND SUPERSEDING INDICTMENT ON
DEFENDANT'S CUSTODY STATUS

1.   Government's Position Before Judge Tomlinson That
<u>Defendant not Entitled to Another Bail Hearing    </u>

The government argued to Judge Tomlinson that the newly

_____

[3]   Arguably, the government may also be faulted for
proceeding too slowly with respect to the murder and tax related
matters pertaining to Mr. Morrison.   Yet, it appears that the
prosecutor and prior defense attorneys were, as noted early-on by
Mr. Mazurek, endeavoring to resolve the case via plea
negotiations "prior to any further indictments."   (Sept. 22, 2004
Tr. at 2-3.)

[4]   Neither the government nor defense has addressed the
question of whether the government carries the burden of
disproving defendant's due process claim, or whether the burden
of proof rests with the defendant as I tentatively opined during
the proceedings on July 12, 2006.   (July 12, 2006 Tr. at 125.)
That issue need not be resolved, however, because it is clear
that under either circumstance, the claimed constitutional
deprivation has not occurred.

created and significantly enhanced proffered bail package did not satisfy the "change of circumstance" statutory prerequisite for the holding of another bail hearing because there was nothing to indicate that the nature and amount of the assets being presented were not known by the defendant in September of 2004. <u>See</u> 18 U.S.C. § 3142(f)(2). In response, one of defendant's attorneys explained:

> [T]he information that we are . . . putting forth today, is information that is newly discovered information, in that the assets that the defendant and his wife, and the source of those assets and investments were handled by other persons, not directly by defendant. <u>He, himself, had not been aware of the extent of his assets</u>."

(May 15, 2006 Tr. at 15-16 (emphasis added).)

Judge Tomlinson decided to hold a hearing based primarily, if not solely, on what I had told defense counsel at the conclusion of the initial detention hearing, viz. that I would entertain an amended bail package should one subsequently be presented. (Sept. 3, 2004 Tr. at 80.)

2.    Evidence Adduced During May 15-16, 2006 Hearing
      Before Judge Tomlinson

Defense counsel presented Judge Tomlinson with a voluminous financial statement, represented by defense counsel to "comprise[] all of the assets that defendant and his wife own jointly." (May 15, 2006 Tr. at 13-14.) To establish that the financial compilation was as represented, the defense called Lynn

-9-

T. Domachowski as a witness.

Ms. Domachowski, a certified public accountant, indicated that she "was retained by the Morrisons to assemble a statement of financial assets back in January of 2006." (<u>Id.</u> at 44.)  She determined that as of March 31, 2006 the Morrisons had total worldwide assets of "56,563,991." (<u>Id.</u> at 52.)  That number corresponds with the total provided in the financial statement mentioned <u>supra</u>.

During the hearing, there was no suggestion that the $56 million dollar figure underrepresented the Morrisons' wealth. Instead, the issue was whether the newly surfaced $56 million dollar figure represented the total of the assets controlled by defendant.[5]

During cross-examination, Ms. Domachowski indicated that what she prepared was, in accounting parlance, a "compilation," i.e. a summary based on information provided by the client.  (<u>Id.</u> at 60-61.)  As such, it has the lowest level of verifiability, below both a "review" and an "audit." (<u>Id.</u> at 59-

_____

[5] The evidence presented during the various bail hearings establishes that Ms. Morrison's role in the operation of the Peace Pipe Smoke Shop located on the Poospatuck Indian Reservation, which is represented to be the primary source of the Morrisons' wealth, is virtually nonexistent; defendant explained, through his attorney, that the business is in his wife's name solely because she is a Native American, which he is not. However, the operation of the shop, as well as the management of the multi-million dollars in profits generated by the business, is handled by defendant.

60.)  Accordingly, the witness acknowledged, for example, that
she would not know that the defendant controlled a particular
bank account unless he told her of its existence.  (Id. at 57–
58.)

In some instances, of course, a review of bank
statements would lead an examiner to discover assets not
identified by the client.  Indeed, that happened here "a few
times."  (Id. at 58.)  Moreover, many of the records furnished by
defendant to Ms. Domachowski were incomplete.  For example, she
reported that her firm "did not have all the bank statements from
Costa Rica or Switzerland, so we couldn't trace wire transfers."
(Id. at 65.)  Indeed, it appears that the witness was never
provided with any actual bank statements for Costa Rican accounts
(see id. ("We didn't have actual statements.")), as distinct from
"a summary from Costa Rica showing the different bank accounts
and what they told us as of March 26, 2006."  (Id. at 62.)  And
from the witness's testimony about that summary, we know that
some of the listed Costa Rica accounts, perhaps all, are in the
name of a person named "Pascal Carlos," identified by the defense
as defendant's brother.  Regarding the accounts in Switzerland,
there is nothing to indicate that Ms. Domachowski was provided
with the corresponding bank statements; presumably she was not,
since "she couldn't trace wire transfers" to, or from, those
accounts.  (Id. at 65.)

For the accounts in Mexico, the witness explained that she was provided with bank statements "from 2000." (_Id._ at 64.) Thus, she could identify wire transfers from listed accounts in that jurisdiction during 2000 and thereafter. Similarly, she testified that she could identify Peace Pipe deposits into North Fork Bank from 2000 forward, as well as wire transfers from North Fork to bank accounts in Mexico. (_Id._ at 72-74.)

During redirect examination by defense counsel, she answered "I don't believe so" to the question "[W]ere you able to trace any wire transfers . . . from Piece [sic] Pipe to North Fork and then to accounts in Costa Rica"? (_Id._ at 74.) Finally, apparently given the paucity of materials furnished regarding assets controlled by defendant in Costa Rica, Ms. Domachowski acknowledged that she had "no idea" as to the circumstances which caused defendant's listed assets in that jurisdiction to increase from $9,000,000 in September of 2004[6] to over $20,000,000 by March of 2006. (_Id._ at 66; _see also_ _id._ at 77 ("I don't have the Costa Rican bank statements.").)

Interestingly, after Ms. Domachowski testified, one of defendant's current attorneys indicated that he:

_____

[6] During the September 2004 detention hearing, the government brought to my attention, inter alia, the $9,000,000.00 in Costa Rica, apparently based on leads it obtained following the execution of a search warrant for defendant's place of business in August 2004. (_See_ Sept. 3, 2004 Tr. at 11-15; _see also_ Gov't's Sept. 2, 2004 Letter Br. at 4-5.)

would like to have Mrs. Morrison and Mr.
Morrison swear under oath that the statements
that they provided to the accountants that
are in that document that is now in evidence,
are true, and that they are a complete
statement of their income, assets, real and
personal; whether they are held in either
name or in both.

So that is the nature of my testimony, my
questioning.  Just one single question to
both Mrs. Morrison first, and then Mr.
Morrison.

(<u>Id.</u> at 86.)

When the government understandably objected to the

extent defense counsel was not offering his client and Ms.

Morrison for cross-examination on this pivotal issue, the

application was withdrawn.  (<u>Id.</u> at 87-88.)  In its stead,

defense counsel "ask[ed] Mrs. Morrison and Mr. Morrison [to] sign

and affirm by their signatures this document."  (<u>Id.</u> at 88.)

This was done, with the document being received into evidence,

without objection and, of course, sans cross-examination.

3.  <u>Judge Tomlinson's Decision</u>

Judge Tomlinson denied defendant's application in a

well-reasoned, thoughtful bench decision.  (May 16, 2006 Tr. at

83-115.)  At the outset, she reviewed the reservations I had

expressed in September 2004 about the truthfulness of defendant's

representations to Pretrial Services that he earned $10,000 a

month from his business, and that he, together with his wife and

their three children, resided in Mastic.

Judge Tomlinson then noted the following, I think particularly apt, statement made by Judge James Orenstein during the course of the February 2006 unsuccessful bail application before him:

> "I just want to make sure that the record is clear that there is no sense in which the relevant consideration is simply how much or little money a person has. But to the extent that there is evidence – and there is quite a bit of evidence that this defendant has extensive assets, and there is some question as to where they are, how extensive they are, and the relationship between the proposed package and the extent of the assets. That is what is critical."

(Id. at 97 (quoting February 16, 2006 Tr. of Proceeding before Judge Orenstein at 34).)

Concerning the testimony of Ms. Domachowski, Judge Tomlinson observed that the witness "testified that [the] compilation [that she had prepared] was based completely on what the client had told her" (id. at 103), that some "accounts were under other people's names [and that] she would not know about them without the defendant having told her." (Id. at 104.) And while Ms. Domachowski testified that she could "trace all wire transfers" from the North Fork Bank to Mexico[7] based on the materials furnished by the defense, Judge Tomlinson expressed concern about what the accountant "ha[d]n't seen." (Id. at 106.) Judge Tomlinson observed that approximately 68% of defendant's

_____

[7] At least from the year 2000 forward, as noted earlier.

assets were "held abroad." (Id. at 110.)

Based on, inter alia, the foregoing, Judge Tomlinson concluded "that despite the defendant's representations to the contrary, there is sufficient evidence that this defendant . . . has the personal and financial resources to sustain himself outside of the United States for a prolonged period of time" (id. at 113), and, notwithstanding the proffered bail package, still represented an unacceptable risk of flight.[8] (Id. at 114.)

4. Standard of Review, and Application of That
   Standard to Judge Tomlinson's May 16, 2006 Decision

As explained on the record on July 12, 2006 (July 12, 2006 Tr. at 133), the law is clear that this Court's role is to review Judge Tomlinson's determination de novo. United States v. Leon, 766, F.2d 77, 80 (2d Cir. 1985). Having employed that standard, I find myself in total agreement with Judge Tomlinson's first-rate decision except for the previously noted burden of proof issue.

5. Broadened Scope of Analysis Given New Charges
   in Second Superseding Indictment

a) Bases for Current Decision. On July 11, 2006, the

_____

[8] Although the issue of whether the government or defendant bears the burden of proof may be complicated in this case based on what I said to defendant's then-attorney on September 3, 2004 about a further bail application, as discussed supra, it seems to me that the ultimate burden of proof vis-a-vis the continued detention of Mr. Morrison — as distinct from the burden of coming forward with an amended bail application — rests squarely with the government. To the extent Judge Tomlinson concluded to the contrary (id. at 114-15), I disagree.

-15-

second superseding indictment was returned.  As a result, this Court's task is not simply to review the adequacy of the newly proffered bail package vis-a-vis the first superseding indictment that was before Judge Tomlinson, but also, and more importantly, to consider that bail package in conjunction with the charges as they now stand.  Accordingly, the entire record of this case insofar as it pertains to detention, beginning with the Pretrial Service Report prepared on August 4, 2004 through to the return of the current indictment on July 11, 2006, together with the corresponding arguments and proffers made by current counsel based on that broad-based record, has been considered in determining if continued detention is appropriate.

b) <u>Court's Task at This Juncture</u>.  The relevant inquiry before me at this juncture is to determine whether the government has established that defendant represents a risk of flight (by a preponderance of the evidence), and/or a danger to a particular individual or the community at large (by clear and convincing evidence).  If either or both of those questions is answered in the affirmative, I am required to go to the second part of the analysis, that being whether there are any conditions or combination of conditions which would sufficiently ameliorate those concerns as to warrant release pending trial.  <u>See</u> <u>United States v. Friedman</u>, 837 F.2d 48, 49 (2d Cir. 1988).  Each of these three questions will be addressed in turn, beginning with

risk of flight.

6.    The Risk of Flight

        Several factors indicate to me that defendant
represents a risk of flight.  Firstly, as explained by the Court
at length during the course of the September 2004 proceeding, the
defendant was less than candid, to say the least, in describing
the amount of his income and the residence of his family during
his interview with Pretrial Services in August of 2004.  (Sept.
3, 2004 Tr. at 67-73.)[9]

        Of course, that a person lacks credibility is, standing
alone, irrelevant to a bail application.  But if that shortcoming
manifests itself via material false information being presented
to a court, as is the case here, it is germane.[10]

        In paragraph E of the August 4, 2004 Pretrial Service
Report, entitled "Education/Employment Status," the following
appears: "Regarding employment, Mr. Morrison advised that he has
been self employed, selling cigarettes since 1994.  He noted that
his company, Peace-Pipe is located next to his residence in

_____

        [9]  There are several references throughout the remainder of
this opinion to the proceedings before me on September 3, 2004.
In those instances where specific page cites are provided, the
subject materials are hereby incorporated by reference.

        [10]  The defendant does not claim that the pretrial service
officer who prepared the August 4, 2004 report misunderstood what
he, the defendant, said, or committed a scrivener's error as to
the two, above-mentioned subjects of primary concern, or
otherwise for that matter.

Mastic and that he earns $10,000 a month." It is clear that
Peace Pipe's net income, and, inferentially, defendant's income
far exceeded that amount. (See, e.g., Sept. 3, 2004 Tr. at 68-
70.) Raymond L. Colon, Esq., of the Cochran Firm, Mr. Morrison's
attorney at the time the matter was before Judge Orenstein,
suggested that the gross per day was $100,000 with "perhaps maybe
$20-30,000 [being the net]." (Feb. 16, 2006 Tr. at 28-29.) The
government indicated to the Court in September 2004 that the
correct figure is probably in the neighborhood of $80,000 a day,
net, based, in part, on what the Peace Pipe manager told one of
the officers executing the search warrant on August 4, 2004.
(Sept. 2, 2004 Gov't's Letter Br. at 3.)

Mr. Colon endeavored to explain to Judge Orenstein that
defendant's misstatement as to his monthly earnings was
attributable to the trauma he experienced at the time of his
arrest. (Feb. 16, 2006 Tr. at 25-26.) On July 12, 2006, the
explanation provided to me by defense counsel was that the
$10,000 per month figure represents the average amount of
"pocket" money (July 12, 2006 Tr. at 17) taken by defendant from
the business.

I have significant reservations about the accuracy of
both explanations because, among other things, the evidence
adduced, including from character witnesses called by the defense
on July 13th, indicates that Mr. Morrison is an acute, bold, hard-

driving businessman who, in my judgment, was (1) unlikely to be
significantly traumatized by simply one more in a series of
multiple arrests and (2) surely understood that "pocket" money
and total monthly income are not synonymous.

With respect to defendant's ties to New York, the
Pretrial Service Report reflects that defendant reported that he,
his spouse, and their children "all reside . . . in Mastic."
That representation was erroneous as to all the family members
mentioned except for defendant.[11]  Ms. Morrison and the children
resided in Mexico for years immediately prior to his arrest and
the children were attending school in that jurisdiction.[12]  (See,
e.g., Sept. 3, 2004 Tr. at 16 ("[T]he $4.6 million account was
used to purchase and build two homes in Mexico and that's [the]
money that the family has used to live on in the last several
years in Mexico."); see also July 13, 2006 Tr. at 183.)

And there are other important items not in the Pretrial
Services Report, such as any reference in the "Financial
Resources" portion to the extensive overseas assets controlled by

_____

[11]  The government proffered in September of 2004 that
defendant actually resided in East Moriches at the time of his
arrest, not in the apparently modest quarters behind the Peace
Pipe in Mastic.  (Sept. 3, 2004 Tr. at 52-53.)  Be that as it
may, however, there is evidence that defendant is a long time
resident of this area, although he was semi-retired at the time
of his arrest, allowing him ample time for world travel. (July
12, 2006 Tr. at 149.)

[12]  Since defendant's arrest, Ms. Morrison and the children
have resided locally.

defendant. With those assets, defendant and his family could
live comfortably anywhere in the world.

In August 2004, Pretrial Services recommended that
defendant be detained on the then pending arson related and
firearm charges. Three judges since then have reached the same
conclusion. Now, in addition to those charges, defendant is
charged with ordering the murder of Sherwin Henry, a former
employee and competitor in the cigarette marketing business.
(July 13, 2006 Tr. at 188-89.) The government's evidentiary
proffer as to the corresponding counts in the second superseding
indictment is formidable, including a purported admission by
defendant during a proffer session that "he paid $15,000 to the
murderers who killed Sherwin Henry, $5,000 on the day of the
murder, [and] $10,000 three or four weeks after the murder took
place." (July 12, 2006 Tr. at 52-53.) That admission was
apparently coupled by defendant's explanation that he did not
intend for the visit to Mr. Henry to result in his death. (Id.
at 53; see also July 13, 2006 Tr. at 185 (concerning colloquy
between Court and defense counsel about statements in Newsday
ascribed to counsel about the visit paid to Mr. Henry by
defendant's agents).)

Concerning the issue of defendant's intent, the
government further proffered that a witness with firsthand
information will testify that the message, at least in part,

given by defendant to the actual killers was that he "never wanted to see Sherwin Henry again." (July 13, 2006 Tr. at 190.)

The inclusion of the murder related counts in the current indictment makes this a "death penalty" eligible case. (See Counts Ten and Eleven and 18 U.S.C. § 1958.) So instead of facing what the government believed was a likely sentence of 15 years under the first superseding indictment, if convicted, (Sept. 3, 2006 Tr. at 48), he now is looking at the possibility of life imprisonment, and perhaps, death should the government carry its burden of proof at trial.

In sum, the government has established by a preponderance of the evidence that defendant represents a significant risk of flight given: (1) the incomplete and misleading information given to Pretrial Services in August of 2004, (2) the resulting uncertainty as to the locations and amounts of his vast wealth, (3) the restatement and underscoring of that uncertainty via the testimony of Ms. Domachowski before Judge Tomlinson, (4) the ability of the defendant — semi-retired and world traveled — to live well anywhere in the world with his family should he elect to flee the United States, and (5) the alternate sentences he faces under the second superseding indictment should he be convicted. Simply put, the evidence indicates that defendant has multiple reasons to flee this jurisdiction, and few, if any, to stay, if given the choice.

7.  <u>Danger to Community</u>

Thus far defendant has been detained solely as a flight risk.  Indeed, I concluded on September 3, 2004 that "on the information before me . . . the government has not met its burden by clear and convincing evidence" of showing that defendant represents a danger to the community.  (Sept. 3, 2004 Tr. at 65.) That determination was made notwithstanding the detailed outline that the government furnished as to its expected proof at trial. (<u>Id.</u> at 25-28.)  Thus, with respect to the arson-related counts, it was explained: "[T]here's no disputing that the car was torched . . . and there are witnesses who will indicate that Mr. Morrison in fact paid the individual to do it.  And that he subsequently spoke to one of the victims and threatened them, that if any of this comes back to him, they'll get it."  (<u>Id.</u> at 25-26.)  Yet, after listening to defense counsel, I found that the government's proof fell short of the mark.

The return of the second superseding indictment changes the landscape.  The grand jury has found probable cause to believe that defendant engaged in additional criminal conduct beyond arson and the unlawful possession of firearms, including robbery (Racketeering Act One(B) under Count One) and murder (Racketeering Act Three(C) under Count One, and Count Eleven). While defendant has pled not guilty and is presumed innocent, the government's substantial anticipated proof as to murder-related

-22-

charges certainly permits the inference, when viewed in conjunction with the government's arson proffer, that defendant, acting through others, is likely to use violence to advance his perceived interests.

In sum, the government has established by clear and convincing evidence that defendant is a danger to the community.[13]

8.    There are no Conditions of Release That Will
      Reasonably Assure the Appearance of Defendant
      as Required and the Safety of the Community

Defendant has asked to be released on a reasonable amount of bail, with conditions. The bond suggested is $25,000,000 (slightly short of 50% of the $56,563,911 amount shown in the compilation prepared by Ms. Domachowski), to be secured by $10,000,000 in cash and pledged assets.[14]

I harbor grave reservations as to the sufficiency of that bail package, or of any bail package, given the attendant circumstances. In addition to what was previously discussed about risk of flight and danger to the community, we are told (in a seeming effort to explain the sequential, ever increasing

---

[13]    The government, in meeting its burden, was not aided by the rebuttable presumption found in 18 U.S.C. § 3142(e). That presumption, as the government correctly noted during colloquy with the Court on July 12, 2006, (July 12, 2006 Tr. at 134-38), is inapplicable to the present case.

[14]    I signed an ex-parte restraining order on July 11, 2006, precluding the transfer of many, if not all of defendant's assets known to the government. Presumably, the assets subject to that Order would be unavailable to defendant for bond purposes if his detention was terminated.

identification of assets by the defense from August 2004 to May 2006) that the defendant was unaware of the nature and extent of his holdings until recently. (May 15, 2006 Tr. at 15-16.) To cure that deficiency, accountants were hired. But as Ms. Domachowski explained to Judge Tomlinson, the assets listed in her compilation are those identified by defendant (supplemented, in small measure, by those she was able to uncover from the incomplete records furnished by the defense). This circular process reinforces, rather than alleviates the problem which first confronted me in September of 2004, as well as Judges Orenstein and Tomlinson thereafter, viz. what assets does defendant actually control, in which countries, and in whose names are those assets titled? Moreover, the evidence of incentive to flee, as noted earlier, is compelling. The Court concludes that continued detention is appropriate.

In deciding that the government has satisfied its burden of proof as to this issue, I considered, as required, "the available information concerning" the factors listed in 18 U.S.C. § 3142(g). Some of those factors have already been discussed, such as the nature of the offenses charged, the weight of the evidence against defendant, defendant's family and community ties, his employment, his financial resources, and "the nature and seriousness of the danger to . . . the community that would be posed by [his] release." 18 U.S.C. § 3142(g)(4).

Also considered, but thus far unmentioned, is the defendant's criminal record. (July 12, 2006 Tr. at 54-55; <u>see also</u> Sept. 30, 2004 Tr. at 64 and copy of NCIC report and local arrest record attached to the Aug. 4, 2004 Pretrial Services Report.) Although his record is troubling — beginning with a youthful offender adjudication in 1984 for an act which, if committed by an adult, would constitute Robbery in the First Degree — none of his convictions are within the last decade.[15]

To partially reiterate, the government has established that no condition, or combination of conditions, will reasonably assure defendant's appearance in court as required and the safety of the community. Accordingly, defendant will continue to be detained pending trial.

### FUTURE COURT DATES

(1) <u>Appearance Before Judge Tomlinson</u>. The case will appear on Judge Tomlinson's calendar next Wednesday, July 26, 2006, at 11:00 a.m. for a status conference regarding 18 U.S.C. § 3005. Counsel should be prepared to articulate their respective positions — with supporting authority — regarding both the procedural and substantive effects of the statute upon the

---

[15] Current defense counsel argued before me that defendant always appeared in court on his other cases as required. That statement is, at best, problematic. <u>See</u> bench warrant listed in the NCIC report concerning the July 1987 criminal negligent homicide charge to which defendant ultimately pled guilty and received a conditional discharge.

current proceeding. By way of example, defendant should be prepared to address whether he intends to move for the appointment of counsel, who is eligible to become learned counsel under the statute, and what is the legal significance if defendant does not move for appointment of counsel pursuant to section 3005. Additionally, counsel should be prepared to discuss what effect, if any, (1) the applicability of section 3005, and (2) the death penalty consideration process, will have on the trial date.

(2) <u>Hearing Date, if Needed</u>. By notice of motion dated June 26, 2006, defendant has made a number of other motions, including one calling for the suppression of evidence seized from the Peace Pipe pursuant to a search warrant executed in August 2004. Those motions, now fully framed for decision as of earlier this week, will be decided shortly. Should a hearing be required, it will be held beginning at 10:30 a.m. on September 6, 2006; the attorneys are directed to adjust their schedules accordingly.

(3) <u>Trial Date</u>. Jury selection is hereby scheduled to commence at 9:30 a.m. on September 18, 2006, with the Court's preliminary instruction and counsels' opening statements to commence immediately thereafter. Again, all attorneys are directed to adjust their schedules accordingly.

CONCLUSION

Defendant's pretrial detention/due process motion is denied, as is his application to be released from detention pending trial.

Additionally, a status conference has been scheduled before Judge Tomlinson for next week, plus a hearing date, if needed, has been established, together with a date for the commencement of the trial.

SO ORDERED.

Dated: Central Islip, New York
       July 21, 2006


                              _____/S/_____
                              DENIS R. HURLEY, U.S.D.J.