UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------X
UNITED STATES OF AMERICA,

MEMORANDUM AND ORDER

     -against-           04-CR-699 (DRH)(S-2)


RODNEY ARNOLDO MORRISON,

             Defendant.
----------------------------X
A P P E A R A N C E S:

For the Government:
     Roslynn R. Mauskopf
     United States Attorney
     Eastern District of New York
     One Pierrepont Plaza
     Brooklyn, New York  11201
       By: James M. Miskiewicz, A.U.S.A.
          Richard Thomas Lunger, Jr., A.U.S.A

For Defendant:
     William H. Murphy, Jr. & Associates
     12 West Madison Street
     Baltimore, MD 21201
       By: William H. Murphy, Jr.

     Anthony A. Capetola, Esq.
     2C Hillside Avenue
     Williston Park, New York 11596

     Law Offices of Peter Smith & Associates
     232 East Main Street
     Huntington, New York 11743
       By: Peter Smith, Esq.

     Colleen Quinn Brady, Esq.
     99 Hudson Street - 8th Floor
     New York, New York 10013

     Daniel Nobel, Esq.
     401 Broadway - 25th Floor
     New York, New York 10013

     Law Offices of Richard Ware Levitt
     148 E. 78th Street
     New York, New York 10021
       By: Richard Ware Levitt, Esq.

William T. Martin & Associates
32 Court Street
Suite 707
Brooklyn, New York 11201
  By: William T. Martin, Esq.

HURLEY, Senior District Judge

By notice of motion dated October 6, 2006, Rodney Arnoldo Morrison ("defendant" or "Morrison") requested a number of items of relief including the one which is the subject of this opinion, to wit, an order dismissing the indictment or, in the alternative, precluding the government from using, for any purpose, statements made by him at a proffer session held on May 19, 2005. The bases for the motion include purported violations of defendant's rights under the Fifth and Sixth Amendments to the United States Constitution.

For reasons provided <u>infra</u>, the relief sought is granted to the extent that the government may not use any statement Morrison made during the May 19, 2005 proffer session for any purpose;[1] defendant's alternative request for a dismissal of the indictment is denied.

<u>BACKGROUND</u>

(a)  Nature of Charges in First and Second Superseding
     <u>Indictments</u>

Under indictment 04-699(S-1) filed on August 31, 2004, defendant stood accused of a series of arson related crimes, plus

---

[1]  <u>But</u> <u>see</u> n.14, <u>infra</u>.

two counts of being a felon in possession of a firearm.  A second
superseding indictment, returned on July 11, 2006 (04-699(S-2)),
added several new charges, including counts alleging tax
violations and defendant's involvement in the murder of Sherwin
Henry.

(b)   Reverse Proffer Session of January 28, 2005 and
      Proffer Session of May 19, 2005

          In the interim between the return of those two
accusatory instruments, the defendant participated in two proffer
sessions.  The first, on January 28, 2005, was held in the United
States Attorney's Office in Central Islip and was attended, inter
alia, by Morrison, his attorneys at the time (viz. Gerald
Shargell ("Shargell"), Henry Mazurek ("Mazurek"), and Sabrina
Shroff), Assistant United States Attorneys Gary R. Brown
("Brown"), and Wayne L. Baker ("Baker"), as well as Suffolk
County Police Detective Robert Trotta ("Trotta.")

          The purpose of the January 28, 2005 session was, as
explained by the government:

> [T]o summarize for the defendant and his
> lawyers the government's investigation thus
> far, specifically regarding racketeering, tax
> evasion and the Sherwin Henry murder — crimes
> that had not been charged at that time, but
> which the government previously asserted to
> this Court were "imminent" absent a pre-trial
> disposition.  The disposition proposed by
> AUSA Brown was that Morrison enter into
> guilty pleas in federal and state courts in
> lieu of additional charges and face 18 years
> imprisonment.  Morrison would also be
> required to forfeit $15 million as part of a

> deal to resolve federal tax evasion
> violations that were also part of the
> investigation.[2]

(Gov't's Mem. in Opp'n to Def.'s Mot. for Dismissal or Preclusion of Evidence at 5, docket no. 202 (internal citation deleted).)[3]

Another proffer session was held at the same location in May of that year, to wit on May 19, 2005.  On that occasion, Morrison was with his then attorney Ephraim Savitt ("Savitt"); Trotta was also present as part of the government contingent. Morrison made several incriminating statements at the May meeting.  Contemporaneously, he signed a proffer agreement permitting the government's use of those statements "as substantive evidence to cross-examine [him] should [he] testify . . . and . . . as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [him] at any stage of a criminal prosecution."  (Id. Gov't's Ex. 5 ¶ 3.)[4]

---

[2] The January 28, 2005 proffer was referred to during the hearing and in the post-hearing submissions as a reverse proffer because the information provided during the session was furnished by the government, not the defense.  The situation is otherwise in a standard proffer agreement — such as the one executed by the parties on May 19, 2005 — during which the information disclosed emanates from the defendant, typically with the hope of receiving a cooperation agreement from the government.

[3] In some instances, the Court refers to docket numbers where it would otherwise be difficult to identify the document cited.

[4] All references to "Gov't's Ex." are to exhibits to Gov't's Mem. in Opp'n to Def.'s Mot. for Dismissal or Preclusion of

Defendant now seeks, in effect, to suppress what he said at the May 19th proffer session, thus rendering the accompanying proffer agreement a nullity.

(c)  <u>Positions of Parties</u>

The primary basis for defendant's application is that Trotta and Suffolk County Detective Timothy Gozoloff ("Gozoloff"), while transporting the incarcerated defendant from the United States Attorney's Office to the Metropolitan Detention Center ("MDC") following the January 28, 2005 reverse proffer session, advised defendant, in no uncertain terms, that he should admit his wrongdoing, and accept the government's offer of 18 years imprisonment to cover not only the arson and weapon charges then pending but also the uncharged tax violations and claims related to the Sherwin Henry homicide. Not to do so, Trotta advised, would be a mistake because if Morrison went to trial he would lose and face a far more onerous sentence.

That advice, according to Morrison, was repeated by Trotta on other occasions, including during the trip from the MDC to the United States Attorney's Office for the May 19, 2005 proffer session. Morrison avers that he "relied on Trotta's advice and . . . participated in the [May 19th] proffer as a result of [his] being influenced by Trotta's comments and encouragement." (Oct. 6, 2006 Morrison Aff. ¶ 23, attached as

Evidence, docket no. 202.

Ex. 2 to Nobel Affirmation of same date ("Oct. 6, 2006 Morrison Aff.").)  Savitt was unaware, as were defendant's earlier attorneys, that Trotta had been advising Morrison during this critical stage of the proceedings.  (See Jan. 27, 2007 Morrison Aff. ¶ 10, attached to Jan. 29, 2007 Nobel letter ("Jan. 27, 2007 Morrison Aff.") ("I never discussed my interactions with Trotta with any attorney.").)

In opposing the relief sought by defendant, the government's main arguments are as follows: (1) Morrison "initiated" the conversation during the trip from the United States Attorney's Office to the MDC "about the just completed reverse proffer meeting" on January 28th, not Trotta (Gov't's Mem. in Opp'n to Def.'s Mot. for Dismissal or Preclusion of Evidence, docket no. 293, at 7), (2) from his comments during that trip, as well as during the proffer session itself, it was clear defendant wished to speak directly to the government about charged and uncharged crimes and required no encouragement to do so, (3) the "detectives did not encourage Morrison [to enter into a proffer agreement] but instead warned him to listen to his counsel" (id. at 8), (4) that Trotta, in essence, merely repeated what he said at the meeting in the presence of counsel during the trip back to the MDC, (5) that the various defense attorneys met with defendant on multiple occasions in the interim between January 28 and May 19, 2005 as evidenced by the MDC sign-in

sheets, (6) that "Mr. Savitt testified that he was the person who initiated cooperation and a proffer with the government as an option discussed with Morrison sometime after he was retained and before the proffer itself in May" (<u>id.</u> at 11), (7) that Savitt described Morrison as "'an intelligent and sophisticated person'" who was hesitant to "'strip himself naked'" at a proffer session, and who "clearly 'understood the ramifications of a proffer session'" (<u>id.</u> at 12), (8) "Mr. Savitt remained in 'frequent communication' about the case, until September 2005, when the prosecutor informed [him] that a cooperation agreement to the defendant would not be forthcoming," (<u>id.</u> at 14) (9) that Morrison lied in his October 6, 2006 affidavit when he stated that "he attended the [May 19th] proffer session 'even before [he] had an opportunity to thoroughly discuss it with [his] new attorney'" (<u>id.</u> at 17), and (10) defendant's right to counsel had not attached for Sixth Amendment purposes as to the homicide and tax matters given that the second superseding indictment containing those charges was not returned until well after the second proffer session.

## DISCUSSION

(a)   Advice Provided by Trotta and Gozoloff
      to Morrison During the January 28, 2005 Trip
      From United States Attorney's Office to the MDC

        We know what was said by each person in the vehicle on

January 28, 2005 from the recording made by Trotta.  As the

government correctly notes, in some instances the detectives

complimented defense counsel and, on several occasions, advised

the defendant to follow the advice of his attorneys.  That such

statements would appear on the tape is certainly not surprising

given the detectives' knowledge that everything they said was

being recorded and might, at some point, be made available to the

defense.[5]  Moreover, it is also true that the officers did not

question the defendant in an effort to obtain incriminating

information and that the defendant was more than a willing

participant in the ongoing colloquy concerning the charges he

faced and the feasibility of resolving his legal problems via

negotiations with the government; in fact, at least in January of

2005, that is what he wanted to do but at some number less than

the 18 years offered by Brown.  All of that being said, however,

it is clear that Trotta and, to a lesser extent, Gozoloff, tried

_____

        [5]  Defense Attorney Nobel reports that "[d]uring a
conference on September 15, 2006 the defense was first provided
with a functioning CD ROM disc containing a recording of a
conversation on January 28, 2005, between the defendant, Rodney
Morrison, and the lead government investigator, Suffolk County
Detective Robert Trotta."  (Oct. 6, 2006 Nobel Aff. ¶ 6.)

to use their time alone with defendant, i.e. absent his attorneys, to convince him that he had no chance of prevailing at trial and, accordingly, he should accept the government's plea offer lest he spend the rest of his life in jail or, possibly, receive the death penalty. That such was their intended overriding goal is evident from the tape. By way of some examples, consider the following excerpts from the government's transcript of the January 28th conversations:

1.   Trotta explaining to Morrison that he should "be kissing Brown's ass right now" in return for the eighteen year offer (Ex. 3 to Gov't's Mem. in Opp'n to Def.'s Mot. for Dismissal or Preclusion of Evidence, docket no. 202, at 20);

2.   When Morrison states that Shargell wants to go to trial, Trotta explains "[t]hey want a new boat. Exactly, it is all about the money" (<u>id.</u> at 4);

3.   Trotta explaining to Morrison that if he goes to trial and loses he "will get life" (<u>id.</u> at 24);

4.   Trotta telling Morrison that it is "up to [him] if [he] want[s] to go for life or do 18 years" (<u>id.</u> at 25);

5.   Trotta explaining "hypothetically" that even if an individual charged "on . . . violent stuff" was not convicted, the judge "could say I know he did this, so I am going to give you 60 years for tax" (<u>id.</u> at 27);

6.   Trotta, supposedly speaking to Detective Gozoloff, explaining that "in the federal system murder is either life in prison or death penalty. So the plea was to [be taken] in the state; they would give him 15 or 18 years . . . [a]nd run it concurrently with the arson and racketeering . . . so he will . . . get 18 and do 15" (<u>id.</u> at 33);

7.   Trotta saying "I am not talking to you [meaning

Morrison]," whereupon he asks Gozoloff to "[e]xplain felony murder" (<u>id.</u> at 34);

8.  Trotta explaining to Morrison that he "has no jury appeal" and that "[t]hey [presumably meaning the jury] will crush him" (<u>id.</u> at 43);

9.  Trotta explaining, purportedly to Gozoloff, that when the jury learns "how Rodney beat his wife . . . every woman on the jury will fucking hate him" (<u>id.</u> at 43); when Morrison asks who is going to so testify, Trotta replies "I can put five or six people on to say it" (<u>id.</u>);

10. Trotta explaining to Gozoloff that Morrison "is looking at 30 to 60 years and possibly life or possibly death, so he takes the 30, cut it in half and it is 18" (<u>id.</u> at 46);

11. Trotta explaining to Morrison that "there is no piece of evidence we don't have, short of you confessing saying I killed Sherwin Henry" (<u>id.</u> at 54);

12. Trotta explaining to Morrison "[i]t is obvious we know about these tattoos [referring to some of Morrison's female employees being tattooed with his initials].  What do you think the jury is going to think, normal people – I am not asking you any question – these women up there and they start showing these . . . tattoos?  Those jurors are going to go oh, my God, what . . . the hell is with this guy?" (<u>id.</u> at 56);

13. Trotta, in replying to Morrison's observation that the government must have "something that I don't know about," that "[w]e have a ton of stuff you don't know about" (<u>id.</u> at 88);

14. Trotta explaining to Morrison "[t]hink of all the substantiation we have.  Everything is double and triple and quadruple substantiated" (<u>id.</u> at 89);

15. When Morrison raises the possibility of prevailing at trial or of receiving "less time than they're offering" should he be convicted, Trotta tells him: "In your case that can't happen" (<u>id.</u> at 93);

16.  Gozoloff stating that "if they do a RICO, you are fucked" (<u>id.</u> at 89-90), to which Trotta adds: "They are going to, if they do RICO you are dead" (<u>id.</u> at 90);

17.  When Morrison says "Never, never[;] 18 years, that would be crazy" Trotta replies "[n]ever say never" (<u>id.</u> at 104);

18.  Trotta saying to Morrison "[p]lead guilty to the whole thing, you'll be out in 15 years" (<u>id.</u> at 114);

19.  Trotta explaining to Morrison, or possibly Gozoloff that in "the federal system . . . [p]eople don't win.  They don't win" (<u>id.</u> at 121); and

20.  As Morrison is exiting the car at the end of the trip, Trotta explains to him "Rodney, between me and you, take the plea. I am telling you, you are making a mistake" (<u>id.</u> at 132).

In sum, there are portions of the tape which are consistent with the government's representations.  For example, the detectives did not try to persuade Morrison to enter into a proffer agreement, as distinct from simply pleading guilty. Instead, when Morrison voiced the desire to be the beneficiary of a "proffer for the day"[6], and "to talk to [Brown]" directly for

_____

[6]  It does not appear that Morrison, when he spoke of a "proffer for the day," accurately understood the meaning of the term.  To begin with, the purpose of the January 28th meeting that he had just left, which presumably provided the context for his comment, was for the government to proffer its proof in an effort to induce the defendant to accept its plea offer, not to solicit information from him.  Moreover, Savitt's testimony is telling in this regard.  Savitt was hired "to achieve . . . a disposition . . . better than [the] existing plea offer of 15 years." (Mar. 15, 2007 Tr. at 24.)  Savitt concluded that the best way to realize that goal would be to enter into a proffer agreement.  He thereupon explained that process to Morrison

that purpose, Trotta counseled otherwise, explaining: your

attorneys "know the law.  They don't want you saying something

that might come back to bite you" and "might help us lock in

things that we don't have locked in."  (<u>Id.</u> at 53.)

(b)  Advice Furnished by Detectives on January 28, 2005 to
     Morrison as to the Hopelessness of his Situation Should
     he Decline the Government's Plea Offer was Contrary
     <u>to the Advice Provided to him by his Attorneys</u>

       As to the captioned subject, consider the following

excerpt from the defendant's transcript of the January 28, 2005

conversation:

          DETECTIVE TROTTA: That is your decision.
          I think you should talk to your lawyer and
          say listen, can we beat this?  Can you get me
          less than 18?  And I think their answer if
          they are totally honest and they should be is
          take the 18.

          RODNEY MORRISON: They think they can
          beat it.

(Ex. 1 to Def.'s Oct. 6, 2006 Notice of Mot. at 55.)[7]

_____

including that it would typically entail furnishing information
about other crimes and individuals.  Armed with that information,
Morrison "was hesitant to go down that road initially" (<u>id.</u> at
18), suggesting that his understanding of the term as of January
28, 2005 was problematic at best.

       [7]  The tape, of course, is the core evidence with the
transcripts being merely aids in determining what is on the tape.
Elsewhere in this opinion, I have used the government's
transcript in reviewing what was said by the detectives and
Morrison on January 28, 2005.

       The alternate transcript submitted by the defendant
largely parallels the government's subject to a few exceptions.
Having listened to the tape, however, I find that the defendant's
transcript alone accurately reflects the above quoted dialogue

(c)  Other Messages Conveyed by Trotta and Gozoloff During
     January 28, 2005 Trip

        Although the detectives made some general statements
advising Morrison to follow the advice of counsel, some
significant countervailing considerations were presented in
addition to those already mentioned.  Specifically, it was
suggested to Morrison that his relationship with counsel suffered
from communication problems — as evidenced by the "totally
honest" statement referenced in subparagraph (b) above — as well
as a potential divergence of interest regarding the plea/trial
dilemma given Shargell's interest in generating legal fees.  (See
Gov't's Ex. 3 at 41-42 (Gozoloff explaining to Morrison: "[s]ome
attorneys, and Shargell is like too top of the top.  But some
attorneys that we dealt with in the past, push this shit along,
push this shit along.  Shargell is fucking loaded.  You see what
I am saying?"; see also id. at 4 (concerning defense counsel
wanting a "new boat") and 15 (Trotta explaining to Morrison that
"[He doesn't] think [Shargell] wants to go trial.  Money wise
maybe.").)  And when Morrison complains that the reverse proffer
on January 28, 2005 ended precipitously Trotta tells him that "I
didn't stop the meeting.  It is your lawyer." (Id. at 45.)  When
the conversation turns to Sabrina Shroff, Esq., who was one of

_____

between Trotta and Morrison and, accordingly, this excerpt from
the tape is taken from defendant's transcript instead of the
government's.

the defense counsel who attended that proffer session, Trotta asks Morrison, "Is she married, that little girl." (<u>Id.</u> at 49.)

Additionally, Trotta's remarks — detailed in subparagraphs 11, 12, 13, 14 and 20 of paragraph (a) of the DISCUSSION portion of the opinion, <u>supra</u> — were intended to demonstrate his control over Morrison and Morrison's case. (<u>See also, e.g.</u>, <u>id.</u> at 12-13 (Trotta's right to question defendant's wife); <u>id.</u> at 60 (Trotta telling Morrison that he saw Mrs. Morrison wearing pajamas under a mink coat at noon); <u>id.</u> at 22-23 (Trotta explaining to Morrison that his goal in speaking about Sherwin Henry during the January 28, 2005 proffer session was to assure a "fair and balanced sentence" (<u>id.</u> at 23).) I find that the purpose of these, and like remarks, was to indicate to Morrison that he should look to Trotta for guidance instead of his attorneys to the extent their legal advice may differ from his.

(d)    Reinforcement of Advice Given on January 28, 2005 During the May 19, 2005 Trip During Which Trotta Drove Morrison to <u>the United States Attorney's Office for the Proffer Session</u>

Trotta claims he has essentially no recollection of what was said during the other, unrecorded times that he was with Morrison, sans Morrison's attorneys being present. However, Morrison does recall the other trips, including the one on May 19th, to the extent that "[e]ach time Trotta would tell me that I should plea[d] guilty because there was no chance that I would

win the case that he had built against me." (Jan. 27, 2007
Morrison Aff. ¶ 5.)  He further avers that the "remarks that
Trotta made on May 19, 2005, reinforced the decisions I had made
[to enter into a proffer with the government] based on the
earlier occasions when Trotta had discussed my case, such as the
January 18 [sic], 2005 trip from Central Islip to the MDC."
(Oct. 6, 2006 Morrison Aff. ¶ 20.)

(e)   The Government Interfered With the Relationship
      Between Morrison and his Attorneys

        Based on the colloquy detailed in paragraph (a) of the
DISCUSSION portion of this opinion, <u>supra</u>, considered in
conjunction with the other evidence in the record, it is clear
that the government interfered with Morrison's relationship with
his attorneys via the "egregious behavior" of the Detectives.[8]
And, "[u]nquestionably, government interference in the
relationship between attorney and defendant may violate the
latter's right to effective assistance of counsel."  <u>United
States v. Ginsberg</u>, 758 F.2d 823, 833 (2d Cir. 1985); <u>Maine v.
Moulton</u>, 474 U.S. 159, 171 (1985)("Once the right to counsel has
attached and been asserted, the State must of course honor it. .

---

        [8]  "Egregious behavior" is the term used by the Supreme
Court in <u>United States v. Morrison</u>, 449 U.S. 361, 363 (1981) to
describe the efforts of government agents in meeting with an
indicted and represented defendant, without counsel's permission
or knowledge, for the purpose of obtaining corroborative evidence
in a related investigation.  That label is equally applicable, if
not more so, to the present scenario.

. . [A]t the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.")  Such interference may have also compromised Morrison's Fifth Amendment right against self incrimination if it caused him to enter into the May 19, 2005 proffer agreement involuntarily or unknowingly.

Before discussing whether the subject misconduct, in fact, did either, i.e. violated Morrison's Fifth or Sixth Amendment rights, attention will be turned to which party has the burden of proof.

(f)  <u>Defendant has Burden of Proof</u>

Defendant seeks to suppress the incriminating statements he made during the May 19, 2005 proffer session (and to invalidate the proffer agreement bearing the same date) on the ground that "they [the statements] were not voluntarily made but rather were the fruit of misconduct by Detective Trotta."  (Feb. 26, 2007 Levitt Letter at 1.)  Is it Morrison's obligation to prove entitlement to the relief requested, or does the onus of establishing non-entitlement rest with the government?  The defense maintains, citing <u>Missouri v. Seibert</u>, 542 U.S. 600, 609 n.1 (2004), that it is the government's obligation to "prove, by a preponderance of the evidence, that Mr. Morrison's alleged statements during the proffer session were voluntarily made."

(<u>Id.</u>)  The government has not provided an opinion on the subject.

In <u>Missouri v. Seibert</u>, the Supreme Court held that <u>Miranda</u> warnings given mid-interrogation after defendant gave an unwarned confession, were ineffective, and thus a confession repeated after the warnings were given was inadmissible at trial. <u>Seibert</u> did not, unlike the present case, involve an incriminating proffer statement made pursuant to a proffer agreement.  Is that a meaningless distinction for burden of proof purposes?  The holdings in some cases suggest it is.  <u>See, e.g.</u>, <u>United States v. Paris</u>, No. 3:06-cr-0064, 2007 WL 1158118, at *4 (D. Conn. Apr. 18, 2007)("The government must show by a preponderance of the evidence that Paris waived the provisions of FRE 410 knowingly and voluntarily" in opposing defendant's motion to suppress proffer statements made after a proffer agreement was signed);  <u>United States v. Parra</u>, 302 F. Supp. 2d 226, 233 (S.D.N.Y.)(same).  However, the following cases, directly or by analogy, indicate that the burden of proof rests with the defendant who seeks to extricate himself or herself from terms of the proffer agreement which gave rise to the targeted proffer statement: <u>United States v. Mezzanatto</u>, 513 U.S. 196, 204 (1995)("Respondent bears the responsibility of identifying some affirmative basis for concluding that the plea-statement Rules [in Fed. R. Crim. P. 11(e)(6) and Fed. R. Evid. 410] depart from the presumption of waivability [applicable to voluntary

agreements between parties]"); <u>United States v. Sanders</u>, 341 F.3d 809, 817 (8th Cir. 2003)("To succeed, Sanders must show more than that he misunderstood the extent of his waiver [contained in the pre-proffer agreement he signed] or its ramifications; he must show his will was overborne"); <u>United States v. Maynard</u>, 232 F. Supp. 2d 38, 40 (E.D.N.Y. 2002)("In the final analysis the defendant has voluntarily made the bed he has to lie in.  Unless he can show that the government did not act in good faith, eliciting the proffer admissions without intending to work out a mutually advantageous plea deal, or that defendant lied in making his admissions because of some improper inducement or coercion by the government, he is stuck with his proffer agreement.").

        Here, Morrison, with counsel present, signed a proffer agreement and made incriminating statements as part of the proffer process.  Under that agreement, Morrison agreed "not [to] assert any claim under [Fed. R. Crim. P. 11(e)(6) or Fed. R. Evid. 410] or any other provisions of law that [his statements at the proffer session] or any leads therefrom should be suppressed."  (Gov't's Ex. 5 ¶ 5.)  Under the circumstances, it is his burden to demonstrate that the contract between himself and the government is flawed in that his consent was involuntarily obtained.  The scenario is simply not akin to an incriminating statement obtained in a custodial interrogation context such as in <u>Missouri v. Seibert</u>, the case relied upon the

defendant. Indeed, <u>Miranda</u> warnings are not required to be given at a proffer session. <u>Sweeney v. Carter</u>, 361 F.3d 327, 331 (7th Cir. 2004); <u>United States v. Reich</u>, No. 04CR257, 2005 WL 524553 at *7, (E.D.N.Y. Jan. 24, 2005).

In sum, the burden of proof rests with Morrison, not the government as opined by the defense.

(g)  <u>Defendant's Burden of Proof as to his Constitutional Claims</u>

Having determined that Morrison has the burden of proof, the question arises as to what he must prove.

(i) <u>Burden as to Sixth Amendment Claim</u>

The elements of Morrison's Sixth Amendment claim are that his relationship with counsel was compromised to the extent of significantly diluting counsels' effectiveness with resulting prejudice. <u>United States v. Ginsberg</u>, 758 F.2d 823, 833 (2d Cir. 1985).

As a threshold matter, however, he must also establish that his right to counsel had attached for Sixth Amendment purposes as of May 19, 2005 when he made the incriminating statement he now seeks to suppress. Typically, attachment does not occur "until a prosecution is commenced, that is at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175 (1991)(citations and internal quotation marks omitted). As

of May 19, 2005, Morrison stood accused under indictment No. 04-699(S-1) with a series of crimes related to destruction by fire of an automobile owned by a delinquent borrower from Morrison, as well as two counts of possessing a firearm as a prior felon.  The charges pertaining to the tax matters and the Sherwin Henry homicide were not filed until July 11, 2006 when indictment No. 04-699(S-2) was returned.  Therefore, under <u>McNeil</u>, only the admissions made by defendant pertaining to the charges in the earlier indictment would implicate the Sixth Amendment.[9]

(ii) <u>Burden as to the Fifth Amendment Claim</u>

For the Fifth Amendment claim, Morrison needs to demonstrate that his waiver of the protections afforded by the Fifth Amendment and by Federal Rule of Evidence 410[10] during the

---

[9] Whether the Sixth Amendment line of demarcation articulated in <u>McNeil</u> should be relaxed in the present case given that the government had committed itself to prosecute Morrison for the tax violations and the Sherwin Henry homicide as of January 28, 2005, if not before (<u>see, e.g.</u>, <u>Matteo v. Superintendent</u>, 171 F.3d 877, 892 (3d Cir. 1999) (indicating under certain circumstances the right to counsel may attach earlier); <u>United States v. Busse</u>, 814 F. Supp. 760, 763-64 (E.D. Wisc. 1993))(same)) need not be decided because, as indicated in the text <u>infra</u>, Morrison has established that the government violated his rights under the Fifth Amendment by causing him to enter into the May 19, 2005 proffer agreement involuntarily.  For that reason, the incriminating statements pertaining to the additional charges in the second superseding indictment will not be further discussed in the text vis-a-vis the Sixth Amendment.

[10] Rule 410 of the Federal Rules of Evidence provides in pertinent part:

[E]vidence of the following is not, in any civil or criminal proceeding, admissible

May 19, 2005 proffer was unknowing, involuntary, or both.[11] <u>Cf.</u>
<u>United States v. Velez</u>, 354 F.3d 190, 194-95 (2d Cir. 2004).

(iii) Conclusion re Common Element of
<u>Defendant's Constitutional Claims</u>

To satisfy the Sixth Amendment prejudice requirement
regarding the arson and weapons admissions, as well as the
claimed Fifth Amendment violation as to all of the May 19, 2005
admissions, Morrison must show that the incriminating utterances
were involuntary. Accordingly, that is the central issue
discussed <u>infra</u>.

(h) Defendant has Established That his Incriminating
<u>Proffer Statements of May 19, 2005 Were Involuntary</u>

(i) <u>Government's Position re Prejudice</u>

To prevail, Morrison must demonstrate a link between
the government's misconduct and his plight. The government

---

against the defendant who made the plea or
was a participant in the plea discussions: .
. . any statement made in the course of plea
discussions with an attorney for the
prosecuting authority which do not result in
a plea of guilty or which result in a plea of
guilty later withdrawn.

[11] Initially, defendant argued that his waiver of the
protections afforded under the Fifth Amendment and Federal Rule
of Evidence 410 was both "unknowing and involuntarily." (<u>See</u>
Mem. in Supp. of Def.'s Mot. for Dismissal or Preclusion at 18-
19.) To the extent he earlier claimed it was "unknowing," that
position is wholly inconsistent with the previously mentioned
credible testimony of Savitt about Morrison's understanding of
the proffer agreement. In any event, that argument by the
defense has apparently fallen by the wayside, with his focus now
being confined to the voluntariness aspect of the May 19, 2005
waiver.

maintains there is none, noting that (1) almost four months separated the January 28, 2005 and the May 19, 2005 proffer sessions and that, during that period, defendant had over 40 visits from his various attorneys while he was housed at the MDC and (2) Savitt testified, as earlier noted, that the defendant is intelligent and fully understood the ramifications of entering the proffer agreement.

(ii) <u>Defendant's Position</u>

In defendant's affidavit of January 27, 2007, he explains, after discussing the conversations he had with the detectives, that if he had "not had [those] conversations with Detective Trotta and other members of SCPD [he] would not have given the statement that [he] in fact made on May 19, 2005." (Jan. 27, 2007 Morrison Aff. ¶ 2.) That is so, he reports, because he viewed "Trotta [as] the moving force in gaining [his] arrest and that he remained the single most influential individual in all aspects of decision making regarding the handling of [his] case." (<u>Id.</u>)

It warrants mention that Morrison did not call himself as a witness at the hearing. Standing alone, the above and similar assertions by Morrison in his affidavit — insulated as they are from the truth seeking crucible of cross-examination — are not entitled to great weight. But, as shall be discussed <u>infra</u>, those assertions do not stand alone but rather are part of

a body of evidence which, on balance, supports Morrison's claims that his admissions of May 19, 2005 were involuntary.

### (iii) Evidence in Record Corroborating Morrison's Averments That his Proffer Statements Were Involuntary

Preliminarily, it warrants mention that the Court believes that Morrison fully understood the ramifications of entering into the proffer agreement on May 19, 2005. That conclusion is based on the testimony of Savitt, which testimony, as earlier noted, the Court accepts as accurate. Moreover, to the extent Morrison maintains that he had insufficient time to discuss the upcoming proffer session with Savitt prior to the May 19th session, I reject that assertion, again based on the contrary information furnished by Savitt. (See, e.g., Mar. 15, 2007 Tr. at 7 and 11.) That being said, however, there is adequate evidence in the record corroborating certain material aspects of Morrison's position as advanced in his affidavits. Specifically, I am satisfied that Trotta was successful in convincing Morrison that he, Trotta, was the key player in determining his fate, at least when compared to his counsel. Thus, we see that "[o]n February 2, 2005 . . . Morrison instructed his wife, 'Call [Shargell] back and let him know I want to meet with the D.A. [presumably, the AUSAs Brown and Baker] as soon as possible and if he could make an appointment for me as soon as possible . . . and I want Detective Trotta to

pick me up.'" (Gov't's Mem. in Opp'n to Def.'s Mot. for Dismissal or Preclusion of Evidence, docket no. 293, at 8 (parenthesis in original).)

I am also satisfied with Morrison's proof as to the effectiveness of Trotta's efforts to convince him that his situation was hopeless, thus requiring a plea of guilty lest he spend the rest of his life in prison should he escape the death penalty. The same can be said of the detectives' oblique, but generally disparaging comments about Shargell. As a result of those efforts, Shargell was discharged shortly after the January 28, 2005 reverse proffer session, with Savitt being hired "sometime in March" of 2005 (Mar. 15, 2007 Tr. at 4) for the sole purpose of trying to negotiate "the best possible disposition . . . of the charges . . . and the potential [i.e. tax and homicide] charges against [Morrison]." (Mar. 15, 2007 Tr. at 22.)

Savitt, in an effort to accomplish that goal, suggested to Morrison that he enter into a proffer agreement. Savitt explained that the process would entail more than just acknowledging the legitimacy of the pending and prospective charges against him (which is what Morrison apparently understood the term "proffer" to mean, see Gov't's Ex. 3 at 53), but would also call for him to divulge information about other participants in those endeavors and about "other crimes" he and/or others had committed. (Mar. 15, 2007 Tr. at 11.) After being so advised,

Morrison, as reported by Savitt, "was hesitant to go down that road initially" (id. at 18) "because [he] felt, (A), he would have to strip himself naked, in his words, and, (B), that he didn't have perhaps sufficient information to give the government in order to persuade them to give him a cooperation agreement." (Id. at 24-25.)  However, after extended discussions with Savitt, Morrison agreed to the suggested course of action.

Savitt, upon learning after the fact of the detectives' misconduct, sagely opined: "there appeared to be an attempt to place a wedge between Mr. Morrison and his then defense lawyer, Mr. Shargel[l], to persuade Mr. Morrison that his best and only good option in the case was to accept an 18-year plea offer, and that going to trial would be foolish." (Id. at 27-28.)  And that, in my judgment, is precisely what happened concerning the option of going to trial.  Whereas Morrison seemed to believe at the outset of the trip on January 28, 2005 that he had two viable options in dealing with the government, viz. going to trial[12] or negotiating a plea, and that, in any event, the trial option was a meaningful bargaining chip for negotiation purposes, the detectives managed to dissuade him from that view.  The sole option, Morrison reasonably concluded based on the detectives' comments, was to go "hat in hand" to the government in the hope

---

[12] (Gov't's Ex. 3 at 3-4 ("We feel in our own heads for our own stupid reasons we can beat 99.9 percent of the things you have.").)

of minimizing the inevitable, that being his time in jail.  Thus
Savitt replaced Shargell, whereupon Morrison, although initially
reluctant, participated in the May 19, 2005, proffer session.

In sum, although Morrison knowingly entered into the
May 19, 2005 proffer agreement in the sense he fully understood
the accurate explanation of the process provided by Savitt, his
decision to do so was not "'the product of a free and deliberate
choice,'" <u>Velez</u>, 354 F.3d at 196 (quoting <u>Moran v. Burbine</u>, 475
U.S. 412, 421 (1986)), but rather was largely driven by his
belief, created by the detectives' comments, that, as a practical
matter, he had no choice.  As such, his decision was
significantly predicated on intimidation and deception
promulgated by government agents.

(i)  Government's Failure to Timely Respond
     to Defendant's Discovery Request

The defense also complains, legitimately so, of the
government's belated response to Morrison's Federal Rule of
Criminal Procedure 16 discovery request "made on January 7, 2005,
three weeks before the reverse proffer session." (Def.'s Reply
Mem. in Supp. of Mot. for Dismissal or Preclusion at 21.)  The
government does not dispute that it was served with the discovery
demand.

Rule 16(a)(1)(B)(i) provides:

<u>Defendant's Written or Recorded Statement</u>.
Upon a defendant's request, the government
must disclose to the defendant, and make

> available for inspection, copying, or
> photographing, all of the following:
>
> (i) any relevant written or recorded
> statement by the defendant if:
> • the statement is within the government's
> possession, custody, or control; and
> • the attorney for the government knows–or
> through due diligence could know–that the
> statement exists.

Fed. R. Crim. P. 16(a)(1)(B)(i).

No justification has been proffered, nor presumably could be, to explain the approximately twenty months which separated defendant's demand and the recording being furnished.[13] The government's belated disclosure of the recording to the defense is of major significance for present purposes. That is so because had Savitt known of the detectives' actions, and the "breach of trust" between the government and the defense that it symbolizes, he would have advised Morrison "not to go forward with the proffer session," which advice, he believes Morrison would have accepted. (Mar. 15, 2007 Tr. at 29-30.) Indeed, instead of going to a proffer session, Savitt would have told Morrison that "we ought to make . . . an appropriate motion to the judge with respect to this conduct." (Id. at 30.)

---

[13] Although there is authority to the effect that a Rule 16 discovery demand must be reasonably specific to trigger the government's disclosure obligation (cf. United States v. Carrasquillo-Plaza, 873 F.2d 10, 12-13 (1st Cir. 1989)), here such specificity was not possible since the defense was not aware, and had no reason to know of the tape's existence until it was furnished on September 5, 2006. The government has not argued to the contrary.

Savitt's testimony establishes that Rule 16's first precondition to disclosure, i.e. that the recording be "relevant," has been met. And as to the Rule's other two preconditions, the government does not contest that the recording has been in its "possession" since January 28, 2005, and that "the attorney for the government kn[e]w[] — or through due diligence could [have] know[n]" of its existence on that date or shortly thereafter. Under the circumstances, it is clear that the government breached its Rule 16 disclosure obligation by not providing the defense with the recording prior to the May 19, 2005 proffer session.

Simply put, had the government met its obligation of disclosure under Rule 16, the proffer session of May 19, 2005 would not have occurred nor would the subject incriminating statements. In fashioning an appropriate sanction, if any, for a violation of Rule 16, the Court has broad discretion. <u>See</u> Rule 16(d)(2) and <u>United States v. Miller</u>, 116 F.3d 641, 681 (2d Cir. 1997).

The government's violation of defendant's constitutional rights under the Fifth Amendment, and under the Sixth Amendment (at least as to admissions he made concerning the arson and weapon related charges in indictment 04-699(S-1)), viewed in conjunction with the violation of its disclosure obligations under Rule 16 calls for a sanction. The issue, then,

becomes what sanction is appropriate.

(j) <u>Appropriate Sanction</u>

The Supreme Court in <u>United States v. Morrison</u> explained that "our approach has . . . been to identify and then neutralize the taint [attributable to governmental misconduct] by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." 449 U.S. 361, 365 (1981). Application of that standard (although promulgated in a Sixth Amendment context but presumably equally applicable for a Fifth Amendment violation) to the present scenario indicates that the government should be, and hereby is precluded from using any of the statements Morrison made during the May 19, 2005 proffer session during the course of the trial.[14] The alternate relief requested, viz. dismissal of the indictment, is rejected as more than necessary to rectify the situation. As explained by the Supreme Court in <u>Morrison</u>:

> [A]bsent demonstrable prejudice, or
> substantial threat thereof, dismissal of the
> indictment is plainly inappropriate, even
> though the violation may have been
> deliberate. This has been the result reached
> where a Fifth Amendment violation has
> occurred, and we have not suggested that

---

[14] Neither party has addressed whether the statements made by Morrison on May 19, 2005 should be available to the government for impeachment purposes should the defendant take the stand and testify inconsistently with what he said at the proffer session. If the government believes it should have that right, a letter motion to that effect should be made on or before October 8, 2007.

> searches and seizures contrary to the Fourth
> Amendment warrant dismissal of the
> indictment.  The remedy in the criminal
> proceeding is limited to denying the
> prosecution the fruits of its transgression.

449 U.S. at 365-66.

(k)  Other Arguments and Considerations Warranting Mention

In concluding that defendant has met his burden of proof, I considered the multiple arguments advanced the parties. Some of those agreements have not been discussed but warrant brief mention, viz: (1) the government's arguments that Trotta merely repeated what he said at the January 28, 2005 reverse proffer session during the trip back to MDC, and (2) the defendant's request for a continuation of the hearing which lead to this decision.  In addition, I considered, sua sponte, the case of Brown v. Doe, 2 F.3d 1236 (2d Cir. 1993) in conjunction with Morrison's decision not to inform any of his attorneys of the legal advice provided by Trotta and Gozoloff.  These "open issues" will be addressed separately in reverse order, beginning with Brown.

(i)  Brown v. Doe. Brown initiated a series of interviews with the FBI against the advice of counsel and, on each occasion, signed a waiver of his right to have counsel present.  Following Brown's conviction, he claimed that "the FBI interviews interfered with his right to counsel at the plea bargaining stage because, without counsel, he did not know to

withhold valuable information about his comrades until some offer of a plea was made to him." 2 F.3d at 1244.  In denying Brown habeas relief, the Circuit declined his invitation to adopt a per se rule that uncounseled post-indictment interrogation violated the Sixth Amendment.  In so doing, the Circuit observed that:

> The Sixth Amendment protection requires that counsel be effective, not that counsel be heeded.  A competent defendant who disregards counsel may confess[15] or otherwise undermine his own defense without creating by that deliberate conduct a basis under the federal constitution for later reversal of his conviction.

Id. at 1244-45.

Could it not be said, based on Brown, that Morrison's decision to keep his attorneys in the dark as to the detectives' conduct undermines his constitutional claims?  Had counsel been advised, we now know as a result of Savitt's testimony, the May 19th proffer session would not have been held and the present application would never have materialized.  In other words, since Morrison arguably contributed to the problem by his silence, can he now legitimately be heard to complain?  That last question, in my judgment, calls for an affirmative answer for Brown is readily distinguishable.

In Brown, unlike here, the "record [did not] evidence

---

[15]  Defendant Brown's incriminating statements made during one of his sessions with the FBI were suppressed by the state trial court and were not an issue before the Second Circuit.

government misconduct intended to interfere with the attorney-client relationship or otherwise dilute [the defendant's] Sixth Amendment rights." Id. at 1245. Brown also initiated the uncounseled contact with the FBI whereas the transportation team of Trotta and Gozoloff was thrust upon Morrison on January 28, 2005 absent any input from him. And, in the final analysis, Morrison, unlike Brown, followed the advice of his then attorney, Savitt, in entering into a proffer agreement with the government on May 19, 2005.[16] That Morrison, for whatever reason, elected not to tell his attorneys that he was also being counseled by the detectives does not eradicate their wrongdoing nor, more importantly, alter the effect their actions had on his state of mind. To conclude otherwise would re-victimize the layman target of governmental overreaching.

In sum, Brown, at first blush, seemed to me to suggest that Morrison has no viable constitutional claims since he, by his silence, contributed to the situation. However, upon further analysis, it is evident that the rationale embodied in the Brown holding is not germane for the reasons indicated.

### (ii) Defendant's Request For Phase II

The defense asks, as it did during the hearing

---

[16] As we know, that advice would not have been given had Savitt known of the governmental misconduct which had significantly tainted the plea bargaining/proffer agreement process.

regarding the transportation of Morrison, for a continuation, or a "Phase II" of the hearing. In doing so, the defense cites the purported "need to follow lines of inquiry suggested by the record that indicate that additional and more severe sanctions are appropriate." (Post-Hr'g Mem. in Supp. of Def.'s Mot. for Dismissal or Preclusion at 28.) In that regard, it developed during the hearing that an Assistant United States Attorney, according to at least one witness, approved the taping of the January 28, 2005 trip from the United States Attorney's Office to the MDC. But, of course, knowing of the taping — which Trotta testified was done "for [his, Trotta's] own good" should Morrison charge that the detectives acted inappropriately during the trip (Feb. 28, 2007 Tr. at 117) — cannot be equated with knowledge of what would be said by the detectives during the trip. Nonetheless, the defense speculates that the government may have joined a conspiracy to violate Morrison's Sixth Amendment rights with regard to trying to elicit an incriminating statement from him.

The Court is advised that such additional inquiry "would be directly responsive to a concern" I expressed during the course of the hearing. (Post-Hr'g Mem. in Supp. of Def.'s Mot. for Dismissal or Preclusion at 27.) The concern I endeavored to express was that the defense was pursuing lines of inquiry that far exceeded the purpose of the hearing.

-33-

Specifically, I said:

> If there was any kind of incriminating
> statement here, [i.e. during the car ride]
> <u>and</u> if this was an investigative technique
> trying to elicit an incriminating comment
> from the defendant, it would be significant
> [thus warranting further inquiry].

(Feb. 22, 2007 Tr. at 33.)

But there was no incriminating statement obtained from

the defendant on January 28, 2005 (which is not surprising given

that the detectives did not interrogate Morrison during the

trip). Accordingly, the additional line of inquiry sought to be

pursued was not germane and was, thus, foreclosed. I see no

reason to revisit that issue because the defense would like

additional ammunition "were the government to appeal the decision

to preclude the proffer statement" (Post-Hr'g Mem. in Supp. of

Def.'s Mot. for Dismissal or Preclusion at 28), or based on

defendant's belief, rooted in speculation, that the government's

misconduct may extend beyond the detectives and include such

items as whether "the firearms recovered during the search of

Peace Pipe had remained at the Smoke Shop in anticipation of the

search as a result of the government having interfered with Mr.

Morrison's effort to return those firearms to their rightful

owner" (<u>id.</u> at 30).

In sum, the grounds advanced for Phase II are

unpersuasive and, accordingly, the requested continuation of the

hearing is denied.

(iii) Trotta, According to the Government,
      "Merely" Repeated What he Said at
      the January 28, 2005 Proffer Session
      During the Trip Back to the MDC

In Trotta's undated affidavit, he avers:

> Every statement that I made regarding the
> strength of the government's case, or my
> views regarding the plea offer, were
> repetitions of what I had said during the
> reverse proffer meeting with Morrison and his
> lawyers.

(Gov't's Ex. 2 ¶ 21.)

Even if that were true, as noted by defendant:

> [t]here is a distinction between expressing
> an opinion at a meeting where the defendant
> is represented by counsel but it is quite
> another thing for an adversary — a police
> officer no less — to attempt to supplant
> counsel by isolating the client without his
> lawyer, by providing heavily slanted legal
> advice, and by ridiculing the defendant's
> attorneys.

(Def.'s Reply Mem. in Supp. of Mot. for Dismissal or Preclusion
at 19.)

Beyond that, I have significant reservations as to the
accuracy of Trotta's representation.  Firstly, he states on the
January 28, 2005 tape that "[he] talked for less than 30 seconds"
during the just completed proffer session suggesting that his
comments were brief on that occasion as distinct from expansive,
as they surely were, during the trip to the MDC.  (Gov't's Ex. 3
at 45.)  Nonetheless, it does appear from a review of the January
28, 2005 tape as well as Trotta's affidavit, that his comments at

the proffer session on that day, through brief, involved (1)
mentioning the Sherwin Henry murder and the significance of that
fact, (2) recommending that the defendant accept Brown's offer of
18 years, and (3) discussing Shargell's age with respect to that
offer, indicating that if the defendant took the plea he would be
out of jail by the time he was Shargell's age as of January 2005.
But I do not accept the notion that everything Trotta said in the
car about the strength of the government's case and its plea offer
had been stated by him at the proffer session including, inter
alia, the concept of felony murder, how Morrison would be an
unsympathetic figure before the jury once they learned of the
tattooed female employees and how he beat his wife, and that he
would surely lose if he went to trial for the reasons detailed
during the car ride.

### CONCLUSION

For the reasons indicated, the defendant's motion is
granted to the extent the government is precluded from using any
incriminating statements made by Morrison during the May 19, 2005
proffer session, and is otherwise denied.

SO ORDERED.

Dated: October 3, 2007
        Central Islip, New York


                            _____/s/_____
                            DENIS R. HURLEY, U.S.D.J.