UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
UNITED STATES OF AMERICA,

      -against-

RODNEY ARNOLDO MORRISON,

           Defendant.
--------------------------------X

<u>MEMORANDUM AND ORDER</u>
04-CR-699 (DRH)(S-2)

A P P E A R A N C E S:

For the Government:
    Benton J. Campbell
    United States Attorney
    Eastern District of New York
    610 Federal Plaza
    Central Islip, New York  11722
        By: James M. Miskiewicz, A.U.S.A.
            John Joseph Durham, A.U.S.A.
            Diane C. Leonardo-Beckman, A.U.S.A.

For Defendant:
    William H. Murphy, Jr. & Associates
    12 West Madison Street
    Baltimore, MD 21201
        By: William H. Murphy, Jr., Esq.
            Kenneth W. Ravenell, Esq.

    Law Offices of Peter Smith & Associates
    389 Fort Salonga Road
    Northport, New York 11768
        By: Peter Smith, Esq.

    Daniel Nobel, Esq.
    401 Broadway - 25th Floor
    New York, New York 10013

    Levitt & Kaizer, Esqs.
    148 E. 78th Street
    New York, New York 10075
        By: Richard Levitt, Esq.

HURLEY, Senior District Judge:

      Presently before the Court is the motion by defendant

Rodney Morrison ("defendant" or "Morrison") to dismiss Counts Two

and Eight of the second superseding indictment (hereinafter
"indictment") under Federal Rule of Criminal Procedure ("Rule")
29 or for a new trial pursuant to Rule 33.  For the following
reasons, defendant's motion is DENIED.

BACKGROUND

Familiarity with the facts and procedural background is
presumed.  Thus, the Court states only those facts necessary for
disposition of the instant motion.

## I.   The Indictment

On July 11, 2006, the government filed the indictment
charging defendant, a cigarette on-reservation retailer,[1] with
eleven counts, to wit: (1) Count One (conducting and
participating in the affairs of an enterprise in violation of the
Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18
U.S.C. § 1962(c) ("substantive RICO count")); (2) Count Two
(racketeering conspiracy in violation of 18 U.S.C. § 1962(d)
("RICO conspiracy")); (3) Count Three (arson conspiracy in
violation of 18 U.S.C. § 844(i)); (4) Count Four (arson in
violation of 18 U.S.C. §§ 844(i) and 2); (5) Count Five
(conspiracy to use extortionate means to punish nonrepayment of
credit in violation of 18 U.S.C. § 894(a)(2)); (6) Count Six
(extortionate punishment for nonrepayment of credit in violation

---

[1]  For ease of identification, defendant is refereed to as a
reservation retailer although his business also included a
significant wholesale component.

of 18 U.S.C. §§ 894(a)(2) and 2); (7) Count Seven (use of fire to commit a felony in violation of 18 U.S.C. §§ 844(h)(1) and 2); (8) Count Eight (illegal possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1)); (9) Count Nine (illegal possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1)); (10) Count Ten (conspiracy to use interstate facilities in the commission of murder for hire in violation of 18 U.S.C. § 1958); and (11) Count Eleven (use of interstate facilities in the commission of murder for hire in violation of 18 U.S.C. §§ 1958 and 2).

The indictment charged eighty separate predicate acts, viz. (1) Racketeering Act One (robbery conspiracy in violation of 18 U.S.C. § 1951(a) and robbery in violation of 18 U.S.C. §§ 1951(a) and 2); (2) Racketeering Act Two (conspiracy to use extortionate means to punish nonrepayment of credit in violation of 18 U.S.C. § 894(a)(2); use of extortionate means to punish nonrepayment of credit in violation of 18 U.S.C. §§ 894(a)(2) and 2; arson conspiracy in violation of N.Y. Penal Law §§ 150.10 and 105.10; and arson in violation of N.Y. Penal Law §§ 150.10 and 20.00); (3) Racketeering Act Three (conspiracy to use interstate facilities in the commission of murder for hire in violation of 18 U.S.C. § 1958; use of interstate facilities in the commission of murder for hire in violation of 18 U.S.C. §§ 1958 and 2; murder conspiracy in violation of N.Y. Penal Law §§ 125.25(1) and

3

105.15; and murder in violation of N.Y. Penal Law §§ 125.25(1) and 20.00); and (4) Racketeering Acts Four through Eighty (trafficking in contraband cigarettes in violation of 18 U.S.C. §§ 2342(a) and 2).

## II. <u>Racketeering Acts Four through Eighty – Contraband Cigarettes</u>

Racketeering Acts Four through Eighty of the indictment alleged that Morrison "knowingly and intentionally sold and distributed contraband cigarettes . . . lacking valid New York State tax stamps, in violation of Title 18, United States Code, Sections 2342(a) and 2" from January 8, 1997 to August 2, 2004. 18 U.S.C. § 2342(a) is part of the Contraband Cigarettes Trafficking Act ("CCTA"), 18 U.S.C. §§ 2341 et seq., and provides:

> It shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes or contraband smokeless tobacco.

18 U.S.C. § 2342(a). Contraband cigarettes are defined in § 2341 as follows:

> a quantity in excess of 60,000[2] cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, <u>if the State or local government</u>

---

[2] At the time of the acts alleged in the indictment, "contraband cigarettes" was defined to mean a quantity in excess of 60,000 cigarettes which bore no evidence of the payment of state cigarette taxes. The statute was amended in March 2006 and the number required to trigger the provisions of the CCTA was reduced to 10,000.

> <u>requires a stamp</u>, impression, or other
> indication to be placed on packages or other
> containers of cigarettes to evidence payment
> of cigarette taxes, and which are in the
> possession of any person other than [setting
> forth exempted persons]

<u>Id.</u> § 2341(2) (emphasis added).

III. <u>New York Tax Law</u>

Article 20 of the New York State Tax Law imposes "a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax" or on certain sales to the United States. N.Y. Tax Law § 471(1). Federal law forbids the collection of these taxes on cigarettes sold on Native American reservations to enrolled tribal members for their personal consumption. <u>See</u> <u>Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation</u>, 425 U.S. 463 (1976). However, when cigarettes are sold on the reservation to non-Native Americans, the taxes may be collected. <u>See</u> <u>Washington v. Confederated Tribes of Colville Indian Reservation</u>, 447 U.S. 134 (1980).

With regard to all cigarettes the state has power to tax, including cigarettes sold on-reservation to non-Native Americans, § 471(2) sets forth a mechanism for the collection of the tax whereby a state licensed stamping agent is required to advance the amount of the tax by purchasing adhesive stamps from the state and affixing them to each package of cigarettes. N.Y.

Tax Law § 471(2).[3]  The stamping agent then adds the amount of the tax to the price of the cigarettes sold to its customers, which is passed along the chain of distribution to the consumer. Thus, § 471(2) provides that "the ultimate incidence of and liability for the tax shall be upon the consumer."  Id. § 471(2).

Although § 471(2) provides that "the tax commission may by regulation provide that the tax on cigarettes imposed by this article shall be collected without the use of stamps," id. § 471(2), no such regulation has been passed.  Thus, pursuant to § 471, all cigarettes that the state has the power to tax are required to be stamped.

IV.  Racketeering Acts Four through Eighty Charged
     Morrison with Violations of the CCTA
     Under Both 18 U.S.C. § 2342(a) and 18 U.S.C. § 2

Racketeering Acts Four through Eighty charged Morrison with selling and distributing contraband cigarettes in violation of 18 U.S.C. § 2342(a) and 18 U.S.C. § 2.  For each Racketeering Act Four through Eighty, the indictment sets forth the approximate quantity of contraband cigarettes sold by defendant on the reservation and sets forth a specific date per act.

V.   The "Forbearance Policy"

In 1988, the New York Department of Taxation and Finance (the "DTF") determined that large volumes of unstamped

_____

[3]  Wholesalers may be licensed by New York as stamping agents pursuant to New York Tax Law § 472(1).

cigarettes were being purchased by non-Native Americans from reservation retailers.  Department of Taxation and Finance of N.Y. v. Milhem Attea & Bros., Inc., 512 U.S. 61, 64-65 (1994). Because unlawful purchases of unstamped cigarettes deprived New York of substantial tax revenues, the DTF adopted regulations, 22 NYCRR §§ 336 et seq., for the enforcement of the collection of taxes from non-Native American purchasers of cigarettes from on-reservation retailers.  Id. at 65; see also N.Y. Assoc. of Convenience Stores v. Urbach, 646 N.Y.S.2d 918, 921 (Sup. Ct. Albany County 1996).  The regulations recognized the right of exempt Native American consumers to purchase untaxed cigarettes on the reservation.  However, "[t]o ensure that nonexempt purchasers do not likewise escape taxation, the regulations limit[ed] the quantity of untaxed cigarettes that wholesalers may sell to tribes and tribal retailers."  Milhem, 512 U.S. at 65. "To prevent non-Indians from escaping the tax, [the] regulatory scheme . . . impose[d] record keeping requirements and quantity limitations on cigarette wholesalers who sell untaxed cigarettes to reservation Indians."  Id. at 64.  Under the regulations, "[r]etailers were to keep accurate records of those to whom they sold untaxed cigarettes and submit these records to the [DTF]." Warren v. Pataki, No. 01-CV-0004E, 2002 WL 450056, at *1 (W.D.N.Y. Jan. 9, 2002).

Following adoption of the regulations, a proceeding was

7

commenced by Native American merchants to permanently enjoin the DTF from enforcing them and, as a result, the DTF suspended implementation pending the outcome of that litigation. <u>N.Y. Assoc. of Convenience Stores v. Urbach</u>, 712 N.Y.S.2d 220, 221 (3d Dep't 2000) (discussing the <u>Milhelm</u> case). Ultimately, the Supreme Court in <u>Milhelm</u> held that the regulations were valid and enforceable. 512 U.S. at 78; <u>see id.</u> at 75 ("[W]e now hold that Indian traders are not wholly immune from state regulation that is reasonably necessary to the assessment or collection of lawful state taxes."). Despite this outcome, the DTF continued its non-enforcement or "forbearance" policy. <u>Urbach</u>, 712 N.Y.S.2d at 221.

According to evidence adduced at trial, in February 1996, Governor Pataki announced his intention to begin enforcement of the regulations and formally notified the tribes that they had 120 days to comply, or prepare to comply, with the regulations. (Tr. at 11087.)[4] However, the following year, in May 1997, Governor Pataki did an about-face and directed the repeal of the regulations and proposed legislation that would allow on-reservation stores to sell tax-free cigarettes. <u>Santa Fe Natural Tobacco Co. v. Spitzer</u>, No. 00 CIV. 7274, 00 CIV. 7750, 2001 WL 636441 (S.D.N.Y. June 8, 2001), <u>rev'd on other</u>

---

[4] References to "Tr." are to the trial transcript in this case.

8

grounds, 320 F.3d 200 (2d Cir. 2003).  The regulations were repealed by the DTF on April 28, 1998.  New York Assoc. of Convenience Stores v. Urbach, 92 N.Y.2d 204, 214 (1998). Although Governor Pataki sent to the legislature a bill that would amend the State Tax Law to allow reservation stores to sell tax-free cigarettes, the proposed amendments never passed. Nonetheless, the State's policy of non-enforcement or "forbearance" continued.

In July 1998, the New York Court of Appeals held that convenience stores in direct competition with Native American reservation retailers had standing to bring an equal protection challenge to the DTF's forbearance policy based on a "differential enforcement of the tax laws," id. at 212, and that the applicable standard was whether there was a rational basis for the DTF's forbearance policy, id. at 213.  Because the regulations had been repealed prior to the court's decision, the matter was remanded to the New York Supreme Court so that "the court can reconsider the dispute in light of the Tax Department's newly minted long-term policy of abstaining from taking active measures to enforce the legislatively mandated excise and sales taxes on motor fuel and cigarettes destined for sale on Indian reservations."  Id. at 215 (emphasis in original).

Upon remand, the New York Supreme Court found, and the Third Department affirmed, that there was "a rational basis for

9

[the DTF's] indefinite forbearance." <u>Urbach</u>, 712 N.Y.S.2d at

222.  Explaining that "'the rational basis test' has been

characterized as 'the lowest level of judicial review,'" the

court found:

> Because of tribal immunity, the retailers
> cannot be sued for their failure to collect
> the taxes in question, and State auditors
> cannot go on the reservations to examine the
> retailers' records.
>
> Additionally, the [DTF] cannot compel the
> retailers to attend audits off the
> reservations or compel production of their
> books and records for the purpose of
> assessing taxes.  In that regard,
> representatives of the [DTF] engaged in
> extensive negotiations with the tribes in an
> effort to arrive at an acceptable agreement.
> Those efforts were largely unsuccessful and
> the vast majority of the Indian retailers
> refused to register with the [DTF].  In
> further efforts to enforce the statute, the
> State attempted interdiction, i.e.,
> interception of tobacco and motor fuel
> shipments and seizure of those shipments that
> were found to be in noncompliance with the
> Tax Law.  That strategy resulted in civil
> unrest, personal injuries and significant
> interference with public transportation on
> the State highways.  In our view, all of
> these factors provide a rational basis for
> the differential treatment of the parties . .
> . .

<u>Id.</u> at 222.

VI.  Defendant's Pre-Trial Motion to
     <u>Dismiss Racketeering Acts Four through Eighty is Denied</u>

     By motion filed September 11, 2007 (docket no. 332),

defendant moved to dismiss Racketeering Acts Four through Eighty

pursuant to Rule 12.  Defendant argued, inter alia, that because

New York State was not enforcing its tax law with regard to on-reservation cigarette sales, New York did not "require[] a stamp" on cigarettes sold on reservation under § 2341(2) of the CCTA.

By bench decision dated October 9, 2007, the Court denied defendant's motion, finding, inter alia, that "what the state requires[] is determined by the statutes enacted by the legislative body." (Oct. 9, 2007 Tr. at 57.)[5]  In denying defendant's motion, the Court indicated that it had decided the motion "on the issues as framed in the motion papers" and that it would be amenable to revisiting defendant's application on new grounds, including a potential substantive due process violation. (Oct. 9, 2007 Tr. at 63.)

VII. The Verdict

On May 1, 2008, the jury found that the government had proved Racketeering Acts Five through Eighty (the "CCTA Racketeering Acts")[6] and found defendant guilty of Count Two,

---

[5] In reaching this decision, the Court relied in part on United States v. Kaid, 241 Fed. Appx. 747 (2d Cir. Sept. 12, 2007) (summary order), where the Second Circuit rejected defendants' argument that the "non-enforcement policy effectively de-taxed sales of cigarettes to non-Native Americans on reservation land," finding it to be "meritless." Id. at 750 (internal quotation marks omitted).  The Kaid case is discussed in more detail in the text infra.

[6] Racketeering Act Four was dismissed at the conclusion of the government's case-in-chief given that no evidence was adduced as to that act.

RICO conspiracy based on the CCTA Racketeering Acts.[7]  The jury

also found defendant guilty of illegal possession of the firearm

as alleged in Count Eight.  During the second part of the

bifurcated trial as to that charge, the jury found that defendant

was a prior felon on May 5, 2008.  Defendant was found not guilty

on all remaining counts, as well as on Racketeering Acts One

through Three.

VIII. <u>The Instant Motion</u>

By instant motion, defendant seeks to dismiss Counts

Two and Eight under Rule 29, or for a new trial under Rule 33.

For the reasons stated below, the motion is denied.

<u>DISCUSSION</u>

I.   Defendant's Motion to Dismiss
     <u>Count Two (RICO Conspiracy) is Denied</u>

Upon finding that the government had proved that

defendant conspired to commit Racketeering Acts Five through

Eighty under the Count Two RICO conspiracy charge, the jury

returned a guilty verdict as to that count.  Defendant advances

three primary arguments in support of his motion to dismiss Count

Two: (1) "[New York] Tax Law § 471 neither authorizes, requires,

[n]or permits the collection of taxes on cigarettes sold on

Indian reservations absent implementing regulations, and § 471

---

[7]  As will be discussed <u>infra</u>, the Court dismissed
Racketeering Acts Five through Eighty as to Count One after the
government rested.

therefore cannot support a CCTA prosecution"; (2) "[t]his criminal RICO conspiracy prosecution of a New York Indian retailer under the CCTA for on-reservation sales deprived . . . Morrison of substantive due process"; and (3) "[t]he CCTA racketeering acts incorporated into Count Two – and therefore Count Two itself – should be dismissed for the same reason the Court dismissed these same acts as charged in Count One, i.e. insufficient evidence to prove the government's theory of prosecution, that . . . Morrison aided and abetted off-reservation cigarette sales in violation of the CCTA."  (Def.'s Mem. of Law in Supp. at i - ii.)  The Court will address defendant's arguments seriatim.

     A.    The Absence of Regulations
             Under New York Tax Law § 471 Does not
             Preclude Prosecution Under the CCTA

Defendant argues that the CCTA Racketeering Acts should be dismissed because "New York Tax Law § 471 is not self-executing with respect to the collection of taxes on cigarettes sold on Indian reservations, but rather may be enforced against Indian retailers only in tandem with implementing regulations, which, at a minimum, must outline a system providing a certain quantity of tax free cigarettes for sales to Native Americans." (Def.'s Mem. of Law in Supp. at 6.)  For the reasons that follow, the Court finds this argument unpersuasive.

1.    The Court Will Address Defendant's Argument
      Concerning the Regulations Even Though
      it was Previously Addressed by the Court

Before the trial began, defendant moved to dismiss

Racketeering Acts Four through Eighty.  During oral argument, the

Court asked defense counsel whether the New York Tax Law could

function absent the regulations.  (Oct. 5, 2007 Tr. at 144.)

Citing Warren v Pataki, No. 01-CV-0004E, 2002 WL 450056 (W.D.N.Y.

Jan. 9, 2002) and Day Wholesale v. State of N.Y., No. 06-7688,

(N.Y. Sup. Ct. Jan. 2, 2007), defense counsel argued that it

could not.  (Id. at 144-46.)

Oral argument continued on October 9, 2007, and defense

counsel again argued that absent the regulations, Native American

retailers were permitted to sell unlimited quantities of

unstamped cigarettes on the reservations.  (Oct. 9, 2007 Tr. at

19, 25, 44-45.)  The government, on the other hand, asserted that

the repeal of the regulations was a "red herring" as it "did not

eviscerate the existing statute."  (Id. at 38; see also id. at

40-41.)  Ultimately, the Court rejected defendant's arguments and

denied his motion to dismiss Racketeering Acts Four through

Eighty.  (Id. at 51-66.)

Thereafter, by letter dated October 16, 2007 (docket

no. 367), defendant moved for reconsideration of the Court's

October 9th decision, arguing that New York Tax Law § 471 was not

a self-executing statute as applied to the sale of cigarettes on

14

tribal lands absent implementing regulations. Defendant again

relied on the Day Wholesale case. By Memorandum and Order dated

November 9, 2007, the Court denied defendant's motion, finding

that this issue was explicitly discussed at oral argument on the

original motion (see Oct. 5, 2007 Tr. at 144) and that defendant

failed to satisfy his burden of showing that the Court overlooked

a controlling decision or material fact that would alter the

outcome of its previous decision. United States v. Morrison, 521

F. Supp. 2d 246, 252 (E.D.N.Y. 2007). The Court also stated:

> Parenthetically, the Court notes that
> Defendant's reliance on cases such as Pierre
> v. Gonzales, – F.3d –, 2007 WL 2597600 (2d
> Cir. Sept. 11, 2007) and United States v.
> Belcher, 927 F.2d 1182, 1185 (11th Cir.
> 1991), is misplaced as the treaty and statute
> addressed, respectively, in those cases were
> clearly not self-executing. Here, on the
> other hand, the effect of the repeal of the
> regulations is that cigarette retailers
> located on Indian reservations can sell an
> unrestricted number of untaxed cigarettes
> without keeping records or reporting to the
> DTF but "the repeal [of the regulations] does
> not eliminate the statutory liability for
> taxes as they relate to sales on Indian
> reservations to nonexempt individuals."
> Urbach, 92 N.Y.2d at 214 [citation and
> internal quotation marks omitted].

Id. at 252 n.5.

By instant motion, defendant attempts yet once again to

have another bite at the apple, arguing that the recent decision

of the Fourth Department affirming the lower court's holding in

Day Wholesale[8] "lends substantial support to [his] argument and demonstrates that absent the necessary implementing regulations there simply are no 'applicable' taxes – i.e., taxes that are 'capable of being applied' – concerning on-reservation cigarette sales." (Def.'s Mem. of Law in Supp. at 7.) Defendant also relies on Milhelm Attea, 512 U.S. 61, a case also previously addressed by the Court, albeit briefly. In response, the government simply indicates that "there is nothing 'new' about th[e Day Wholesale] decision or any legal opinion that would alter this Court's previous rulings." (Gov't's Mem. in Opp'n at 22.)

Although the Court has already rejected defendant's argument in this regard, given the emphasis defendant places on Day Wholesale and Milhelm Attea coupled with the fact that the Court's decision on this point was not as expansive as it might have otherwise been, the Court will address defendant's arguments.

### 2. The CCTA and the New York Tax Law

Before examining Day Wholesale and Milhelm Attea, it is helpful to briefly review the general framework of the CCTA and the New York State Tax Law. It is also helpful to note that the racketeering acts at issue occurred from May 2, 2003 to August 2,

---

[8] Day Wholesale, Inc. v. State of N.Y., 856 N.Y.S.2d 808 (4th Dep't 2008).

2004.

Morrison was charged with selling and distributing

contraband cigarettes under the CCTA, which provides:

> It shall be unlawful for any person knowingly
> to ship, transport, receive, possess, sell,
> distribute, or purchase contraband cigarettes
> or contraband smokeless tobacco.

18 U.S.C. § 2342(a).  Contraband cigarettes are defined by

reference to state law as:

> a quantity in excess of 60,000 cigarettes,
> which bear no evidence of the payment of
> applicable State or local cigarette taxes in
> the State or locality where such cigarettes
> are found, <u>if the State or local government
> requires a stamp</u>, impression, or other
> indication to be placed on packages or other
> containers of cigarettes to evidence payment
> of cigarette taxes, and which are in the
> possession of any person other than [setting
> forth exempted persons]

<u>Id.</u> § 2341(2) (emphasis added).

Section 471(1) of the New York Tax Law provides that

"[t]here is hereby imposed and shall be paid a tax on all

cigarettes possessed in the state by any person for sale, except

that no tax shall be imposed on cigarettes sold under such

circumstances that this state is without power to impose such tax

. . . ."  N.Y. Tax Law § 471(1).  It is undisputed that federal

law forbids the collection of these taxes on cigarettes sold on

Native American reservations to enrolled tribal members for their

personal consumption, <u>see</u> <u>Moe</u>, 425 U.S. 463, but that taxes may

be collected on cigarette sales made on the reservation to non-

Native American consumers, see Confederated Tribes of Colville Indians Reservation, 447 U.S. 134.

Section 471(2) sets up a mechanism whereby state licensed stamping agents, including wholesalers, are required to prepay the amount of the tax by purchasing tax stamps from the state and affixing them to each package of cigarettes. N.Y. Tax Law § 471(2) ("Agents . . . shall purchase stamps and affix such stamps in the manner prescribed to packages of cigarettes to be sold within the state . . . ."). These taxes are passed along the distribution chain to the consumer. Id. ("It is intended that the ultimate incidence of and liability for the tax shall be upon the consumer, and that any agent or dealer who shall pay the tax to the tax commission shall collect the tax from the purchaser or consumer."). There is no dispute that this statute was in effect and governed all of the racketeering acts alleged in this case.

Effective May 13, 2003, the New York State Legislature enacted § 471-e, which provided as follows:

> Where a non-native American person purchases, for such person's own consumption, any cigarettes or other tobacco products on or originating from native American nation or tribe land recognized by the federal government and reservation land recognized as such by the state of New York, the commissioner shall promulgate rules and regulations necessary to implement the collection of sales, excise and use taxes on such cigarettes or other tobacco products.

18

Id. § 471-e (2003).  This version of § 471-e, which was effective
until February 28, 2006, was contemporaneously in effect with all
but three of the CCTA Racketeering Acts presented to the jury in
this case (Racketeering Acts Eight through Eighty).  The other
three, Racketeering Acts Five through Seven, occurred prior to
the enactment of § 471-e.  However, neither party claims that
this version of § 471-e, which pertains solely to non-Native
American purchasers acquiring cigarettes for their "own
consumption," governs the instant CCTA prosecution.[9]

        Section 471-e was later amended.  The Notes to the
statute provide that the amendment "shall take effect March 1,
2006 provided that any actions, rules and regulations necessary
to implement the provisions of [the statute] on its effective
date are authorized and directed to be completed on or before
such date."  Id. § 471-e (Historical and Statutory Notes 2006).
This amendment post-dates all of the CCTA Racketeering Acts
charged in the indictment.

        The amended version of § 471-e provides that "all
cigarettes sold on an Indian reservation to non-members of the
nation or tribe or to non-Indians shall be taxed, and evidence of
such tax will be by means of an affixed tax stamp."  Id. § 471-

---

        [9]  As defendant notes "§471 [, as distinct from 471(e),
either in its original or amended state,] is the applicable state
statute" vis-a-vis Racketeering Acts Five through Eighty.
(Def.'s Reply at 4.)

e(1)(a) (2006). It further provides that "[q]ualified Indians may purchase cigarettes from a reservation cigarette seller exempt from the cigarette tax even though such cigarettes will have an affixed cigarette tax stamp." Id. § 471-e(1)(b). This is achieved through a tax exemption coupon system, spelled out in the amended version of the statute, which is discussed in more detail below.

        3.   <u>The Day Wholesale Case</u>

      In arguing that § 471 is inoperative as applied to the collection of taxes on cigarettes sold on-reservation absent implementing regulations prescribing a scheme for such collection, defendant places great reliance on the <u>Day Wholesale</u> case, which involved the viability of the amended version of New York Tax Law § 471-e. Although this statute is not applicable to the instant prosecution as the earliest date it could have taken effect is March 1, 2006 -- which postdates all of the racketeering acts charged in the indictment -- for purposes of dispelling defendant's argument, the Court addresses this decision below.

      In <u>Day Wholesale</u>, plaintiffs Day Wholesale, Inc. ("Day"), a cigarette wholesaler, and Scott Maybee ("Maybee"), a reservation owner, sued New York State and the New York Attorney General, among others, seeking an injunction to prevent the enforcement of the amended version of § 471-e. As explained by

the Fourth Department, pursuant to § 471(2), "the ultimate liability for the cigarette tax falls on the consumer, but the cigarette tax is advanced and paid by agents such as Day through the use of tax stamps."  856 N.Y.S.2d at 808.  Recognizing that not all cigarettes sold by reservation retailers are subject to taxation, viz. those sold to Native American Indians on their own reservation, the amended version of § 471-e was "designed to serve dual goals, i.e., providing for the collection at the wholesale level of cigarette tax from non-Indians or Indians purchasing cigarettes off of their own reservation and exempting from the cigarette tax purchases made by qualified Indian consumers."  Id. at 809.  Thus, the amended version of § 471-e sets forth a scheme by which wholesalers are required to stamp all cigarettes to be sold on a reservation but reservation retailers are permitted to purchase a limited amount of stamped cigarettes tax-free upon the presentment to the wholesaler of tax exemption coupons.  The statute provides that the DTF "shall" provide these coupons to the tribes based upon "probable demand." N.Y. Tax Law § 471-e(2) (2006).  "Qualified Indians may [then] purchase cigarettes from a reservation cigarette seller exempt from the cigarette tax even though such cigarettes will have an affixed cigarette tax stamp."  Id. § 471-e(1)(b).  A cigarette wholesaler can then redeem the coupons and obtain a refund "with respect to any cigarette tax previously paid on cigarettes it

sold without collecting the tax because it accepted an Indian tax exemption coupon from its purchaser . . . ." Id. § 471-e(4).

Section 471-e provides that it "shall take effect March 1, 2006, provided that any actions, rules and regulations necessary to implement the provisions of [the statute] on its effective date are authorized and directed to be completed on or before such date." Id. § 471-e (Historical and Statutory Notes 2006). However, the DTF "did not take any action or promulgate any rules or regulations necessary to implement the statute on or before March 1, 2006." Day Wholesale, 856 N.Y.S.2d at 809. In that regard, the DTF failed to issue tax exemption coupons for qualified Native Americans. Instead, the DTF issued an advisory opinion stating that it would not begin enforcement of the statute on March 1, 2006 due to its forbearance policy. Id. The New York Attorney General, however, concluded that the statute was effective and subject to enforcement as of March 1, 2006 and sent a letter to "Philip Morris and other cigarette manufacturers advising them that Day and other wholesale cigarette dealers were continuing to sell unstamped cigarettes to Indian reservations 'in direct violation' of the amended version of Tax Law § 471-e, and warning them that such sales were a matter of 'significant concern' to the Attorney General." Id. at 809-10. As a result, Philip Morris suspended sales to Day until Day provided assurances that it would not sell unstamped cigarettes to the

reservations or New York State indicated that such sales were not illegal. Id. at 810. Day and Maybee thereafter commenced suit against the State of New York and its then Attorney General Elliot Spitzer.

The Fourth Department initially focused its analysis on the statute's "effective date clause" which explicitly provided that "the amended version of Tax Law § 471-e would become effective only in the event that 'any actions, rules and regulations necessary to implement' its provision were complete on or before March 1, 2006 . . . . At a minimum, the actions, rules and regulations necessary for the implementation of the statutory scheme include the issuance of Indian tax exemption coupons." Id. Given that no such coupons were issued, which coupons were both a condition precedent to the statute becoming effective and an integral part of the statute's specific collection scheme, the Court concluded that the statute was not "presently in effect." Id. at 808.

4. Defendant's Reliance on Day Wholesale is Misplaced

Acknowledging that the amended version of § 471-e does not apply to the racketeering acts alleged in the indictment, defendant nonetheless argues that the Day Wholesale case is relevant because "[i]f (as Day holds) § 471-e is non-enforceable absent implementing regulations with respect to the very specific conduct § 471-e targets (i.e., on-reservation sales) then surely

23

the far broader language of § 471 cannot be enforced with respect to the narrow (and politically sensitive) category of on-reservation sales absent like implementing regulations." (Def.'s Mem. of Law in Supp. at 13-14.) Defendant's argument is without merit.

The very first sentence of the <u>Day Wholesale</u> decision emphasizes that the amended version of § 471-e is a collection mechanism: "Tax Law § 471-e . . . embodies the Legislature's most recent effort to <u>collect taxes</u> on cigarettes sold on Indian reservations." 856 N.Y.S.2d at 808 (emphasis added). The Appellate Division then describes the collection mechanism that the amended version of § 471-e creates: All cigarettes sold on-reservation must be stamped but refund coupons distributed by the DTF permit Native Americans to purchase cigarettes for their personal use free of tax and the cigarette wholesaler can later redeem the coupons to obtain a refund. Because the DTF failed to issue the refund coupons, the Appellate Division found that the statute did not take effect. If all cigarettes on the reservation were to be stamped, then refund coupons had to be available so that exempt sales to qualified purchasers could occur.

The conclusion reached by the Fourth Department is fully understandable and follows given the specific statutory scheme set forth in the amended version of § 471-e. The detailed

collection mechanism set forth in the statute simply cannot take effect absent the issuance of the tax exemption coupons. This is confirmed by the Notes following § 471-e which provide that the statute "shall take effect March 1, 2006, <u>provided</u> that any actions, rules and regulations necessary to implement the provisions of [the statute] on its effective date are authorized and directed to be completed on or before such date." N.Y. Tax Law § 471-e (Historical and Statutory Notes 2006).

<u>Day Wholesale</u> and its analysis of the amended version of § 471-e are distinguishable from the instant case, which is governed by § 471. "The plain, mandatory phrasing of [§ 471] sets forth a requirement that stamping agents affix tax stamps to all cigarettes the state has the power to tax, which includes those sold by reservation retailers for re-sale to the public." <u>City of N.Y. v. Milhelm Attea & Bros., Inc.</u>, 550 F. Supp. 2d 332, 346 (E.D.N.Y. 2008) (Amon, J.). There is nothing in the language of § 471 which even remotely suggests that the statutory liability set forth therein does not attach absent regulations designed to facilitate collection of these taxes on the reservation. <u>Cf.</u> <u>Cayuga Indian Nation of N.Y. v. Gould</u>, No. 2008-16350, 2008 WL 5158093, at *5 (Sup. Ct. Monroe County Dec. 9, 2008) ("Inasmuch as the tax liability referred to in § 1814[10]

---

[10] New York Tax Law § 1814 makes it a crime to evade payment of cigarette taxes.

springs from § 471, the fact that recently enacted § 471-e has been judicially declared by <u>Day Wholesale</u> to be 'not in effect' is of no moment."). Defendant concedes as much when he states that "[<u>a]lthough the State Legislature did not state in haec verba that regulations must be implemented in order for reservation retailers to be obliged, under § 471, to sell only tax-stamped cigarettes to non-exempt persons</u>, the absence of any purely statutory mechanism to achieve this end within this narrow and politically sensitive area confirms that the promulgation of regulations was essential – rather than merely expedient – for taxes to be imposed on sales at Indian smoke shops." (Def.'s Mem. of Law in Supp. at 13 (emphasis added).)

The Historical and Statutory Notes to § 471 further undermine defendant's argument:

> This act shall take effect April 1, 2002;
> provided, however, if this act shall become a
> law after such date it shall take effect
> immediately and shall be deemed to have been
> in full force and effect on and after April
> 1, 2002; . . . provided further that sections
> thirty, thirty-one and thirty-three of this
> act[11]shall take effect April 3, 2002 and
> shall apply to all cigarettes possessed in
> the state by any person for sale and use in
> the state by any person on and after April 3,
> 2002 and to taxes, interest and penalties
> collected or received by the commissioner of
> taxation and finance under sections 471 and
> 471-a of the tax law on and after such date;

---

[11]  Sections thirty, thirty-one and thirty-three refer to sections of the Public Health, Social Services, Tax – Health Care Reform Act of 2000 which amended New York Tax Law § 471.

> provided, however, that the commissioner of
> taxation and finance shall be authorized on
> and after this act shall have become a law to
> take steps necessary to implement these
> provisions on their effective date . . . .

N.Y. Tax Law § 471 (Historical and Statutory Notes 2002). The Notes clearly provide that § 471 "shall take effect" in April 2002 and do not suggest that the statute is inoperative pending the possible promulgation of related regulations. Instead, it explicitly provides to the contrary.

Moreover, the fact that the Notes authorize the DTF to "take steps necessary to implement" this section "on and after this act shall have become a law" does not warrant a different conclusion. Although there were no regulations in place to enforce the collection of the taxes due for on-reservation cigarette sales at the time of the racketeering acts alleged in the indictment, defendant could have easily complied with § 471 by simply purchasing stamped cigarettes from a state licensed wholesaler/stamping agent in the amount necessary to cover his reservation sales to non-Native Americans.[12] At the same time,

---

[12] Defendant attempts to avoid this result by summarily asserting that "tax-stamped cigarettes had <u>never</u> been made available to reservation retailers by cigarette wholesalers . . . ." (Def.'s Mem. of Law in Supp. at 2.) Typically on important cites, defendant provides the Court with a corresponding citation to the trial record, which is well over 10,000 pages. No such reference is offered here. Moreover, the Court has no independent recollection of any testimony, or other evidence, being elicited during the course of the trial which would support this contention. To the extent the implication is that defendant was unable to purchase stamped cigarettes — unlike his off-

defendant could have purchased unstamped cigarettes consistent
with his standard practice, but in such lesser amount as he
deemed necessary to serve the needs of Native Americans on the
reservation for their own personal consumption.  The lack of
implementing regulations does not negate the obligation of
individuals such as Morrison to sell only stamped cigarettes to
non-Native American purchasers but rather implicates the ability
of the state to <u>collect</u> the tax from Native American tribes,
which have repeatedly flouted state attempts at collection.  As
explained by the Third Department in <u>Urbach</u> and as noted earlier:

> The record here clearly reflects . . . that
> the [New York Tax] statutes cannot
> effectively be enforced without the
> cooperation of the Indian tribes.  Because of
> tribal immunity, the retailers cannot be sued
> for their failure to collect the taxes in
> question, and State auditors cannot go on the
> reservations to examine the retailers'
> records.
>
> Additionally, the [DTF] cannot compel the
> retailers to attend audits off the
> reservations or compel production of their
> books and records for the purpose of
> assessing taxes.  In that regard,
> representatives of the [DTF] engaged in
> extensive negotiations with the tribes in an
> effort to arrive at an acceptable agreement.
> Those efforts were largely unsuccessful and
> the vast majority of the Indian retailers

---

reservation cigarette seller counterparts throughout the state —,
such suggestion is clearly frivolous and contrary to the
mechanism set forth in § 471, which provides for the purchase of
stamped cigarettes from a state licensed wholesaler/stamping
agent.

> refused to register with the [DTF]. In
> further efforts to enforce the statute, the
> State attempted interdiction, i.e.,
> interception of tobacco and motor fuel
> shipments and seizure of those shipments that
> were found to be in noncompliance with the
> Tax Law. That strategy resulted in civil
> unrest, personal injuries and significant
> interference with public transportation on
> the State highways.

712 N.Y.S.2d at 222. Essentially, defendant's argument boils

down to the claim that because Native Americans, such as

Morrison, have successfully thwarted enforcement of § 471, the

statute is inoperative until the DTF can figure out a way to

compel compliance. The Court rejects this proposition.

Although the facts in the Second Circuit's decision in

Kaid are distinguishable,[13] the following passage is instructive

for present purposes:

> Federal law prohibits the states from
> taxing cigarettes sold on Native American
> reservations to Native Americans, but allows
> state taxes to be imposed on non-Native
> American consumers on reservations. New York
> law provides for taxes on non-Native
> Americans purchasing cigarettes in stores on
> reservations, but New York has a policy of
> non-enforcement of this tax. [Defendants]
> assert that this non-enforcement policy
> effectively de-taxed sales of cigarettes to
> non-Native Americans on reservation land,
> thereby negating the element of contraband
> necessary to a conviction for trafficking in
> contraband cigarettes under 18 U.S.C. §§

---

[13] The defendants in Kaid were not Native-American retailers
but rather non-Native Americans who purchased large quantities of
untaxed cigarettes on the reservation for the purpose of selling
them off-reservation.

2341-42. This argument is meritless. While
it appears that New York does not enforce its
taxes on small quantities of cigarettes
purchased on reservations for personal use by
non-Native Americans, nothing in the record
supports the conclusion that the state does
not demand that taxes be paid when, as in
this case, massive quantities of cigarettes
were purchased on reservations by non-Native
Americans for resale. . . .

Kaid, 241 Fed. Appx. at 750.

In sum, the Day Wholesale decision only addressed

whether or not the specific collection mechanism set forth in the

amended version of § 471-e, which statute does not even apply to

the present prosecution, could operate absent the issuance of

refund coupons.[14]  The fact that the court found that version of

§ 471-e ineffective does not vitiate the statutory liability set

forth in § 471 and does not support a finding that the latter

statute cannot operate absent regulations designed to facilitate

its enforcement.  See Cayuga Indian Nation, 2008 WL 5158093, at

*4 ("Section 471-e was merely designed to facilitate the state's

collection of cigarette taxes arising from Indian sales to non-

Indian consumers . . . . § 471-e does not create the tax

---

[14] Defendant makes brief reference to the 2003 version of §
471-e by asserting that its very enactment demonstrates an
acknowledgment by the legislature that "regulations were
indispensable to on-reservation sales." (Def.'s Mem. of Law in
Supp. at 13.).  As noted in note 9 supra, he does not contend
that that statute is otherwise relevant for present purposes.  In
any event, there is nothing in the statute to indicate that its
enactment was designed to somehow override the statutory
liability prescribed in § 471 or foreclose liability under that
section absent the promulgation of implementing regulations.

obligation itself, although it refers to it.  The tax obligation

itself long ago was established by the legislature . . . .").

5.    The Milhelm Attea Case

In a separate but related argument, defendant contends

that "[i]f § 471-e could not be implemented and applied to Indian

retailers without [corresponding] regulations, § 471 could not be

implemented without the [Milhelm] Attea regulations."  (Def.'s

Mem. of Law in Supp. at 10.)  As with defendant's other

regulatory claims, this argument is unavailing.

a.    Milhelm Attea

Milhelm Attea, a case decided by the Supreme Court in

1994, arose in response to the DTF regulations adopted in 1988.[15]

Noting that "[o]n-reservation cigarette sales to persons other

than reservation Indians . . . [we]re legitimately subject to

state taxation" 512 U.S. at 64, and that the DTF determined that

"unlawful purchases of unstamped cigarettes [by non-Native

Americans from reservation retailers] deprived New York of

substantial tax revenues . . . estimated at $65 million per

year," the Court explained that in 1988, the DTF adopted

regulations "[t]o ensure that nonexempt purchasers do not . . .

escape taxation."  Id. at 65.  These regulations limited the

number of untaxed cigarettes that wholesalers could sell to

---

[15]    As noted above, the regulations were repealed by the
DTF on April 28, 1998, see Urbach, 92 N.Y.2d at 214.

31

tribal retailers, _id._, and imposed recordkeeping requirements.
_Id._ at 64.

The plaintiffs in _Milhelm Attea_ were wholesalers doing
business on Native American reservations who sued to enjoin
enforcement of the regulations, arguing that they violated the
Indian Trader Statutes.  These statutes provide, inter alia, as
follows:

> The Commissioner of Indian Affairs shall have
> the sole power and authority to appoint
> traders to the Indian tribes and to make such
> rules and regulations as he may deem just and
> proper specifying the kind and quantity of
> goods and the prices at which such goods
> shall be sold to the Indians.

25 U.S.C. § 261.  These statutes have been interpreted as
evidencing a Congressional desire to comprehensively regulate the
field of Indian trading such that there is no room for additional
regulation by the states.  _See, e.g._, _Warren Trading Post Co. v._
_Az. Tax Comm'n_, 380 U.S. 685, 690 (1965).

In finding that the 1988 DTF regulations did not
violate the Indian Trader statutes, the Court distinguished the
_Warren Trading Post_ case, decided by the Court in 1965.  In
_Warren Trading Post_, Arizona State attempted to tax the gross
proceeds of a licensed Native American trader who was located on
the reservation and conducted business with other Native
Americans.  The Court found that the state tax was preempted by
the Indian Trader Statutes:

> We think the assessment and collection of
> this tax would to a substantial extent
> frustrate the evident congressional purpose
> of ensuring that no burden shall be imposed
> upon Indian traders for trading with Indians
> on reservations except as authorized by Acts
> of Congress or by valid regulations
> promulgated under those Acts. This state tax
> on gross income would put financial burdens
> on appellant or the Indians with whom it
> deals in addition to those Congress or the
> tribes have prescribed, and could thereby
> disturb and disarrange the statutory plan
> Congress set up in order to protect Indians
> against prices deemed unfair or unreasonable
> by the Indian Commissioner.

Warren Trading Post, 380 U.S. at 690-91.

"The state law . . . found pre-empted in Warren Trading Post was a tax directly 'imposed upon Indian traders for trading with Indians.'" Milhelm Attea, 512 U.S. at 74 (quoting Warren Trading Post, 380 U.S. at 691). "That characterization[, the Court found,] does not apply to regulations designed to prevent circumvention of 'concededly lawful' taxes owed by non-Indians." Id. at 74-75 (quoting Moe, 425 U.S. at 482-83).

> Moe,[16] Colville,[17] and Potawatomi[18] make clear
> that the States have a valid interest in
> ensuring compliance with lawful taxes that
> might easily be evaded through purchases of
> tax-exempt cigarettes on reservations; that

---

[16] Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation, 425 U.S. 463 (1976).

[17] Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134 (1980).

[18] Ok. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Ok., 498 U.S. 505 (1991).

> interest outweighs tribes' modest interest in
> offering a tax exemption to customers who
> would ordinarily shop elsewhere.  The balance
> of state, federal, and tribal interests . . .
> in this area thus leaves more room for state
> regulation than in others. In particular,
> these cases have decided that States may
> impose on reservation retailers minimal
> burdens reasonably tailored to the collection
> of valid taxes from non-Indians.

Id. at 73 (internal citation and quotation marks omitted).  Thus,

the Court "h[e]ld that Indian traders are not wholly immune from

state regulation that is reasonably necessary to the assessment

or collection of lawful state taxes."  Id. at 75.  After

reviewing the 1988 DTF regulations, the Court found that they did

not impose excessive burdens on Indian traders.  See id. at 75

("We are persuaded, however, that New York's decision to stanch

the illicit flow of tax-free cigarettes early in the distribution

stream is a reasonably necessary method of preventing fraudulent

transactions, one that polices against wholesale evasion of [New

York's] own valid taxes without unnecessarily intruding on core

tribal interests.") (citation and internal quotation marks

omitted).  Thus, the Court held that the "regulations d[id] not,

on their face, violate the Indian Trader Statutes." Id. at 61.

b.  Defendant's Argument

Defendant argues that "[t]he Supreme Court in [Milhelm

Attea recognized that the regulations were key to the

constitutional application of § 471 to cigarette sales on

reservations" (Def.'s Mem. of Law in Supp. at 12) and that "the

34

Legislature's requirement that regulations be enacted to implement §471-e simply reflected the Legislature's recognition that the Supreme Court upheld §471 because of its accompanying regulations . . . ." (Def.'s Reply at 6.) Defendant's argument mischaracterizes the Court's findings.

The Milhelm Attea case involved a facial challenge to New York's regulatory scheme, not a challenge to the underlying statutory liability. In fact, the Court began its discussion by explicitly noting that pursuant to New York law, non-Native Americans purchasing cigarettes on-reservation "must pay" the tax. 512 U.S. at 64 ("Cigarette consumers in New York are subject to a state tax of 56 cents per pack. Enrolled tribal members who purchase cigarettes on Indian reservations are exempt from this tax, but non-Indians making purchases on reservations must pay it.") (emphasis added). Because the State had the power to tax non-native Americans purchasing cigarettes on the reservation, id. at 71, 74, the Court held that the plaintiff wholesalers were "not wholly immune from state regulation that [wa]s reasonably necessary to the assessment or collection of lawful state taxes." Id. at 75. Thus, contrary to defendant's contentions, the Court did not uphold the statutory liability prescribed in § 471 because of its accompanying regulations. Rather, the Court held that the state could impose regulations reasonably necessary to facilitate the collection of the legal

tax and that the 1988 DTF regulations were sufficient in this
regard.  There is nothing in the <u>Milhelm Attea</u> case which even
suggests that liability under § 471 is not operative absent
regulations.

Moreover, it is significant to note that if the
comprehensive 1988 DTF regulations were found by the Supreme
Court to not impose an excessive burden on Native American
traders, then surely Morrison's ability to simply purchase
stamped cigarettes from licensed wholesaler/stamping agents for
resale to non-Native Americans on the reservation, and unstamped
cigarettes for resale to qualified Native Americans, cannot be
deemed excessive.

6.  <u>Conclusions as to Defendant's Regulatory Arguments</u>

In sum, the Court rejects defendant's arguments that
the absence of implementing regulations under § 471 precludes
prosecution under the CCTA.  The 1988 regulations, which were
later repealed, and the enactment of, and later amendment to, §
471-e, were attempts by New York State to solve its problem of
enforcement.  But as the Court has stated many times in this
case, the failure of the executive branch to enforce the law
cannot undermine the viability of a statute duly enacted by the
legislature.  Moreover, the absence of any language in the
relevant New York Tax Law requiring the DTF to prescribe
regulations as a condition precedent to statutory liability

precludes any finding that § 471 is not operative absent the
implementation of a formal regulatory program.

    B.  <u>Change in Theory</u>[19]

        Defendant argues that Count Two should be dismissed
because (1) the government relied solely on an "off-reservation"
theory of prosecution until the Court granted defendant's Rule 29
motion as to Count One's Racketeering Acts Five through Eighty,
and (2) the Court erred when it permitted the government to
change its theory mid-trial and present Count Two to the jury
under a new theory of "on-reservation" sales.

        The government's response to defendant's change of
theory claim is as follows:

        In the context of opposing defendant's
        entrapment-by-estoppel and due process
        claims, the government consistently argued
        that § 471-e had no applicability to this
        case.  Notwithstanding the obvious mis-
        communication that led to the dismissal of
        Racketeering Acts ("RAs") 5 to 80 for
        purposes of Count One [discussed <u>infra</u>], the
        government never asserted, as claimed by the
        defense here, that the defendant's criminal
        liability rested upon proof that, in addition
        to selling un-taxed cigarettes to Peace Pipe
        customers, the defendant subsequently
        performed additional conduct to aid and abet
        in the re-sale of those same cigarettes off
        the reservation.  To the contrary, the
        government sought to prevent the defendant's
        attempts to conflate, and thereby confuse for

────────────────────

        [19]  For purposes of discussion, the Court addresses
defendant's change of theory argument before it reaches
defendant's substantive due process claim, although these
arguments are addressed in reverse order in defendant's brief.

the jury, the regulatory history of Tax Law §
471-e with evidence of the defendant's aiding
and abetting the evasion of the state's
cigarette tax requirements by selling un-
taxed cigarettes to Peace Pipe customers whom
he knew were re-selling to consumers.

(Gov't's Mem. in Opp'n at 7.)

The threshold question, then, is whether the government
did change its theory. However, before addressing that issue, a
brief overview of the relevant portions of the indictment will be
provided.

1. <u>Racketeering Acts Five Through Eighty</u>

Defendant's change of theory argument pertains to
Racketeering Acts Five through Eighty which charge the defendant
with selling contraband cigarettes. Specifically, the indictment
alleges:

On or about the dates set forth below,
within the Eastern District of New York, the
defendant RODNEY ARNOLDO MORRISON, together
with others, knowingly and intentionally sold
and distributed contraband cigarettes, to
wit: the approximate quantity of cigarettes
set forth below, lacking valid New York State
tax stamps, in violation of Title 18, United
States Code, Sections 2342(a) and 2 [; the
foregoing language is followed by a table
with three columns setting forth the number
of each of the racketeering acts, the date of
each transaction, and the approximate
quantity of the cigarettes sold at the Peace
Pipe on that date - which ranged from 60,400
cigarettes for Racketeering Act 80 to 328,400
cigarettes for Racketeering Act 79.[20]]

---

[20] 60,000 cigarettes corresponds to about 300 cartons.

(Indictment ¶ 21, at 9, docket no. 95.)

The Court views the gravamen of paragraph 21, when read in conjunction with other portions of the indictment including the "Enterprise" allegations, as being that defendant, either personally and/or (under § 2 of Title 18 U.S.C.) as an "aider and abettor" <u>in the sense</u> that he "command[ed], induce[d] or procure[d]" certain actions by Peace Pipe employees and others, violated § 2342(a) by the on-reservation sales.[21]  Indeed, although the issue has not been broached by either party, it appears that had a conviction been returned on the theory and concomitant proof that defendant aided and abetted the cigarette purchasers listed in Racketeering Acts Five through Eighty to violate the CCTA by reselling unstamped cigarettes to third parties — either by simply furnishing the product,[22] or by providing additional assistance vis-a-vis such resales — that conviction would be subject to vacatur as a constructive

_____

[21] Defendant, as his counsel explained during his opening statement, also viewed the indictment as charging on-reservation sales.  (Tr. at 409 ("This is the actual allegation against Mr. Morrison, that he knowingly and intentionally sold and distributed contraband cigarettes, to wit: The approximate quantity of the cigarettes set forth below [referring to chart in paragraph 21 of the indictment], lacking valid New York State tax stamps. . . .  In the indictment . . . you will see what you have is that these [referring to Racketeering Acts 4 through 80] are alleged sales of cigarettes by Peace Pipe on these particular dates in question.").)

[22] Assuming that such conduct, arguendo and contrary to the fact (<u>see</u> note 27 <u>infra</u>), standing alone, would render Morrison an aider and abettor under § 2(a).

amendment to the CCTA charge in the indictment.

      2.    During its Case-in-Chief, the Government
            Confined its Theory of Prosecution Regarding
            the CCTA Racketeering Acts to 18 U.S.C. § 2 and
            <u>Off-Reservation Sales</u>

Simply put, defendant has the better side of the argument based on what occurred prior to the Rule 29 motion being granted as to Racketeering Acts Five through Eighty of Count One. Thus, in the government's October 18, 2007 letter brief pertaining to entrapment by estoppel, the Court was advised that "[Morrison's] liability in this case will be determined on evidence that he knowingly and intentionally aided and abetted others in sales and distribution of untaxed cigarettes off the reservation." (Gov't's Oct. 18, 2007 Letter at 2, docket no. 372.)

On November 14, 2007, before opening statements, the Court provided its understanding of the government's theory of prosecution: "In the decision[23] I said, in essence, that the government's theory of this case is, under Section 2 of Title 18 United States Code, that Mr. Morrison aided and abetted individuals who bought product on the reservation and sold the product off the reservation." (Tr. at 122.) The government did not object to this characterization of its theory and consistent

---

    [23] <u>United States v. Morrison</u>, 2007 WL 3274697 (E.D.N.Y. November 5, 2007), vacated on other grounds by bench decision dated February 27, 2008. (Tr. at 9491-9502.)

therewith, appeared to define its theory of prosecution in its opening statement as aiding and abetting off-reservation sales. (Id. at 215-18.)

The Court represented this understanding of the government's theory during defense counsel's opening statement by instructing the jury that the government alleged that defendant had the "specific intent of aiding the . . . non-Indian who bought the cigarettes on the reservation, to then sell them off the reservation without the appropriate taxes . . . ." (Id. at 434.)

The Court distributed its draft, and ultimately unused charge on the CCTA acts on February 27, 2008 (id. at 9459), wherein I described the government's theory thusly:

> [T]he government maintains that the defendant
> is criminally responsible for violations of
> CCTA because he aided and abetted others to
> commit violations of CCTA. Those others, it
> is alleged, consist of individuals who
> purchased contraband cigarettes at Peace
> Pipe, or Smokersden.com for resale to third
> parties off reservation. The government is
> not, and the word not here is underscored,
> the government is not claiming that the sales
> made by Peace Pipe and Smokersden.com to such
> parties violated CCTA.

(Id. at 10536-37.)

The government agreed that the above language accurately depicted its position. (Id. at 9480 ("And I think your Honor has correctly phrased the government's position here.").) In fact, the government, while still pursuing its off-

reservation theory, made a suggestion, out of the presence of the jury, that the Court include within its charge an instruction that on-reservation sales did not violate the CCTA, apparently referring to sales not only to Native Americans but also to non-Native Americans.  Id. at 9482.

Based on the above, all of which occurred before I ruled on defendant's Rule 29 motion directed at the CCTA Racketeering Acts in Count One, I concluded then, as I do now, that the government was proceeding exclusively on the theory that defendant aided and abetted big customers — by selling to them huge amounts of product[24] — which defendant understood would be resold to third parties in an unstamped condition.[25]

_____

[24]  No evidence was presented to the jury suggesting that defendant was involved in the resale of those cigarettes to third parties.

[25]  Parenthetically, before the defendant interjected the forbearance policy and the defense of entrapment by estoppel into the pretrial proceedings, the government's position focused on on-reservation sales.  (See Gov't's letter dated May 25, 2007 but filed September 19, 2007 at 1, docket no. 337, referring to exhibits later admitted at trial evidencing on-reservation sales and the government's intent to rely on such documents "in support of the charges".)  That the defendant understood the government's then position is evident from the defendant's October 16, 2007 letter brief in which it was argued that notwithstanding this Court's conclusion that the forbearance policy did not render on-reservation sales non-taxable events, the "policy of 'forbearance' . . . rendered § 471 unenforceable as applied to reservation cigarette sales."  (Def.'s Oct. 16, 2007 Letter at 1, docket no. 367 (emphasis in original).)

3.    The Court Dismisses the CCTA
      Racketeering Acts as to Count One

After the government rested, and by motion filed
February 28, 2008 (docket no. 636), defendant moved for judgment
of acquittal on, inter alia, Racketeering Acts Four through
Eighty under Rule 29(a) as to Count One.  By bench decision dated
March 4, 2008, the Court reiterated that since October 2007, the
government had indicated that it was relying solely on an aiding
and abetting theory of liability under 18 U.S.C. § 2 with regard
to Racketeering Acts Five through Eighty, viz. that Morrison
aided and abetted the individuals who purchased his cigarettes on
the reservation in committing violations of the CCTA when they
resold the cigarettes off-reservation.  In order to prove that
Morrison was guilty of aiding and abetting the purchasers in
their resale of contraband cigarettes, the Court held, the
government was required to prove, inter alia, that the purchasers
violated the CCTA.[26]  (Tr. at 9925.)  Because there was no
evidence in the record from which a reasonable trier of fact
could so conclude,  as explained in the March 4, 2008 bench

_____

    [26]  See, e.g., United States v. Frampton, 382 F.3d 213, 223
(2d Cir. 2004) ("In order to secure a conviction for aiding and
abetting under 18 U.S.C. § 2(a), the Government must prove: (1)
that the underlying crime was committed by someone other than the
defendant; and (2) that the defendant either acted or failed to
act with the specific intent of enabling its commission.")
(emphasis added).

decision (id. at 9925-32),[27] the Court granted defendant's motion to dismiss Racketeering Acts Five through Eighty with regard to Count One, the substantive RICO count.[28]  (Id. at 9942-43.)

The dismissal was granted because the government's off-reservation theory was not supported by the proof.  In fact, no resale evidence was before the jury.  However, I noted then (id. at 10696-697), as I do now, that there was abundant evidence in the record consistent with the on-reservation charge returned by the grand jury to deny defendant's motion to dismiss the CCTA Racketeering Acts as to Count One had the government not relied exclusively on its off-reservation theory.  Be that as it may, however, the Court was barred from revisiting its ruling as to Count One upon the government's request in its letter brief of March 10, 2008 that I do so because the bench decision of March

---

[27] With respect to the government's initial off-reservation theory, it is, of course, highly probable that the purchasers of the cigarettes sold by Peace Pipe as alleged in Racketeering Acts Five through Eighty resold the product given the large quantities involved.  That does not necessarily mean, however, that those purchasers violated the CCTA because, e.g., the resales may not have involved over 60,000 cigarettes per transaction or the sales may have occurred overseas or in jurisdictions in the United States that do not require stamps to be affixed.

[28] With respect to the constructive amendment question, the Court, by way of a prefatory statement during its bench decision dismissing Racketeering Acts Four through Eighty of Count One stated: "I'm assuming that that theory [i.e. the off-reservation theory] is not inconsistent with what the grand jury has charged. In other words, it's not some type of, in effect, amendment as to the charges faced by the defendant.  I take no position on that matter, and it has nothing to do with my decision in this regard."  (Tr. at 9926-27.)

4th was immediately entered upon its issuance, thus becoming a final order. (Id. at 10768 (citing Smith v. Massachusetts, 543 U.S. 462, 473 (2005).)

> ### 4. The Court Reserves Decision on Defendant's Motion to Dismiss the CCTA Racketeering Acts as to Count Two

By motion filed March 6, 2008, defendant moved to dismiss the CCTA Racketeering Acts as to Count Two, RICO conspiracy, arguing that the Court's prior decision as to Count One "inflict[ed] a fatal blow to [Racketeering Acts] 4-80 in Count Two." (Docket no. 652 at 2.) During oral argument on the motion, the government stated that it had never been "its position that the resale by a purchaser constituted the CCTA act transaction." (Tr. at 10526.) Rather, according to the government, the CCTA violation occurred at the time defendant sold contraband cigarettes on the reservation. (Id. at 10534.) When asked by the Court about its apparent change of position, the government responded that it had misunderstood the Court's characterization of its theory. (Id. at 10527-30; see also id. at 10792 where government proffers that the "indictment speaks for itself," that the government's proof pertained to "sale[s] from the Peace Pipe," and that "it was never the government's contention that the resale [by the Peace Pipe's big customers] formed the basis of the aiding and abetting [under Count One] or for that matter the conspiracy liability [under Count Two]".)

45

On March 11, 2008, the Court reserved decision on defendant's Rule 29(b) motion to dismiss the CCTA Racketeering Acts from Count Two. (Id. at 10779; see also id. at 10791.) Noting that the RICO conspiracy charge was a separate charge from the substantive RICO charge, the Court provided its preliminary view that it was not bound by collateral estoppel or the law of the case doctrine to dismiss the CCTA Racketeering Acts from Count Two merely because it had dismissed them from Count One. (Id. at 10780-81.)  The Court also stated, following oral argument, that it did not appear that the defendant would be prejudiced should the case go forward on an on-reservation sales theory.  (Id. at 10781.)  Thus, the CCTA Racketeering Acts were presented to the jury under Count Two, RICO conspiracy.

5.    The Parties' Arguments

Defendant argues that "[t]he CCTA Racketeering Acts incorporated into Count Two – and therefore Count Two itself – should be dismissed for the same reason the Court dismissed these same acts as charged in Count One, i.e., insufficient evidence to prove the government's theory of prosecution that Mr. Morrison aided and abetted off-reservation cigarette sales in violation of the CCTA." (Def.'s Mem. of Law in Supp. at 36.)  Essentially, defendant contends that "there is no question that the government not only committed exclusively to an 'aiding and abetting off-reservation sales' theory in its case-in-chief, but also

46

explicitly disavowed (and therefore waived) any reliance on an on-reservation sales theory." (Def.'s Mem. of Law in Supp. at 37 (emphasis in original).) Citing various cases dealing with bill of particulars and changes in theory, defendant maintains that the Court erred in permitting the government to change its theory after defendant had filed his Rule 29 motion.

The government's response is limited to arguing that defendant's conviction under Count Two for racketeering conspiracy is supported by sufficient evidence and cites no case law, nor attempts to distinguish defendant's cases, relating to its change of position. Nevertheless, defendant's motion is denied because: (1) the indictment charged defendant with substantive violations of the CCTA, along with a corresponding conspiracy count, both involving on-reservation sales; (2) the evidence at trial overwhelmingly supported the jury's verdict as to Count Two under the on-reservation theory articulated by the government before commencement of defendant's case; and (3) defendant has pointed out no prejudice resulting from the government's change of theory. Point (1) has already been discussed. Points (2) and (3) will be addressed now.

> 6.    No Prejudice to Defendant Shown From
>        Government's Change in Theory, and
>        Overwhelming Evidence Supports Jury's
>        Verdict as to Count Two

The outcome of defendant's attack on Count Two under discussion turns on whether he was prejudiced by the government's

change of theory.

The relationship between a conviction which is the product of the government's change of theory during trial and resulting prejudice, or lack thereof, is addressed in <u>United States v. Mapp</u>, 170 F.3d 328 (2d Cir. 1999). In <u>Mapp</u>, defendant Kevin Moore ("Moore") was convicted, inter alia, of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1). <u>Id.</u> at 330. As a predicate for its prosecution under § 1959, the government contended that Moore murdered the victim in violation of New York Penal Law § 125.25(3), New York's felony murder statute. <u>Id.</u> at 335. The district court instructed the jury that it could find Moore guilty of having violated § 1959 if it concluded, inter alia, that Moore had murdered the victim in violation of § 125.25(3). <u>Id.</u>

After it began deliberating, the jury sent the district court a note asking whether Moore could be found guilty of violating § 1959 if he did not either carry or use the gun involved in the murder. <u>Id.</u> at 337. The court initially responded by reminding the jury of the court's charge under § 1959, including the requirement that the government prove that Moore murdered the victim in violation of N.Y. Penal Law § 125.25(3). <u>Id.</u> The court then supplemented its original charge by informing the jury that it could find Moore guilty of violating that statute if it found that Moore or another

participant in the robbery caused the victim's death.  Id.
Before giving its supplemental instruction, Moore was given the
opportunity to offer additional argument and/or evidence but
declined.  Id.

In rejecting Moore's argument that the district court
violated his Fifth Amendment right to due process by charging the
supplemental instruction, the Second Circuit stated as follows:

> In these circumstances, we believe that
> Moore's challenge to the district court's
> decision to give this supplemental jury
> instruction lacks merit.  Notably, Moore does
> not claim that the supplemental jury
> instruction deviated from the charges
> contained in the indictment.  Nor does he
> maintain that there was any legal error in
> the content of the instruction.  Instead,
> Moore argues only that the instruction
> "changed the government's theory of
> liability" on the section 1959 charge and
> that he might have asserted additional
> defenses at trial if he had known that such
> an instruction would be given.  But this
> contention is unpersuasive because, even now,
> Moore is silent as to what those defenses
> might be.  Finally, by giving him the
> opportunity to respond by presenting
> additional evidence or argument to the jury,
> the district court carefully avoided causing
> Moore any arguable prejudice in the giving of
> the supplemental instruction.

Id.

Here, as in Mapp, the government's changed theory that
the CCTA violation occurred when Morrison sold contraband
cigarettes on-reservation is consistent with the language of the
indictment.  As noted, the CCTA Racketeering Acts charge Morrison

with selling and distributing contraband cigarettes.  Each racketeering act has a corresponding date and number representing the approximate quantity of cigarettes sold by Peace Pipe on that particular date.  The evidence at trial revealed that these sales occurred on-reservation.

Moreover, the evidence at trial overwhelmingly supported Morrison's conviction on this charge, to wit, that Morrison entered into a conspiracy in which the goal was to sell and distribute contraband cigarettes on-reservation.  Defendant does not dispute the sufficiency of the evidence in this regard.  Instead, he argues solely that there was insufficient evidence to prove the government's theory that defendant aided and abetted off-reservation sales and that the government should not have been permitted to change its theory so late in the game.  But, as noted, that argument is directly at odds with the holding in Mapp.

Defendant also fails to demonstrate in a persuasive fashion how he was prejudiced by having the on-reservation theory presented to the jury.  Citing to Rule 29, defendant argues that he has been prejudiced because, even though "the Court suggested that any prejudice encountered as a result of counsel's failure to ask certain questions of government witnesses when they were first called could be remedied by calling them anew, and an adjournment might be granted to mitigate any additional

prejudice, Mr. Morrison is entitled to have his Rule 29(a) motion decided based on the government's proof and theory of prosecution espoused during its case-in-chief, rather than being required to rely on a renewed Rule 29 motion at the close of all the evidence." (Def.'s Mem. of Law in Supp. at 47.) Rule 29(b) provides that "[i]f the court reserves decision, it must decide the motion on the basis of the <u>evidence</u> at the time the ruling was reserved." Fed. R. Crim. P. 29(b), (emphasis added to indicate that operative word for present purposes is "evidence"). The Court did that; Morrison's Rule 29 motion, with respect to which the Court reserved decision, is being denied based on the evidence as it existed at the conclusion of the government's case-in-chief. Absent from Rule 29 is language which would preclude the Court from making its determination consistent with the on-reservation charging language in the indictment even though the government did not initially espouse that theory. Defendant provides no authority to the contrary.

Defendant also attempts to demonstrate prejudice by asserting that the change in theory prejudiced his ability to effectively cross-examine particular witnesses:

> Had we known during the government's case
> that its theory of liability would shift back
> to on-reservation sales we would have
> questioned several of the government's
> witnesses more thoroughly regarding Mr.
> Morrison's day-to-day involvement in the
> Peace Pipe generally, and his involvement in
> the charged sales in particular. We would

51

have questioned Allison Stewart, Thomasina
Mack, Wynette Randall and Tony Phillips fully
and forcefully about Mr. Morrison's semi-
retired status, his frequent trips, his often
absentee status, his lack of knowledge
regarding particular sales, and related
matters, to distance himself from
[Racketeering Acts] 4-80.  Our failure to do
so will inevitably be viewed by the jury as a
tacit admission that Mr. Morrison in fact is
liable for these sales.  Trying to undue that
impression by recalling these witnesses on
the defense case will serve only to re-
enforce our failure to have addressed these
issues previously.  It would also require the
defense to call witnesses whose credibility,
for the most part we have destroyed, to now
suggest they are worthy of belief.  It will,
as well, infringe on our right to rely solely
on the government's proof, or lack of proof
during its presentation of the evidence and
to refrain from calling particular witnesses
during the defense case.  And it violates on
our Sixth Amendment right to confront – in an
appropriate and timely fashion – the
government's witnesses with an understanding
of the theory of prosecution.

(Def.'s Mar. 11, 2008 Letter at 7, docket no 660, incorporated by

reference in Def.'s Mem. of Law in Supp. at 47.)

Morrison, unlike the defendant in Mapp, does indicate

what he would have done differently during the trial but for the

government's change in theory.  As indicated in the above excerpt

from his letter brief, cross-examination of several government

witnesses would have been more expansive "regarding Mr.

Morrison's day-to-day involvement in the Peace Pipe generally,

and his involvement in the charged sales in particular."  (Id.)

That claim does not ring true.  Firstly, it is unclear why the

non-pursued line of inquiry would not be germane under both the on-reservation and off-reservation theories if the point sought to be made was that defendant's absence from Peace Pipe created the likelihood that the charged Racketeering Act sales were made without his knowledge and complicity. But beyond that, this is simply a non-issue under either an on-reservation or off-reservation theory.

Defendant does not suggest that further cross-examination of government witnesses would have included an effort to show that the sales listed in Racketeering Acts Five through Eighty never occurred. In that regard, the defendant was careful to underscore for the jury during his closing argument that the government's documentary proof regarding those sales consisted of the thorough and meticulously maintained documents kept by the Peace Pipe,[29] which documents were recovered during the search of the premises. Indeed, the fact that defendant kept such records was proffered by the defense as evidence that he believed such

_____

[29] (See defendant's closing argument, Tr. at 12068-69 ("Mr. Morrison demanded that detailed records be kept. . . . And Mr. Morrison demanded that all of these records that were being generated at Peace Pipe, the cashier's receipts, he demanded they be kept, and kept for a period of three years. Now, we know that the government has now taken those same documents and used them to prosecute Mr. Morrison. . . . You know the documents they are using to prosecute Mr. Morrison for these CCTA violations, other than the documents – that they are the documents that came from his business.").)

sales were lawful,[30] which was essentially the sole defense to
the CCTA charges advanced during the evidentiary portion of the
trial and emphasized during defendant's opening and closing
arguments.[31]

The notion that the sales might have been made by some
errant employee of the Peace Pipe is at odds with what the
defendant told the jury during opening and closing statements.
The tenor of those statements was that defendant was an excellent
businessman who, aided by employees he selected, trained, and
whose activities he assiduously monitored, transformed a modest
operation (which he founded in 1994) into a highly efficient,
extremely profitable establishment.[32]  Simply put, Morrison,

---

[30]  (See Tr. at 12069 ("[D]oes it [i.e. someone who
maintained such thorough sales records] sound like someone who
was out to commit [a] crime. . . .").)

[31]  (See, e.g., defendant's opening statement at Tr. at 409
("Indian retailers sell untaxed cigarettes on the Indian
reservation[s].  It's what they are allowed to do."); id. at 495
("[W]e think the evidence is going to show that Mr. Morrison had
the belief that he had every right to sell untaxed cigarettes to
. . . non-Native Americans and Native Americans whenever they
came to his business, and that to do it was, in fact, not a
violation of the law, and that the government will have to prove
otherwise."); id. at 496 ("[H]e [Morrison] felt that what he was
doing was absolutely legal. . . ."), and his closing argument,
id. at 12081 ("He [Morrison] sold cigarettes on the
reservation."); id. at 12068 (referring to defendant's carefully
prepared and maintained Peace Pipe sales records constituting the
government's documentary proof regarding Racketeering Acts Five
through Eighty).)

[32]  (See defendant's opening statement, Tr. at 390 ("Rodney
had a great head for business, and Rodney [ran] the business for
Charlotte."); id. at 403 ("That's what the building [the Peace

consistent with the defendant's unflagging theory throughout the trial, was the man-in-charge of the Peace Pipe, the business of which was selling unstamped cigarettes, purportedly under the belief that such sales were lawful. Which is to say, whether the defendant personally, or one or more of his employees, handled the subject, essentially uncontested sales is a non-issue.

Moreover, defense counsel's representations as to Morrison's tight control over the operations of Peace Pipe, made both during defendant's opening and closing arguments, dovetail with the evidence at trial. (See generally Gov't's Mem. in Opp'n at 10-12 which provides an accurate synopsis of the evidence concerning defendant's largely uncontested micro-management of the Peace Pipe.) Under the circumstances, the claimed prejudice to the defendant attributable to the government's change in theory is out of sync with the trial record, including the trial record after it was clear that the government was proceeding based on an on-reservation sales theory. Accordingly, the claim of prejudice is found to be without merit.

─────────────────────

Pipe] looked like before Rodney turned it into an extraordinarily well-run lucrative business."); and his closing argument, id. at 11914 ("First of all, he [defendant] is filthy rich. And that has been made into a sin in this courtroom. He had lots of money. And he worked hard to get it, too. You saw videotape of his operation, spotless, well-organized, high-tech, absolutely a pinpoint in every business way, bar coding, absolutely spotless record-keeping. . . . Worked hard, all hours of the morning, had a code of conduct he believed ought to be followed, made everybody dress well, made them punctual, made them do their jobs, inspected whether they did it or not.").)

Even if, contrary to the fact, the defendant was prejudiced by the government's change in theory, such prejudice could have been obviated by the defense utilizing the opportunity to recall witnesses and to have the matter adjourned, if necessary, for that purpose. See Mapp, 170 F.3d at 337 ("Finally, by giving him the opportunity to respond by presenting additional evidence or argument to the jury, the district court carefully avoided causing Moore any arguable prejudice in the giving of the supplemental instruction."); cf. the following belated disclosure cases which discuss claims of prejudice and the ability to recall witnesses: United States v. Houlihan, 92 F.3d 1271, 1291 (1st Cir. 1996) ("The rule is clear that a defendant's failure to recall a witness, despite permission to do so, undermines a claim of prejudice based on a disclosure that materialized after the witness finished testifying (but before the trial ended)."); United States v. Gordon, 844 F.2d 1397, 1403 (9th Cir. 1988) (finding that where defendant was allowed to recall witnesses and re-examine them regarding belatedly disclosed evidence, defendant "had substantial opportunity to use the [evidence] and to cure any prejudice caused by the delayed disclosure"); United States v. Mourad, 729 F.2d 195, 199 (2d Cir. 1984) (reversal not warranted notwithstanding government's failure to timely produce evidence favorable to defendants given defendants did not request a continuance, recall witnesses for

56

further examination, or introduce rebuttal evidence, in an effort to neutralize the claimed prejudice).

Defendant also claims that "[r]egardless of whether collateral estoppel or law of the case applies, the government's commitment to a particular theory of prosecution, repeated <u>ad nauseam</u> and for strategic advantage,[33] certainly was no less binding on the government (and probably more so) than would be a formal bill of particulars, to which the government is strictly held." (Def.'s Mem. of Law in Supp. at 43.) For that pivotal threshold proposition — i.e. essentially equating a stated theory of prosecution to information furnished in a bill of particulars — one case is cited, <u>United States v. Hickey</u>, 16 F. Supp. 2d 223 (E.D.N.Y. 1998). Therein, as defendant accurately notes, I said: "The government's explanation of its theory of this prosecution — which will be treated as the equivalent of a bill of particulars

---

[33] With respect to the government's change in theory, its initial reliance on an off-reservation theory was to its detriment, not its benefit. Thus, defendant's motion to dismiss the CCTA Racketeering Acts in Count One was granted based on the government's adherence to the off-reservation theory even though the evidence adduced overwhelmingly established the on-reservation charges alleged in the indictment.

The off-reservation theory initially advanced by the government appears to be a misguided effort to remove the issue of the forbearance policy and concomitant entrapment by estoppel defense from being placed before the jury. However, the end result of that process was that such evidence was placed before the jury, although ultimately, as explained in the text <u>infra</u>, the defense of entrapment by estoppel was not included in the Court's charge.

— provides further specificity." <u>Id.</u> at 233.

In <u>Hickey</u>, defendants attacked the legal sufficiency of a mail fraud racketeering act and corresponding substantive count (Racketeering Act One(C) and Count Six), claiming, inter alia, that the indictment "fail[ed] to provide adequate notice concerning the nature of the charge." <u>Id.</u> at 232. In rejecting that claim, I indicated: "Racketeering Act One(C) and Count Six, when read in conjunction with the introductory paragraphs of the Indictment, provide sufficient notice of the charges." <u>Id.</u> at 233. In addition, I made reference to the government's response to the motion to dismiss which included a "synopsis . . . of relevant provisions in the Indictment," which synopsis included the conclusory statement that "[t]he government intends to prove at trial that these false pretenses were material to customers, and that the customers were deprived of money thereby." <u>Id.</u> It was within that context that the cited statement was made. It was not meant to indicate that a theory of prosecution espoused by the government is as immutably fixed in the proceeding as defendant contends is the case for a bill of particulars. In fact, <u>Mapp</u>, by obvious implication, instructs to the contrary.

Finally, for the reasons that follow, none of the cases cited by defendant compels a different result. For example, in <u>United States v. Chase</u>, No. 2:04-CR-135, 2005 WL 3288731 (D. Vt. Nov. 30, 2005), the government was precluded from proceeding

under a theory that was "not contained in the Indictment" and
which would have "constitute[d] an improper constructive
amendment." Id. at *4; see also id. at *5-7.  In United States
v. Mittelstaedt, 31 F.3d 1208 (2d Cir. 1994), the Second Circuit
"refuse[d] to affirm" a conviction based on a theory that was
"nowhere mentioned in the indictment, was not argued to the jury,
and was not addressed in the jury charge." Id. at 1220.  Because
the government's changed theory in the instant case to on-
reservation sales was both explicitly alleged in the indictment,
and presented to the jury both via evidence and the Court's
charge, these cases are inapposite.

        In Marine Midland Bank, N.A. v. United States, Nos. 93
Civ. 0307, 93 Civ. 0357, 1993 WL 248796 (S.D.N.Y. June 28, 1993),
aff'd in relevant part and remanded, 11 F.3d 1119 (2d Cir. 1993),
a civil forfeiture case, the government seized funds from an
interbank account at Marine Midland Bank, N.A. ("Marine Midland")
under 18 U.S.C. § 981.  1993 WL 248796, at *1-2.  That statute
subjects money or property to forfeiture that is "involved on" or
"traceable to" certain specified transactions.  The government's
civil forfeiture complaint alleged both theories.  Id. at *2.

        After Marine Midland moved for return of the seized
funds, the government argued in both its opposition papers and at
oral argument that it had probable cause to seize the account
based on a theory that it was "involved in" the unauthorized

transactions and expressly disavowed a "traceable to" theory.
Id. at *4.  Thereafter, the district court granted Marine
Midland's motion for release of the funds to the extent it found
the funds were not "involved in" the specified transactions.
Id. at *3.  The government then moved for reconsideration,
arguing that it had probable cause to seize the entirety of the
account under a "traceable" theory.  Id. at *4.

    In adhering to its original decision, the court
explained that after the initial motion had been fully submitted
and argued but before the court issued its original decision, the
government asserted for the first time, via letter "as well as in
other subsequent submissions and representations," that it was
proceeding under a "traceable proceeds" theory.  Id.  The court
found, however, that "[t]he Government's last-minute change of
tactic, although advanced prior to the issuance of the Court's
Opinion, was too late . . . ."  Id.  It followed, therefore, that
the government's new theory could not "in fairness be regarded as
an appropriate ground for reconsideration of th[e] Court's prior
decision."  Id.

    In affirming the lower court's finding of waiver, the
Second Circuit stated:

        Under these circumstances, we believe that
        the court acted within its discretion in
        finding that the government raised the
        "traceable proceeds" theory too late to be
        considered by the court.  Ruiz v.
        Commissioner of Dep't of Transp. of the City

60

> of New York, 858 F.2d 898, 902 (2d Cir. 1988)
> (holding that the district court has
> discretion to reject a claim raised on a
> motion for reargument).  Our review of the
> record satisfied us that the court was not
> clearly erroneous in relying on the
> government's own statements.

11 F.3d at 1123.

In the instant case, defendant argues that as in Marine Midland, the government's change of theory "came too late in the day." (Def.'s Mem. of Law in Supp. at 46.)

However, absent from Marine Midland is any suggestion by the Circuit that had the district court ruled differently by finding non-waiver, such a determination would have been an abuse of discretion.  Plus, it warrants mention that the change in theory in the instant case occurred considerably earlier in the case, i.e. before the defendant started his case as distinct from after all submissions and accompanying arguments had been completed.  Simply put, Marine Midland does not warrant the conclusion that the government should have been barred from pursuing its on-reservation sales theory under the circumstances of this case.[34]

---

[34]  Although not cited in the briefs, defendant placed much emphasis at trial on United States v. San Juan, 545 F.2d 314 (2d Cir. 1976).  (See Def.'s Mar. 12, 2008 Letter at 1-2, docket no 662.) In that case, the indictment charged San Juan with failing to report money transported into the United States but did not specify whether the failure occurred on the bus or at the customs house.  Id. at 315-16.  At trial, both the government and San Juan proceeded under a theory that the crime occurred on the bus. Id. at 318.  The court's charge, however, left room for the jury

In sum, the Court finds that its dismissal of the CCTA Racketeering Acts under Count One (substantive RICO) did not mandate dismissal of these acts under Count Two (RICO conspiracy) on the ground that the government was prevented from changing its theory of prosecution.

C.    Defendant's Motion to Dismiss Count Two on Substantive Due Process Grounds is Denied

Defendant argues that his conviction under Count Two (RICO conspiracy) was a violation of his substantive due process rights.  Though stated in different ways throughout his briefs, defendant's argument essentially boils down to this one claim: Because of the long-standing state policy of forbearance, an ordinary Native American retailer would not have understood that New York law "require[d]" a stamp on on-reservation cigarette sales.  See 18 U.S.C. § 2341(2) (defining contraband cigarettes as cigarettes "which bear no evidence of the payment of applicable State or local cigarette taxes . . . if the State or

_____

to convict her even if it found that the crime occurred at the customs house.  Id. at 319.  The Second Circuit reversed her conviction, finding that the manner in which the case was tried was "manifestly unfair to defendant" because San Juan was effectively denied an opportunity to address the accusation that the crime occurred in the customs house.  Id.  In San Juan, the changed theory was incorporated into the jury charge and the defendant was never given the opportunity to present additional evidence or argument to the jury.  Here, the government changed its theory after its case-in-chief and defendant had a chance to respond to the new theory.

local government <u>requires</u> a stamp . . . .") (emphasis added).

For the reasons set forth below, the Court rejects defendant's

claim that a plainly worded statute can be rendered

unconstitutionally vague due to the failure of the executive

branch to enforce what the law clearly proscribes.  Accordingly,

defendant's motion is denied.

1.    <u>Procedural Posture for Motion</u>

The government does not address the substance of

defendant's due process claim.  Instead, the government argues

that defendant's alleged due process violation is beyond the

purview of a Rule 29 or Rule 33 motion as it has already been

ruled on.  The government also contends that to the extent

defendant's motion is a motion for reconsideration (<u>see</u> docket

no. 662), it is untimely and does "not raise any additional or

new information such that the Court would reverse its earlier

ruling." (Gov't's Mem. in Opp'n at 20.)  The government is

mistaken.

Defendant moved pre-trial to dismiss the CCTA

Racketeering Acts based on substantive due process grounds.  That

motion was denied by Memorandum and Order dated November 9,

2007,[35] with the attendant analysis of defendant's void for

vagueness challenge confined solely to the government's then

---

[35]    <u>United States v. Morrison</u>, 521 F. Supp. 2d 246, which is
hereby incorporated herein by reference.

theory that Morrison was an aider and abettor of off-reservation contraband cigarette sales. After finding that the statutes underlying the CCTA charges provided fair notice of the prohibited conduct in the November 9th decision, the Court added, via dicta, that even if, arguendo such were not the case, the heightened scienter requirement for § 2 culpability would cure the deficiency. Embraced within that heightened scienter requirement, I believed, was the need for the government to establish that the defendant (1) acted with the specific intent of enabling the crime's commission and (2) with knowledge of its illegality. Upon further reflection, I recognized, sua sponte, that the latter requirement, i.e. knowledge of illegality, was incorrect and so advised counsel on February 27, 2008. (Tr. at 9496-97.)

Thereafter on March 4, 2008, as discussed supra, the Court dismissed the CCTA Racketeering Acts as to Count One, finding that there was no evidence in the record to support the government's theory that Morrison aided and abetted off-reservations sales. After the Court then permitted the government to change its theory to on-reservation sales with respect to Count Two, defendant moved for reconsideration of its due process motion, arguing that "[t]he factual premise of the Court's [November 9, 2007] decision [i.e. off-reservation theory and knowledge of illegality] ha[d] been drastically altered."

(Def.'s Mar. 12, 2008 Letter, docket no. 662 at 11.)  The Court
reserved decision.  (Tr. at 11538.)

Accordingly, contrary to the government's position, the
issue is ripe for review and the Court will therefore analyze
Morrison's due process claim anew vis-a-vis the charge as
returned by the grand jury and presented to the petit jury, viz.
that Morrison knowingly conspired with others to sell unstamped
cigarettes <u>on-reservation</u>.  However, for the reasons stated
below, the Court concludes that even given the changed
circumstances, the CCTA, as applied to Morrison, did not result
in a violation of his substantive due process rights in large
measure for the reasons articulated in the November 9, 2007
decision minus the pruned dicta.

2.  <u>Applicable Standards</u>

"It is well-established that the Fourteenth Amendment,
which guarantees that no state shall 'deprive any person of life,
liberty, or property, without due process of law,' U.S. Const.
amend. XIV, § 1, ensures that the individual need not 'speculate
as to the meaning of penal statutes' and is 'entitled to be
informed as to what the State commands or forbids.'"  <u>Thibodeau
v. Portuondo</u>, 486 F.3d 61, 65 (2d Cir. 2007) (quoting <u>Lanzetta v.
New Jersey</u>, 306 U.S. 451, 453 (1939)).  Although "this doctrine
does not require 'meticulous specificity' from every statute,"
<u>id.</u> at 66 (quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 110

(1972)), "as language is necessarily marked by a degree of imprecision," id., courts do "apply a more stringent analysis when examining laws that impose criminal penalties because the consequences of imprecision are qualitatively more severe." Id.

"'As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" Gonzales v. Carhart, 550 U.S. 124, 127 S. Ct. 1610, 1628 (2007) (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)). Here, the CCTA, and the concomitant New York State Tax Law, satisfy both requirements.

    3.   Fair Notice

        a.   Standard of Review

A criminal statute fails to provide fair notice "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." Hill v. Colorado, 530 U.S. 703, 732 (2000).

        b.   The Court's November 9, 2007 Decision

In the November 9, 2007 decision, the Court summarized defendant's position as follows: "Defendant argues that an ordinary person would believe that New York does not 'require[]' a stamp and that state taxes are not 'applicable' because the State does not enforce its tax laws." Morrison, 521

F. Supp. 2d at 254.  The Court rejected defendant's argument:

> In the Court's view, Defendant's
> interpretation is strained because it relies
> solely on the executive branch's enforcement
> policies rather than the applicable State
> laws, which clearly provide that Morrison's
> sale of cigarettes to non-native Americans on
> the reservation is a taxable event.
> Defendant's interpretation essentially
> nullifies the requirements of state law as
> that term is commonly understood and reads
> the legislature right out of the picture.
> Simply stated, states "require" certain
> conduct via duly enacted laws; the failure of
> the executive branch to enforce the law is
> not the same as saying that the legislative
> branch has repealed it.  Compare
> Lenscrafters, Inc. v. Wadley, 248 F. Supp. 2d
> 705, 737 (M.D. Tenn. 2003) ("The court can
> see no basis for finding that the avowed
> benefits of a statute duly enacted by the
> legislature may be undermined by poor
> enforcement on the part of the executive
> branch.  If such were the case, the executive
> branch would be in a position to invalidate
> any law with which it disagreed."), aff'd,
> 403 F.3d 798 (6th Cir. 2005).  In addition,
> in drafting the CCTA, Congress chose the term
> "applicable" taxes, not an "enforced" tax or
> a "collected" tax, to trigger a violation.
> The term "applicable" means "capable of being
> applied."  City of N.Y. v. Beretta, 401 F.
> Supp. 2d 244, 261 (E.D.N.Y. 2005) (noting
> common dictionary definitions of word
> "applicable.").[36]  Defendant's attempt to
> equate applicability and enforceability
> belies the plain meaning of the former term
> and, thus, what an ordinary person would

---

[36]  "Section 471 is capable of being applied to the
transactions at issue in this case.  Whether the Department
chooses to enforce it in a particular instance does not nullify
the statute's requirements."  Milhelm Attea, 550 F. Supp. 2d at
347.

understand the statute to mean.[37]

Id.

The Court also noted that the two executive pronouncements Morrison placed great reliance on, to wit, a May 1997 press release by Governor Pataki and an April 1998 statement by the DTF, actually undercut defendant's position, in that they both suggested that the executive's policy of forbearance could not repeal the state law; only the legislature could do that, and it did not. Id. at 255.

> c. Defendant's Arguments as to the Changed
> Landscape do not Alter the Court's
> Previous Conclusion that Morrison was not
> Deprived of Substantive Due Process

Defendant proffers several arguments as to why the changed landscape, i.e., the fact that defendant was convicted of knowingly conspiring with others to sell unstamped cigarettes on-reservation, a general intent crime, warrants a different result on his post-verdict due process motion. For the reasons stated below, the Court finds defendant's arguments unavailing.

Regardless of whether we are talking about on-

---

[37] The Court noted that defendant's position was contrary to the view taken by courts which have addressed the issue. See Kaid, 241 Fed. Appx. at 750 (summary order) (finding that State "demand[s]" taxes be paid regardless of non-enforcement policy); Urbach, 92 N.Y.2d at 214 ("'[T]he repeal [of the regulations] does not eliminate the statutory liability for taxes as they relate to sales on Indian reservations to nonexempt individuals.'") (quoting 20 N.Y.S. Register, Apr. 29, 1998, Issue 17, Book 1, at 23).

reservation sales of unstamped cigarettes or off-reservation sales, the result is the same. The CCTA provides that "[i]t shall be unlawful for any person to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes or contraband smokeless tobacco." 18 U.S.C. § 2342(a). At the time of the acts alleged in the indictment, contraband cigarettes were defined as "a quantity in excess of 60,000 cigarettes, which bear no evidence of the payment of <u>applicable</u> State or local cigarette taxes in the State or locality where such cigarettes are found, <u>if the State or local government requires a stamp</u> . . . ." <u>Id.</u> § 2341(2) (emphasis added).

New York Tax Law § 471(1) explicitly provides that all cigarettes possessed in the state are subject to taxation except where the state is "without power to impose such tax." N.Y. Tax Law § 471(1). It is undisputed that New York State has the power to tax cigarettes sold by Native American retailers to non-Native Americans on the reservation. With regard to these cigarettes, viz. those that the State has the power to tax, § 471(2) provides the mechanism for the collection of the tax whereby a state licensed stamping agent is required to advance the amount of the tax by purchasing adhesive stamps from the state and affixing them to each package of cigarettes. <u>Id.</u> § 471(2). The stamping agent then adds the amount of the tax to the price of the cigarettes sold to its customers, which is passed along the chain

of distribution to the consumer.  Thus, by its plain language, Morrison's on-reservation sales of cigarettes were "require[d]" to be stamped under the CCTA.

This case, however, does not present the typical vagueness challenge because Morrison does not assert that the language of the CCTA or New York Tax Law § 471 is unconstitutionally vague.  In fact, he concedes that "at first blush" the "'plain English' interpretation of § 471" (Def.'s Mem. of Law in Supp. at 25) is that New York State requires that cigarettes sold on reservations to non-Native Americans be stamped.  Rather, defendant contends that the forbearance policy sufficiently muddied the waters so that a typical retailer on the reservation who had read the subject law would not have understood that selling unstamped cigarettes on-reservation was a violation of the CCTA.  The Court disagrees.

As noted by the Court in its November 9, 2007 decision, the failure to enforce by the executive branch cannot obviate, on a constitutional basis or otherwise, plainly worded state legislation.  See Morrison, 521 F. Supp. 2d at 254; see also Milhelm Attea, 550 F. Supp. 2d at 347 ("The Court rejects defendants' arguments that [the forbearance policy] . . . nullifies the requirements of a statute passed by a state's legislature and signed by its governor."); Cayuga Indian Nation, 2008 WL 5158093, at *5 ("Nor does the Tax Department's apparent

70

paralysis in this area, which has been styled a permanent

forbearance policy, rewrite or erase legislative enactments . . .

.") (internal citation omitted); Urbach, 646 N.Y.S.2d at 925

("Neither difficulty of execution nor fear of violence can

elevate the power of [the Commissioner] over the Legislature with

respect to the substantive mandates of the statute, nor enhance

the authority of the Department of Taxation and Finance by

inaction to grant additional exemptions.").  "If such were the

case, the executive branch would be in a position to invalidate

any law with which it disagreed."  Lenscrafters, Inc., 248 F.

Supp. 2d at 737.  Because there is no ambiguity in the language

of the statutes, nor in what conduct is proscribed, the Court

finds that the CCTA, as applied to Morrison, is not impermissibly

vague.

Absent any citation to the record or otherwise,

defendant states that "the Governor of the State of New York

announced that persons such as Mr. Morrison would not be

prosecuted for [selling unstamped cigarettes on the

reservation]."  (Def.'s Mem. of Law in Supp. at 2 (emphasis in

original).)  The Court's independent recollection of the over

10,000 page trial transcript does not point to any evidence

consistent with this assertion.  The Court assumes that defendant

is referring to a May 1997 press release by then-Governor Pataki,

which was discussed in the Court's November 9, 2007 decision.

71

The Court noted in that decision as follows:

> In May 1997, Governor Pataki directed the DTF to repeal its regulations governing the collection of taxes from cigarette sales at reservation stores. (Governor Pataki Press Release, dated May 22, 1997.) The press release states that the Governor "sent to the State Legislature a bill that would amend the State Tax Law to allow reservation stores to sell tax-free . . . cigarettes." (<u>Id.</u>) The Governor stated: "Let me make my message to all Indian Nations clear: It is your land, we respect your sovereignty and, if the Legislature acts as I am requesting, you will have the right to sell tax-free . . . cigarettes free from interference from New York State." (<u>Id.</u>) The Governor's proposed amendments were never passed. Thus, far from communicating that Native-American retailers such as defendant were exempt from the State Tax Law, the Governor's statement was in fact an acknowledgment that the executive's policy of forbearance could not repeal the state law; only the legislature could do that, and it did not.

<u>Morrison</u>, 521 F. Supp. 2d at 255. There is nothing in this press release which indicates that Native Americans such as Morrison would not be prosecuted for selling unstamped cigarettes on-reservation. Moreover, contrary to defendant's contention, the Court did not then, and does not now, place "undue reliance" (Def.'s Mem. of Law in Supp. at 29) on the press release in concluding that the acts of the executive branch cannot eviscerate duly enacted law. Rather, the Court merely points out that the press release does not support defendant's assertions.

Defendant attempts to expand the scope of the forbearance policy to the other branches of government by arguing

that the forbearance policy "has been widely perceived as the policy of the 'state,' as the term is used in 18 U.S.C. § 2341(2), by all of the branches of the State government" (Def.'s Mem. of Law in Supp. at 27 (emphasis deleted)) and argues that "any imposition of criminal liability for on-reservation cigarette sales is inconsistent with the many years and sheer volume of executive, judicial and legislative[38] actions communicating exactly the opposite — that Indian retailers will not be subject to criminal liability for such on-reservation sales." Id. at 25. Defendant contends that an ordinary Native American retailer would not have reason to believe, and according to the several on-reservation retailers who testified at trial did not in fact believe,[39] that the State of New York required cigarettes sold by Native American retailers on-reservation to be stamped.

Despite defendant's attempts to blur the lines between the three branches of government, the forbearance policy is a

---

[38] "[The] one such legislative action [proffered by defendant in support of the above argument] is the requirement for implementing regulations in § 471-e, the principal attempt by the Legislature subsequent to Attea to modify § 471 as applied to sales by Indian retailers." (Def.'s Mem. of Law in Supp. at 25, n. 15.)

[39] Assuming the accuracy of this statement, it does not answer the critical question for surely the ability of Native Americans to thwart enforcement of the law and then act as if it does not apply to them is not the same thing as saying that what the law requires is unclear.

policy by the executive branch not to enforce what is clearly
prescribed statutory liability enacted by the legislature.
Defendant tries to extend the forbearance policy to the judicial
branch by arguing that "[a]t least one state court has reviewed
the state statutory and regulatory scheme pertaining to 'state'
requirements on Indian retailers and reached a conclusion that is
diametrically opposed to the one reached by this Court." (Def.'s
Mem. of Law in Supp. at 28 (citing People v. Tracy, 764 N.Y.S.2d
585, 588 (Watertown City Ct. 2003) ("The Court finds that indians
can sell cigarettes or tobacco products to indians and non-indian
customers without collecting the taxes due upon such at the time
of the sale.")).[40]  In reaching this conclusion, the Tracy court,
citing the New York Supreme Court's decision in Urbach, reasoned
that "since the State can not reach an agreement with indians to
collect the taxes on their sales [of cigarettes on-reservation],
the State is left with collecting them from non-indian purchasers
directly," referencing New York Tax Law §§ 471-a and 471-c.
Tracy, 764 N.Y.S.2d at 588.  What the Tracy court failed to
recognize, however, is that although the Urbach court did state
that "Non-Indian purchasers of cigarettes from on-reservation
Indian retailers are required to pay the excise and sales taxes,"
Urbach, 646 N.Y.S.2d at 921, it never said that on-reservation

---

[40] The defendant in Tracy was accused of evading New York's
cigarette use tax by allowing his credit card to be used to order
cigarettes from a Native American retailer online.

retailers were permitted to sell unstamped cigarettes to these purchasers.  In fact, it indicated that just the opposite was true.  See id. ("There is currently no legal impediment whatsoever to the determination, assessment, collection and enforcement of cigarette . . . sales tax on sales to non-Indian purchasers by on-reservation Indian retailers.  Yet, contrary to the New York tax laws and regulations, wholesale distributors continue to sell tax-free cigarettes to on-reservation Indian retailers in excess of the amount permitted by law and on-reservation Indian retailers continue to advertise and sell tax-free cigarettes and tobacco products to non-Indians at retail in violation of the tax laws and regulations.")  Similarly, the New York Court of Appeals in a later decision in Urbach noted that "'the repeal [of the regulations] does not eliminate the statutory liability for taxes as they relate to sales on Indian reservations to nonexempt individuals.'"  Urbach, 92 N.Y.2d at 214 (quoting DTR Notice, 20 N.Y.S. Register, Apr. 29, 1998, Issue 17, Book 1, at 23).  Accordingly, the Watertown City case, viewed singularly or in conjunction with the other cited State decisions addressing the on-reservation collection problem, hardly supports the notion that the judiciary's acknowledgment of the policy is evidence that the on-reservation retailers have not been provided fair notice of what the law requires.  And, again, the stamping requirement may easily be satisfied by on-reservation retailers

doing exactly what their off-reservation counterparts have done all along, viz. ordering stamped cigarettes from a state licensed wholesaler/stamping agent.

With regard to the legislative branch, defendant asserts that "[t]he Legislature has, whatever its opinion of the policy, incorporated its existence into its official deliberations." (Def.'s Mem. of Law in Supp. at 27.) Defendant posits:

> With regard to the proposed legislation in 2003 for a new § 471-e, the Tax Commissioner submitted an evaluation of the then pending bill. The Commissioner's lengthy and detailed comments to Governor Pataki regarding the bill were included in the 'bill jacket.' Those comments describe the underlying justification for why the forbearance policy was necessary:
>
> > This Part of the Budget Bill seeks to amend the Tax Law to require the Commissioner to promulgate rules and regulations necessary to implement the collection of sales and use taxes for sales made to non-native Americans on recognized reservations. The **State** has no regulatory jurisdiction on Indian reservations, and the Tribes are not inclined to assist the State in the collection of state taxes. This Part proposes no new approach or solutions to this tax collection dilemma, but, instead, mandates the adoption of regulations "necessary to implement the collections of sales and use taxes." Nothing has changed that would permit the effective enforcement of the statutes without the cooperation of

the tribes.

(Id. at 27-28 (quoting Bill Jacket to 2003 A.B. 2106, Ch. 62, Part T3 (entitled "Taxes on Sales Made to Non-Indians on Recognized Reservations") at 37 (emphasis supplied by defendant).)

        The legislature, of course, is aware of the forbearance policy and necessarily factors its existence into its efforts to somehow compel Native American on-reservation retailers to conduct their business in conformity with the clear tax and stamping requirements of § 471.  The Court rejects the defendant's  position that the existence of the forbearance policy, and the legislature's acknowledgment of its existence, somehow triggers or supports a viable substantive due process claim.  To the contrary, the hypothetical Native American on-reservation retailer of ordinary intelligence who read the applicable statutes, and was familiar with the forbearance policy, could be expected to conclude (1) that he, like his off-reservation  counterparts, was required to sell only stamped cigarettes to non-Native Americans, and (2) that the forbearance policy does not obliterate that obligation as is evident from, e.g., Governor Pataki's May 22, 1997 Press Release in which he explained that if the Legislature followed his recommendation, Native American on-reservation retailers would then "have the right to sell tax-free . . . cigarettes free from interference

from New York State"; ergo, since that recommendation was not followed, they did not have the right to sell unstamped cigarettes, i.e. such sales remained unlawful.  Indeed, absent from the voluminous materials provided or referenced by the defense on this subject is any information suggesting that an architect or implementer of New York's forbearance policy ever conveyed a message to the Native American community that forbearance equals an exemption for purposes of § 471 or the CCTA.

Finally, contrary to defendant's contentions, the fact that defendant was convicted under Count Two absent a requirement that the government prove that he acted with the specific intent to violate the law, does not warrant a finding that the statutory scheme is unconstitutional.  Because the Court has already found that the relevant language as applied to Morrison's on-reservation cigarette sales is patently clear, there are no vagueness concerns and thus no need to examine the statute's mens rea for due process purposes.  Compare Gonzales, 127 S. Ct. at 1628 ("The [Supreme] Court has made clear that scienter requirements alleviate vagueness concerns.") (emphasis added).

Defendant's citation to United States v. Hassan, 542 F.3d 968 (2d Cir. 2008) for the proposition that the CCTA as applied to Morrison is unconstitutionally vague absent an elevated scienter requirement is unenlightening.  In Hassan,

the defendant was convicted of controlled substance and money laundering offenses involving cathinone, a Schedule I controlled substance. <u>Id.</u> at 972. The defendant had imported and distributed khat, a plant commonly chewed or brewed in tea in West Africa. <u>Id.</u> Although khat is not a controlled substance under United States law, it may sometimes contain the controlled substance cathinone. <u>Id.</u> The defendant argued that the Controlled Substance Act ("CSA") failed to provide fair warning that the importation or distribution of khat, as opposed to its regulated ingredient cathinone, was unlawful. <u>Id.</u> at 978. The Second Circuit held that the CSA was not unconstitutionally vague, although it expressed concern that "the statutory scheme, as it relates to khat, is troubling."[41] <u>Id.</u> at 979. Nonetheless, despite the statute's "serious constitutional concerns," <u>id.</u> at 980, the court found that "what saves the . . . CSA as it relates to khat . . . from constitutional trouble is the fact that scienter is required for a conviction." <u>Id.</u> at 979.

Here, as opposed to the statute at issue in <u>Hassan</u>, no due process fair-warning concerns are implicated. Instead, the CCTA and concomitant New York Tax Law are quite simple: All

_____

[41] The court noted that "the term 'cathinone' is sufficiently obscure that persons of ordinary intelligence reading the controlled substances schedules probably would not discern that possession of khat containing cathinone . . . constitutes possession of a controlled substance." 542 F.3d at 980 (citation and internal quotation marks omitted).

cigarettes sold on a reservation to non-Native Americans must be stamped. Thus, the conduct proscribed, unstamped cigarettes, is clearly delineated. As discussed above, New York State's failure to enforce the law with regard to on-reservation sales does not invalidate the law itself nor render it unconstitutionally vague. Accordingly, <u>Hassan</u> is inapposite to the instant prosecution.

In sum, the Court finds that the statutory language of both the CCTA and § 471 was sufficiently clear, even when viewed in conjunction with the forbearance policy, to alert Morrison that the conduct he was convicted of was prohibited.

### 4. <u>Arbitrary Enforcement</u>

In the November 9, 2007 decision, the Court rejected defendant's argument that the CCTA as applied to Morrison was an arbitrary application of the law in violation of substantive due process. Much of the Court's analysis in this regard was dependent on the government's then theory of prosecution, aiding and abetting off-reservation sales. Given that this theory was not the one presented to the jury, the Court revisits defendant's argument as it applies to the count he was convicted of, viz. knowingly and intentionally becoming a member of a conspiracy the intended goal of which was to sell contraband cigarettes on-reservation.

### a. <u>Applicable Law</u>

A law is unconstitutionally vague "if it authorizes or

even encourages arbitrary and discriminatory enforcement." <u>Hill</u>, 530 U.S. at 732. "This second ground, which the Supreme Court recognizes as 'the more important aspect of the vagueness doctrine,' mandates that laws contain 'minimal guidelines to govern law enforcement.'" <u>Thibodeau</u>, 486 F.3d at 66 (quoting <u>Kolender</u>, 461 U.S. at 358). "[S]tatutes must 'provide explicit standards for those who apply' them to avoid 'resolution on an <u>ad hoc</u> and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" <u>Id.</u> (quoting <u>Grayned</u>, 408 U.S. at 108-09).

In examining challenges on this ground, the Second Circuit has instructed as follows:

> [C]ourts undertaking an as-applied challenge may determine either (1) that a statute as a general matter provides sufficiently clear standards to minimize the risk of arbitrary enforcement or (2) that, even without such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement was not the result of the unfettered discretion that law enforcement officers and factfinders might have in other, hypothetical applications of the statute.

<u>Id.</u> at 67-68.

        b.    The CCTA Provides
            <u>Sufficiently Clear Standards</u>

In arguing that the CCTA was arbitrarily applied to him, Morrison relies primarily on the fact that he is the first Native American retailer who has been prosecuted under the CCTA

81

for on-reservation cigarette sales.[42]  Noting that "[t]he state

and federal statutory schemes on which this prosecution was based

have existed in essentially their present form for over a decade"

(Def.'s Mem. of Law in Supp. at 30-31), defendant asserts:

> We recognize that there always has to be a
> first prosecution, and it is within a
> prosecutor's discretion to determine when
> that will be.  But, the more prosecuting
> authorities there are with the requisite
> jurisdiction who defer[] initiating a
> prosecution over a longer period of time, and
> the larger the potential target class is, the
> less likely it is that a single prosecution
> is other than a product of arbitrary
> enforcement.  At a minimum these
> circumstances compel the closest possible
> scrutiny for arbitrariness.

(Id. at 30.)

The Court accepts defendant's assertion that the

circumstances of this case call for careful examination.  But

beyond that, defendant's argument is unconvincing.

First, although defendant does not reference the

specific term, the defense of desuetude comes to mind.  Desuetude

is the "obscure doctrine by which a legislative enactment is

judicially abrogated following a long period of nonenforcement."

Note, Desuetude, 119 Harv. L. Rev. 2209 (2006).  As of the date

of this Note, May 2006, only one jurisdiction, the State of West

Virginia, had embraced this concept as a valid defense.  Id. at

2209, 2211.

---

[42]  The government does not contest this allegation.

Putting aside for the moment the fact that no court outside of West Virginia even recognizes the defense, the Court nonetheless notes that even assuming its general viability in this Circuit, the doctrine would be inapplicable to the facts of this case.

Desuetude is primarily rooted in eliminating laws which due to a lack of enforcement have essentially become "obsolete" or "serve no modern purpose." Desuetude, 119 Harv. L. Rev. at 2210. Neither § 471 of the New York Tax Law nor §§ 2341 and 2342 of the CCTA may be so categorized. Section 471 has governed cigarette sales in New York since its enactment. Its impotency, as distinct from its continuing applicability, pertains solely to on-reservation retailers. And, as explained in more detail below, the CCTA was enacted in 1978 to combat large-scale cigarette bootlegging. It cannot be said that the original basis for enacting the statute has ceased to apply or that the statute is otherwise out of date. In fact, tax evasion by Native American retailers continues to be a significant problem, resulting in a tremendous loss of income for New York. See Milhelm Attea, 512 U.S. at 65 (noting that in 1988 "unlawful purchases of unstamped cigarettes [by non-Native Americans from reservation retailers] deprived New York of substantial tax revenues . . . estimated at $65 million per year"); Urbach, 646 N.Y.S.2d at 921 ("Indeed, former Tax Commissioner Wetzler in 1992

83

stated that the failure to collect taxes on the sale of cigarettes . . . to non-Indians "is the largest single form of tax evasion we're aware of . . .") (quoting Wall Street Journal, July 20, 1992)).

Moreover, as discussed above, New York's failure to enforce its tax laws is not due to neglect; rather, it is due in large part to the ability of Native Americans to thwart enforcement. Attempts to enforce the New York tax law have been met with civil unrest and legislative frustration. <u>See</u> discussion <u>supra</u> at 28-29.

Finally, this is not a case where a "statute's obsolescence is indicative of a shift in public morality." 119 Harv. L. Rev. at 2212. To the contrary, there is nothing to indicate any shift in public opinion as presumably the public would not be receptive to a scheme that permits Native Americans to evade taxes in such a large-scale fashion.

Accordingly, to the extent the doctrine of desuetude breathes any life in this Circuit, it does not apply to the instant prosecution.

The second flaw in defendant's argument is that it cannot be said that the law at issue here is so vague that it accords law enforcement and juries unfettered discretion. The CCTA makes it a crime to sell or distribute "contraband cigarettes," 18 U.S.C. § 2342(a), which are defined as "a

quantity in excess of 60,000 cigarettes, which bear no evidence

of the payment of applicable State or local cigarette taxes in

the State or locality where such cigarettes are found, if the

State or local government requires a stamp . . . ." Id. §

2341(2).  The CCTA's standards are sufficiently clear because a

state requires that cigarettes be stamped if state law so

provides.  Here, as discussed above, New York Tax Law § 471

provides that all cigarettes sold on-reservation to non-Native

Americans are taxable under subdivision (1) and must be stamped

under subdivision (2).  The fact that the executive branch of New

York State is not enforcing § 471 to on-reservation sales does

not mean that it is unclear when a violation of that statute

occurs.  Indeed, as the Second Circuit found in Thibodeau, this

statutory scheme

> does not resemble the standardless laws the
> Supreme Court has found unconstitutionally
> vague-laws that, for example, required an
> individual to provide 'credible and reliable'
> identification at the request of the police
> officer without explaining how the police
> officer was to determine the credibility of
> an identification, [Kolender v. Lawson, 461
> U.S. 352, 353 (1983)], or that required
> "[t]hose generally implicated by the
> imprecise terms of the ordinance . . . to
> comport themselves according to the lifestyle
> deemed appropriate by the Jacksonville police
> and the courts," Papachristou v. City of
> Jacksonville, 405 U.S. 156, 170, 92 S. Ct.
> 839, 31 L.Ed.2d 110 (1972).  See also Smith[
> v. Goguen], 415 U.S. [566], 578, 94 S.Ct.
> 1242 [(1974)] ("The language at issue is void
> for vagueness as applied to Goguen because it
> subjected him to criminal liability under a

standard so indefinite that police, court, and jury were free to react to nothing more than their own preferences for treatment of the flag.").

486 F.3d at 68. Instead, the CCTA and § 471 give law enforcement officials clear standards on prosecutable conduct.

Moreover, as noted in the Court's November 9, 2007 decision,

> The CCTA was enacted in 1978. At the time of its enactment, the clear intent of Congress was to pass legislation to deal with large-scale cigarette bootlegging and the involvement of organized crime because the states had theretofore been unable to successfully address the problem themselves. See S. Rep. 95-962 (2d Sess. 1978), reprinted in 1978 U.S.C.C.A.N. 5518, 5526. As stated in the relevant Senate Report:
>
>> We continue to believe that many of the states most affected have not made serious commitments to the enforcement effort in this area. . . . We continue to believe strongly that primary efforts to stop cigarette smuggling must be made by the states affected. However, we recognize that federal legislation in aid of state enforcement effort may be desirable, if not essential, in light of the interstate nature of the problem.
>
> Id. Thus, contrary to Defendant's assertions, "it should of be of no surprise that the federal government would utilize the CCTA under these circumstances precisely because of the State's forbearance policy, i.e., because New York was not getting the job done itself, and not in spite of it.

Morrison, 521 F. Supp. 2d at 257-58.

The final flaw in defendant's argument is that his claim that the federal government arbitrarily chose to prosecute him alone sounds more in selective prosecution, rather than arbitrary enforcement. Although United States Attorneys enjoy broad discretion to enforce criminal laws, their discretion is subject to constitutional constraints. United States v. Armstrong, 517 U.S. 456, 464 (1996). "One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." Id. (citations and internal quotation marks omitted). To make out a claim for selective enforcement, a defendant must provide "clear evidence" that the prosecutorial decision "had a discriminatory effect and that it was motivated by a discriminatory purpose." Id. at 465 (citations and internal quotation marks omitted). The discriminatory effect prong requires a showing that "similarly situated individuals of a different [classification] were not prosecuted." Id. To establish discriminatory purpose, a defendant must establish that "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Cobb v. Pozzi, 363 F.3d 89, 110 (2d Cir. 2004).

Here, Morrison did not raise a selective prosecution claim at any point during his trial, nor did he adduce any evidence that the government's prosecution was based on bad faith or any other impermissible considerations.  It is well established that the mere fact of selective prosecution – absent evidence of intentional and purposeful discrimination on the part of the government – is not a defense to prosecution.  <u>See</u> <u>Oyler v. Boles</u>, 368 U.S. 448, 445 (1962) ("[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation."); <u>United States v. Rice</u>, 659 F.2d 524, 527 (5th Cir. 1981) ("[S]elective enforcement of the law is not in itself a constitutional violation, in the absence of invidious purpose. . . . [S]election of cases for close investigation and for prosecution (only if illegal conduct is discovered) is not impermissible simply because focused upon those most vocal in a concerted effort to encourage violation of the nation's tax laws"); <u>United States v. Catlett</u>, 584 F.2d 864, 868 (8th Cir. 1978) ("[S]election for prosecution based in part upon the potential deterrent effect on others serves a legitimate interest in promoting more general compliance with the tax laws.  Since the government lacks the means to investigate every suspected violation of the tax laws, it makes good sense to prosecute those who will receive, or are likely to receive, the attention of the media."); <u>Cruz v. Town of Cicero, Ill.</u>, No. 99 C 3286, 1999 WL

560989, at *12 (N.D. Ill. July 28, 1999) ("[A]s long as a law or regulation is rationally based, the mere failure of those who administer it to treat all persons who have violated it with complete equality does not of itself infringe the constitutional principle of equal protection. Many actions resulting in unequal enforcement are wholly unrelated to the kind that are actionable under equal protection law. The failure to enforce against all may be random, or may result from lack of resources, or an effort by the authorities to get the most 'bang for their buck' by concentrating on the most notable lawbreakers.") (citations and internal quotation marks omitted). Similarly, although it may very well be that Morrison's prosecution was unexpected by him and others similarly situated based on the forbearance policy, that does not render his prosecution constitutionally invalid.[43] Accordingly, to the extent Morrison's challenge to his conviction may be characterized as a claim for selective prosecution, his claim fails.[44]

---

[43] Cf. Cayuga Indian Nation, 2008 WL 5158093 at *11 ("The discretionary considerations which animate the Tax Department's policy of forbearance under Tax Law § 471-e cannot dictate or circumscribe the exercise of discretion vouchsafed by statute to other governmental actors, here the elected district attorneys in Seneca and Cayuga counties, under County Law § 700 to determine whether criminal charges should be brought under plainly applicable penal statutes such as Tax Law § 1814."). As noted earlier, New York Tax Law § 1814 criminalizes tax evasion under § 471.

[44] Alternatively, the Second Circuit has instructed that even if a statute does not provide sufficiently clear standards to

89

c.   <u>Lack of Scienter</u>

As indicated above in the fair notice analysis, there is no ambiguity in the language of the CCTA and what it proscribes.  Thus, there are no vagueness concerns and the lack of an elevated mens rea, in and of itself, does not render the statute unconstitutional.

In this regard, defendant's citation to <u>Colautti v. Franklin</u>, 439 U.S. 379 (1979) is inapposite.  In <u>Colautti</u>, plaintiffs challenged the constitutionality of a state statute which required a physician to determine, prior to performing an abortion, whether a fetus was or might be viable.  The Supreme Court found that the statute was plagued with ambiguity, including that it was unclear whether in determining if a fetus may be viable, the statute called for an exclusively subjective standard (based on experience and judgment) or a mixed subjective and objective standard  (based on the perspective of a cross section of the medical community).  <u>Id.</u> at 391.  The Court also noted that the vagueness of the statute was "compounded by the fact that the Act subjects the physician to potential criminal liability without regard to fault."  <u>Id.</u> at 394; <u>see also</u> <u>id.</u> at

_____

minimize the risk of arbitrary enforcement, it is not unconstitutionally vague if  "the conduct at issue falls within the core of the statute's prohibition." <u>Thibodeau</u>, 486 F.3d at 67-68.  That is the case here as New York Tax Law § 471 "requires" that all cigarettes sold to non-Native Americans on-reservation be stamped and thus defendant's conduct was a clear violation of the CCTA.  <u>See</u> 18 U.S.C. § 2341(2).

90

395 ("Because of the absence of a scienter requirement in the provision directing the physician to determine whether the fetus is or may be viable, the statute is little more than 'a trap for those who act in good faith.'").

Defendant argues that the CCTA suffers the same infirmities as the statute in <u>Colautti</u> because the Court's jury charge on the CCTA Racketeering Acts only required the jury to find that defendant "knowingly and intentionally" conspired with others to sell unstamped cigarettes in violation of the CCTA. Defendant's analogy is flawed. Here, unlike in <u>Colautti</u>, the language of the CCTA is clear and unambiguous. Thus, there are no vagueness concerns and no need to examine the statute's scienter. <u>See id.</u> ("This Court has long recognized that the constitutionality of a <u>vague statutory standard</u> is closely related to whether that standard incorporates a requirement of <u>mens rea</u>.") (emphasis added). To the extent defendant argues that the CCTA is similarly vague due to the forbearance policy, that argument has already been rejected.

5.   Conclusion as to Defendant's
     <u>Substantive Due Process Claim</u>

The Court finds that the CCTA as applied to Morrison is not unconstitutionally vague.

II.  Defendant's Motion for a New Trial as
     <u>to Count Two (RICO Conspiracy) is Denied</u>

In support of defendant's motion for a new trial on

91

Count Two, RICO Conspiracy, defendant proffers three primary arguments.  The Court will address each in turn.

   A.   Defendant's Application for a New Trial Based
        Upon the Court's Response to the Deliberating
        Jury's Note Marked as Court's Exhibit 35

        1.   Jury's Inquiry; Defendant's Proposed
             Response; and Response Provided by Court

On April 8 and 9, 2008, the deliberating jury sent two notes concerning the same subject.  The first inquiry, marked Court Exhibit 27, reads: "Does the defendant need to know the acts he intends to commit are criminal in nature to be considered entering into a conspiracy as far as Count 2?"  The next day, before the Court responded to this inquiry, alternate number 1 was substituted for one of the first twelve jurors, thereby causing deliberations to begin anew.  That same day, i.e. on April 9th, the newly constituted jury asked, as reflected in Court Exhibit 35, essentially the same question: "As it relates to Count 2, [i]f 2 [a]cts are proven[, d]oes the defendant have to know the acts that are committed are illegal or criminal in nature[ a]s the definition of conspiracy as charged on page 42 is a partnership for criminal purposes."

     The defendant submitted a letter memorandum, proffering that the Court should instruct the jury "that it may convict Mr. Morrison under Count Two (RICO Conspiracy) if and only if it finds, beyond a reasonable doubt that [he], with an understanding of the unlawful character of the conspiracy . . . intentionally

engaged, advised or assisted in it for the purpose of furthering
the illegal undertaking," citing Sand and Siffert, Instruction
19-6 (emphasis in the original). (See Apr. 8, 2008 Mem. of Law
in Supp. of Suggested Instruction in Resp. to Court Ex. 27,
docket no. 724, at 1.)[45]

         The question was not whether there is some type of
error in the portion of the Sand's charge incorporated in the
defendant's proposed response but rather whether the subject
language would be likely to answer the jury's inquiry. A fair
reading of Court Exhibit 35 indicated that the jury sought
clarification regarding the mens rea required under Count Two;
more specifically, did the term in the Court's instruction "a
partnership for criminal purposes" indicate that the defendant
had to know that the charged goal of the conspiracy was unlawful,
or would it be sufficient if the proof established that the
defendant was aware of the goal of the conspiracy (which goal
was, in fact, illegal), and armed with knowledge, he knowingly
and intentionally joined the conspiracy with the specific intent
to advance that goal. Simply adopting the language proposed by
defendant, or repeating the Court's language regarding
conspirators being involved in a "partnership for criminal

_____

[45] As noted in the text, Court Exhibits 27 and 35 are
essentially the same. Accordingly, it is undisputed that
defendant's proposed response to Court Exhibit 27 pertains to
Court Exhibit 35 as well.

purposes" would not have been responsive to the jury's expressed concern.

For the reason just noted, together with the reasons provided _infra_, the Court concluded that defendant's proposed response was incorrect, and instructed the jury thusly:

> To refresh your recollection, [your] note . . . reads as follows:
>
> ["]As it relates to count two, if two acts are proven, does the defendant have to know the acts that are committed are illegal or criminal in nature as the definition of conspiracy as charged on page 42 is a partnership for criminal purposes.["]
>
> Since you do reference that item on page 42, just to refresh your recollection, let me read that paragraph for you.
>
> It reads: ["]The crime of conspiracy is an independent crime.
>
> Conspiracy is an offense separate from the commission of any offense or offenses that may have been committed pursuant to the conspiracy.
>
> The formation of a conspiracy or as it's frequently described a partnership for . . . criminal purposes is in and of itself a crime.["]
>
> With respect to count two, I have instructed you as you know on the law of conspiracy generally and that's numbered paragraph 28 in part one and specifically as to count two, see pages 114 through 124 [of the Charge, a copy of which has been provided to each of you].
>
> Now, honing in more on your particular question, the government need not prove that the defendant knew that the goals of the

conspiracy as intended or even if
accomplished were criminal in nature.

That is, that the subject conduct violated
state or federal law.

The same is true as referenced in the
Court's instructions regarding the fourth
element that the government must prove beyond
a reasonable doubt as to the count two charge
which is to say the government must prove,
among other things, with respect to count two
that the defendant knowingly and
intentionally joined the charged conspiracy
and in so doing agreed to join forces with at
least one other person to achieve one or more
of the unlawful goals of the conspiracy.

However, unlawful in this context means
that the intended acts of the conspirators
are in fact against the law, not that a
defendant/conspirator necessarily was aware
of the illegality.

Simply put, the government is not required
to prove among the many elements that they
must prove beyond a reasonable doubt, they
are not required to prove that the defendant
knew that the charged conspiratorial goals or
the intended racketeering acts violated state
or federal law.  That is, referring back to
your note, that they were, quotes, illegal,
close quotes, or quotes, criminal in nature,
close quotes.

So, simply put, the answer to your
specific inquiry is no, that's not something
that the government has to prove.

(Tr. at 13047-49.)

    2.   Court's Bench Decision Regarding
        Response to Court Exhibit 35

As noted, the jury asked whether the defendant had to

know that the goals of the conspiracy were "illegal or criminal

in nature" for purposes of Count Two, i.e. whether such knowledge
was an element of the crime required to be proven by the
government beyond a reasonable doubt.  After receiving
considerable input from counsel, I gave a bench decision
explaining the rationale for the response that was later given to
the jury, which bench decision is hereby incorporated by
reference.  (Tr. at 13005-13.)  In the process, I cited a number
of cases including United States v. Feola, 420 U.S. 671, 686
(1975)(Court rejected Feola's argument that "Government must show
a degree of criminal intent in the conspiracy count [under Title
18 U.S.C. § 371] greater than is necessary to convict for the
substantive offense"); United States v. Ansaldi, 372 F.3d 118,
127-28 (2d Cir. 2004)(in rejecting appellants' argument that
their various conspiracy convictions could not stand because
"there was evidence in the record that they believed they were
breaking no law," the Second Circuit noted: "[i]gnorance or
mistake of law is not a defense to all criminal charges.  For the
most part, the prosecution need not show that the defendant knew
the illegality of the conduct with which he is charged.  It is
true that some crimes require proof of knowledge of a legal
requirement, and, in proving those crimes, the prosecution must
prove the requisite legal knowledge. [Appellants] were not
convicted of such a crime"); United States v. Baker, 63 F.3d
1478, 1493 (9th Cir. 1995)("[B]ecause the CCTA does not require

proof of intent to violate the law, the defendants can be guilty of conspiring to violate RICO even if they were not aware their actions were illegal."); <u>United States v. Scotto</u>, 641 F.2d 47, 56 (2d Cir. 1980)(Circuit explained that the trial judge erroneously charged the jury that the government was required to prove that defendant "'participated in the [RICO] conspiracy with a specific and criminal intent, that is, a purpose to violate the law,'" (quoting charge) pointing out that "the quantum of mens rea required for a RICO conspiracy conviction [is no] different from or greater than required for a substantive RICO offense"), <u>overruled on other grounds</u>, <u>Reves v. Ernst & Young</u>, 507 U.S. 170 (1993); <u>United States v. Schafer</u>, No. CR. S-05-238, 2007 WL 2121734, at *3 (E.D. Cal. July 24, 2007)("[T]he government is required only to prove that defendants agreed to commit the acts which make up the objects of the conspiracy, which here, are <u>not</u> specific intent crimes — i.e., they do not require proof of an intent to violate the law. Defendants' beliefs concerning the legality of the use of 'medicinal marijuana' are not a proper defense and evidence of their beliefs, or their reasons for those beliefs, are irrelevant to the charges.").

However, upon completion of my bench decision detailing the authority for my intended response to the jury's note, I was advised by defense counsel that I had answered the wrong question, coupled with the comment "I am aware of no circuit

court decision in modern history that has disputed the basic notion that regardless [of] whether or not a conspirator must know he's violating federal law, he still must have a general understanding that what he is doing is wrong." (Tr. at 13014-15.)

In other words, defendant argues, the appropriate question is whether the government must prove, in addition to the other elements under the RICO conspiracy, that defendant was, at the very least, generally aware that the goal of the conspiracy was "wrongful."

> 3. Instructing the Jury That the Government
> Must Prove That the Defendant, Inter Alia,
> Understood That the Goal of the Conspiracy
> was "Wrong" Would Have Been Both Non-Responsive
> to the Jury's Inquiry, as Well as an Incorrect
> Statement of the Law

In the defendant's April 8, 2008 proposed response to the jury's inquiry, he speaks of the government being required to prove that he had "an understanding of the unlawful character of the conspiracy." After the Court's bench decision, the defense shifted gears. No longer was the operative word "unlawful," perhaps given that the cases cited in the bench decision indicate that the mens rea for a conspiracy to commit a particular substantive crime is no greater than that required for the commission of the substantive crime.[46]

---

[46] Here, the goal of the RICO conspiracy, i.e. the commission of Racketeering Acts 5 though 80, did not require a mens rea

Instead, the focus of defendant's current mens rea
submission is upon the government's purported need to establish
that "Mr. Morrison had . . . a general understanding that his
alleged conspiratorial conduct was wrongful." (Def.'s Mem. of
Law in Supp. at 48.)  However, left unaddressed by the defense is
the standard to be utilized in gauging wrongfulness in the
present context.  Should I have instructed the jury in responding
to Court Exhibit 35 that the operative standard was some type of
societal norm independent of society's criminal laws, the
defendant's personal view of right and wrong, or perhaps some
other measure?  Surely that question, as to each of the possible
alternative responses, must be answered in the negative.  For the
Court to have asked the jury to make such a determination
untethered to the law would have been nonsensical.  The
appropriate reference point for determining whether an accused
had a general awareness of the "wrongful[ness]" of a
conspiratorial goal would be, of necessity, the laws which
pertain to the subject.  Simply put, the semantical shift by the
defense from "unlawful" to "wrongful" is not meaningful.
Accordingly, the authorities cited in my bench decision and

_____

beyond the knowing and intentional commission of the charged
conduct.  Accordingly, absent from the government's burden as to
the corresponding CCTA-based RICO conspiracy count was a
requirement to show that the defendant knew that such conduct was
prohibited.  <u>Baker</u>, 63 F.3d at 1493.

earlier in this decision are equally applicable to defendant's post-bench decision reconfigured argument.

The above conclusion is reinforced by reference to United States v. Cohen, 260 F.3d 68 (2d Cir. 2001), a decision not cited in my bench decision. Cohen addressed and rejected the notion that a person may not legitimately be found to be a conspirator unless it is shown that he, at the very least, appreciated "that what he is doing is wrong." (Tr. at 13015.) Cohen was charged under an eight count indictment with conspiracy and substantive offenses in violation of 18 U.S.C. § 1084. That Section prohibits a person engaged in the business of wagering from knowingly using a wire communication for the transmission in interstate or foreign commerce of bets, wagers or certain information related thereto, subject to certain exceptions which are not presently relevant.

Following his conviction, Cohen presented multiple issues to the Second Circuit, including "whether the Government was required to prove a 'corrupt motive' in connection with the conspiracy in [his] case." 260 F.3d at 71. In that regard, Cohen maintained at trial that he did not know that the goal of the charged conspiracy constituted illegal conduct. However, the "district court instructed the jurors that to convict, they needed only to find that Cohen 'knew that the deeds described in the statute as being prohibited were being done,' and that a

misinterpretation of the law, like ignorance of the law, was no excuse." Id. at 75-76. This, Cohen insisted, constituted error because it improperly eviscerated "his alleged good-faith belief about the legality of his conduct," citing People v. Powell, 63 N.Y. 88 (1875). 260 F.3d at 71.

In finding that the challenged portion of the charge was not erroneous, the Circuit: (1) specifically rejected the holding in People v. Powell, to wit that "'[p]ersons who agree to do an act innocent in itself, in good faith and without the use of criminal means, are not converted into conspirators [] because it turns out that the contemplated act was prohibited by statute,'" id. at 72 (quoting Powell, 63 N.Y. at 92); and (2) in doing so, the Cohen Court, inter alia, (a) explained that the "American Law Institute has expressly rejected Powell, [by stating that the] 'melodramatic and sinister view of conspiracy' upon which Powell was premised is no longer valid," id. at 72, and (b) cited Feola, 420 U.S. 671, in which, the Circuit explained, "the Supreme Court, in another context, rejected the notion that a federal conspiracy conviction required proof of scienter." Id. at 73. The concept of corrupt motive, specifically rejected by the Second Circuit in Cohen, is fundamentally akin to the defendant's argument that he had to possess knowledge that the goal of the conspiracy was unlawful or, under his alternate theory, generally "wrongful."

101

Reference to <u>Cohen</u>, and to the other cases discussed <u>supra</u>, compel the conclusion that defendant's argument that the government was required to establish that he had at least a general understanding of the wrongfulness of the conspiratorial goal is simply incorrect.

4.    Conclusion Regarding Response
      <u>Given to Court Exhibit 35</u>

For the reasons provided, defendant's application for a new trial as to Count Two based on the Court's response to Court Exhibit 35 is denied.  As to that Count, it was not the government's burden to prove that defendant knew that the goal of the conspiracy was "unlawful" or "wrong."[47]

---

[47] None of the cases cited by defendant, including <u>Hassan</u>, 542 F.3d 968 and <u>United States v. Jackson</u>, 180 F.3d 55 (2d Cir. 1999), supports a contrary conclusion.  A perusal of <u>Hassan</u> indicates that it is <u>sui</u> <u>generis</u> to khat prosecutions, given the largely unintelligible statutory scheme and concomitant due process concerns implicated in such prosecutions.  Absent from the holding in <u>Hassan</u> is anything which casts into doubt the well established principles of law earlier explained in this opinion.

<u>Jackson</u> is similarly unavailing to the defense.  Jackson claimed to be the illegitimate daughter of the comedian Bill Cosby.  She told him that, absent a payment of forty million dollars, she would report to the media that Cosby was her father and that he left her destitute.  As a result, Jackson was charged with threatening to injure his reputation with the intent to extort money in violation of 18 U.S.C. § 875(d) and a related conspiracy count.

Section 875(d) does not define "intent to extort."  Jackson asked the district court to instruct the jury — apparently properly, as determined on appeal — that a demand must be "wrongful" to violate the statute <u>in the sense</u> that the government must prove that the accused was not entitled to payment from the victim, nor did she believe that she was so

102

B.     The Court Properly Charged the
       Elements of the CCTA to the Jury

Defendant contends that the Court erred in its charge

by removing from the jury's consideration two elements of proof

vis-a-vis the Count Two CCTA conspiracy, to wit (1) whether New

York State law required tax stamps to be affixed to the

cigarettes sold by Peace Pipe and/or Smokersden.com as alleged in

paragraph 21 of the indictment, and (2) "whether the specific on-

reservation sales identified in [those] racketeering acts

involved Native American purchasers or other exempt persons."

(Def.'s Mem. of Law in Supp. at 54.)

To place the argument in context, the following

excerpts from the instructions to the jury are provided:

> The term "contraband cigarettes" means a
> quantity in excess of 60,000 cigarettes,
> which bears no evidence of the payment of
> applicable state cigarette taxes in the state
> where such cigarettes are found, if such
> state requires a stamp, impression, or other

---

entitled.   That request was denied, with the jury being told
that "it makes no difference whether the defendant was actually
owed any money by Bill Cosby or thought . . . she was."  Jackson,
180 F.3d at 66.  In finding the district court's instruction to
be erroneous and remanding the case for a new trial, the Circuit
explained that not all demands for money, even if coupled with a
threat to damage the person's reputation in the absence of
compliance, constitute extortion.  That holding is not
inconsistent with the Supreme Court and Circuit authority
provided earlier in the text in this decision, nor, apart from
that authority, does it even suggest that a defendant charged
under the CCTA with selling unstamped cigarettes, or conspiring
to do so, must know that his conduct is illegal or wrongful in
nature.

<u>indication to be placed on packages or other</u> <u>containers of cigarettes to evidence payment</u> <u>of cigarette taxes</u>. [footnote 10 omitted].

. . . .

C.  <u>Applicable New York Law</u>

      At this point, we will discuss the following two clauses found in the previously provided definition of contraband cigarettes: "applicable state cigarette taxes" and "if such state requires a stamp."  These clauses are significant because a CCTA violation may not occur unless the unstamped cigarettes were required to be stamped under New York Law.

      Under New York Law Section 471, insofar as presently relevant and as it existed during the time period alleged in Racketeering Acts Five through Eighty, tax stamps were required to be affixed to cigarettes sold by Peace Pipe and/or smokersden.com as alleged in paragraph 21 of the indictment. [footnote 11] [footnote 11 reads as follows:]

      A sale by Peace Pipe or smokersden.com of what otherwise would be contraband cigarettes to Native American(s) is not illegal.  However, you are <u>not</u> being called upon to determine whether the claimed conspiracy to make the sales listed in Racketeering Acts Four through Eighty were to be made to Native Americans or non-Native Americans [end of footnote 11].

      Section 471(2) provides that a state licensed wholesaler/stamping agent, in effect, advances the amount of the tax by buying cigarette stamps from the state and affixing the stamp to the cigarette packages. The stamping agent then adds the amount of the tax to the price of the cigarettes sold to its customers, with the same procedure being followed down the chain of distribution so that, ultimately, the burden of the tax

falls on the consumer.

(Docket no. 769-3 at 121-23.)

Defendant's two arguments will be addressed seriatim beginning with whether the Court committed error by informing the jury that New York Tax Law § 471 required tax stamps to be affixed to the cigarettes allegedly sold by Peace Pipe and/or Smokers.com as listed in paragraph 21 of the indictment.

1.  The Court's Instruction as to Section
    471 was Appropriate

It is well established that the Fifth and Sixth Amendments require that criminal convictions rest "upon a jury determination that the Defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." United States v. Gaudin, 515 U.S. 506, 509-510 (1995); see also Sullivan v. Louisiana, 508 U.S. 275, 277-78 (1993). Such is the case not only as to purely factual matters but also regarding mixed questions of law and fact. Gaudin, 515 U.S. at 512-13.

The above principles, however, did not, as defendant contends, citing Gaudin and United States v. Parkes, 497 F.3d 220, 227 (2d Cir. 2007), preclude the Court from instructing the jury that New York Tax Law § 471 "required [tax stamps] to be affixed to cigarettes sold by Peace Pipe and/or Smokersden.com as alleged in paragraph 21 of the Indictment." (Docket no. 769-3 at 122.) That instruction solely involved an issue of law and did not interfere with the jury's responsibility to determine factual

105

as well as mixed questions of law and fact, nor did it impinge upon the jury's ultimate role "to apply the law to [the] facts and draw the ultimate conclusion of guilt or innocence." <u>Gaudin</u>, 515 U.S. at 514. Indeed, the historically imbedded functions of court and jury would be impermissibly blurred beyond recognition had I asked the jury to determine the applicability of § 471 to the case at hand. As explained in <u>Gaudin</u>, "[i]n criminal cases . . . the judge must be permitted to instruct the jury on the law and to insist that the jury follow his instructions." <u>Id.</u> at 513.

United States v. Clements, 588 F.2d 1030, 1037 (5th Cir. 1979) is instructive. Clements was convicted under 18 U.S.C. § 1955 of engaging in a business involving five or more persons who violated state gambling laws. In seeking to set aside that conviction, defendants advanced numerous grounds including that the government failed to prove that the charged gambling business violated state law. Relatively short shrift was devoted to this ground with the Fifth Circuit simply noting that "[t]here is no question that there was a violation of Texas law" and that the court properly so charged the jury, coupled with the unremarkable but presently germane observation that "[t]he determination of the applicable state law is a question of law to be determined by the Court." <u>Id.</u>; <u>see also</u> <u>United States v. Dedman</u>, 527 F.3d 577, 587 (6th Cir. 2008)("[J]udges are still

entitled – and indeed required – to determine the applicable law, even if that law is the law of other states" and jurors are duty bound to accept "the court's determination of the applicable law"); United States v. Wynn, 987 F.2d 354, 357-58 (6th Cir. 1993) (where defendant was convicted under 18 U.S.C. § 1958 of causing another to use a telephone "with intent that a murder be committed in violation of the laws of [Tennessee]," § 1958(a), "district court . . . properly refused to direct a verdict for the defendant and did not commit error when it instructed the jury that murder violates Tennessee law"; "[o]ur judicial system requires the prosecution to prove facts, not laws . . . . In contrast [to factual elements of a crime], legal elements, even when required for culpability, may properly be part of the district court's statement of the law when it instructs the jury."). In the present case, the applicability of New York law to Racketeering Acts Five to Eighty was for the Court to decide, not the jury.

In urging a contrary conclusion, defendant relies on Gaudin and Parkes. That reliance, however, is misplaced for both of those cases implicated mixed questions of law and fact, whereas here no such inextricability exists. Gaudin was convicted of making false statements on federal loan documents in violation of 18 U.S.C. § 1001. Section 1001 provides, in essence, that whoever knowingly and willfully makes a materially

107

false statement to a government official or entity is guilty of a crime. Justice Scalia, writing for the <u>Gaudin</u> Court, explained that "whether a statement is 'material' requires the determination of at least two subsidiary questions of purely historical fact: (a) 'what statement was made?' and (b) 'what decision was the agency trying to make?' The ultimate question: (c) 'whether the statement was material to the decision,' requires applying the legal standard of materiality . . . to these historical facts." 515 U.S. at 512. As such, it presents a mixed question of law and fact for the jury, not the judge, to decide.

The defendant in <u>Parkes</u> was charged with a Hobbs Act violation under 18 U.S.C. § 1951(a). That section provides in pertinent part that "[w]hoever in any way or degree obstructs, delays, or affects commerce . . . by robbery . . . shall be guilty of a crime]." The government took the position that since the properties targeted by the robbery were controlled substances and related proceeds, and given that the relevant legislative history demonstrates that drug transactions invariably impact interstate or foreign commerce, that the judge should have instructed the jury that the interstate commerce requirement was satisfied as a matter of law. The judge ultimately — as did the Circuit upon appellate review based primarily on <u>Gaudin</u> — rejected that argument. In doing so, the Circuit held that the

fact finding process vis-a-vis the robbery's affect on interstate commerce could not be constitutionally bypassed due to the purported obviousness of the answer as seemingly proffered by the government. Again, like in <u>Gaudin</u>, the jury, not the judge was required to determine the issue.

In the present case, the issue of the applicability of New York Tax Law § 471 is not a mixed question of law and fact, unlike the "materiality" issue in <u>Gaudin</u> and the "interstate commerce" element in <u>Parkes</u>. Instead, it is simply a question of law. To the extent defendant seeks to create subsidiary factual issues akin to those articulated in <u>Gaudin</u> based on the decision of the executive branch to forego efforts to collect monies due under § 471 for on-reservation sales to non-Native Americans, defendant, not surprisingly, provides no authority for the proposition that such forbearance changes the law or creates a factual issue as to the applicability of the law. <u>See generally</u> <u>United States v. Cohen</u>, 260 F.3d 68, 77 (2d Cir. 2001)(["I]t is clear to lawyer and layman alike that an act must be permitted by law in order for it to be legal. . . . Where a state's statute declares an act to be 'unlawful,' . . . that act is not 'legal.'").

In sum, the Court believes that its statement to the jury about § 471 was appropriate for the reasons provided.

Attention will now be directed to the second claimed

flaw in the Court's CCTA conspiracy charge, to wit that the
government should have been required to prove beyond a reasonable
doubt, as part of its burden of proof, that the purchasers listed
in Racketeering Acts Five through Eighty were not Native
Americans or otherwise exempt from the prohibitions contained in
the CCTA.

>     2.   The Government was not Required to Prove That the
>          Persons or Entities That Purchased the Cigarettes
>          Referenced in Racketeering Acts Five Through Eighty
>          Were Non-Native Americans or Otherwise Exempt
>          From the CCTA

>     The jury was instructed:

>     A sale by Peace Pipe or Smokersden.com of
>     what otherwise would be contraband cigarettes
>     to Native American(s) is not illegal.
>     However, you are not being called upon to
>     determine whether the claimed conspiracy to
>     make the sales listed in Racketeering Acts
>     F[ive] through Eighty were to be made to
>     Native Americans or non-Native Americans.

(Docket no. 769-3 at 122 n. 11.)

In so instructing the jury, defendant argues the Court
erred.  The validity of that argument hinges on whether sales to
exempt individuals is a element of the crime charged, or an
affirmative defense.  See generally United States v. Mayo, 705
F.2d 62, 74 (2d Cir. 1983)("Resolution of this issue [i.e.
whether government's proof sufficient to sustain conviction of
various firearm offenses] turns on whether the final sentence of
18 U.S.C. § 921(a)(3) [excluding 'antique firearm[s]' from the
definition of prohibited firearms] establishes an affirmative

110

defense or an additional element that the government must prove to establish the crime."), overruled on other grounds, Mathews v. United States, 485 U.S. 58 (1988).

During the charge conference, the Court's view and that of the defense on this issue was framed thusly:

> THE COURT: That leads us to th[e] question as to whether the government is required to prove as part of their case the exemptions or whether that's an affirmative defense, which would require the defense to come forward with the evidence in the first instance, although the ultimate burden of proof would rest with the government? That's the question, isn't it?[48]

> MR. LEVITT: No, I don't think it is, your Honor.

> I think there is a question with regard to the exemptions, although, we, of course, believe that those exemptions have to be disproven by the government beyond a reasonable doubt.

(Tr. at 11562.)

By way of further background, it is undisputed that (1) neither party endeavored to place evidence before the jury as to

_____

[48] Defendant's statement that the Court ultimately "found that it was the defendant's burden to establish that any of the purchasers [listed in paragraph 21] were Native American" (Def.'s Mem. of Law in Supp. at 59) is misleading as is evident from a review of his accompanying citation to "Tr. 11626-28." Instead, my position was, and remains for the reasons detailed infra, that the onus or burden of coming forward with information suggesting that the purchasers are either statutorily or, via judicial decisions, exempt rests with the defendant, and that, once the matter has been so placed in controversy, the burden of proof rests solely and exclusively with the government. (Tr. at 11626-28.)

the exempt or non-exempt status of any purchasers; and (2) the
state may not tax on-reservation cigarette sales to Native
Americans for their personal consumption.  <u>Milhelm Attea</u>, 512
U.S. at 64 (citing <u>Moe</u>, 425 U.S. at 475-83).

The previously given statutory definition of
"contraband cigarettes" concludes with the language "which are in
the possession of any person <u>other than</u>" (emphasis added),
followed by a listing of exempt individuals and entities such as
"a person holding a permit issued pursuant to Chapter 52 of the
Internal Revenue Code of 1986 as a manufacturer of tobacco
products," 18 U.S.C. § 2341(2)(A), and a common carrier
transporting the cigarettes involved "under a proper bill of
lading or freight bill which states the quantity, source, and
destination" of such cigarettes.  <u>Id.</u> § 2341(2)(B).  As to such
statutory exemptions, the Supreme Court explained in <u>McKelvey v.</u>
<u>United States</u> that "it has come to be a settled rule in this
jurisdiction that an indictment or other pleading founded on a
general provision defining the elements of an offense . . . need
not negative the matter of an exception made by a proviso or
other distinct clause, whether in the same section or elsewhere,
and that it is incumbent on one who relies on such an exception
to set it up and establish it."  260 U.S. 353, 357 (1922).  <u>See</u>
<u>also</u> <u>United States v. Hill</u>, 935 F.2d 196, 199 (11th Cir.
1991)("[T]he burden of going forward to prove a statutory

exception is on the defendant.  Once the defendant has produced

clear and convincing evidence that the conduct fits within an

exception, the burden of persuasion is on the government.");

United States v. Murray, 618 F.2d 892, 901 (2d Cir. 1980)("[T]he

government bears the burden of proving non-registration or non-

entitlement once the defendant introduces evidence that he falls

within one of the statutory exemptions or exceptions.").  Indeed,

the defendant does not strenuously contend otherwise.  (Def.'s

Mem. of Law in Supp. at 59 ("While the cases relied upon by the

Court might provide authority for the proposition that the

enumerated exemptions in § 2341(2) are not elements of the

offense . . .").)

　　　　In defendant's view, however, the rule governing

statutory exceptions such as those found in § 2341(2) is

inapplicable to the exemption under discussion for Native

Americans.  (Id. ("[T]he Court mistakenly grouped the Native

American purchasers with the other exempt persons set forth in 18

U.S.C. § 2341(2).") (emphasis added).)

　　　　Specifically, as to this point the defendant argues:

> [T]he cases relied upon by the Court . . .
> are inapplicable to the issue presented
> here regarding Native American purchasers, as this
> group is not among the statutory exempt
> categories [under § 2341(2)].  Instead,
> pursuant to § 471(1), they are permitted to
> possess cigarettes "which bear no evidence of
> payment of applicable State or local taxes."
> Thus, the Court's instruction simply
> eliminated an essential element of the crime

> of sale of, or conspiracy to sell,
> "contraband cigarettes" — contained in the
> body of the definition itself and <u>not</u> in the
> list of exempt persons or entities — that
> mandates a finding that "applicable" law
> required evidence of the payment of cigarette
> taxes.

(<u>Id.</u> at 59-60.)

Presumably, defendant's use of the prefatory phrase "pursuant to § 471(1)," and the accompanying reference to § 2341(2)'s definition of "contraband cigarettes" is not meant to imply that the term "Native American" appears in either statute for, of course, it does not. Yet, § 471(1) does "except" from its tax mandate those transactions over which the "state is without power to impose such tax" (New York Tax Law § 471(1)), apparently referring to on-reservation sales to Native Americans for personal consumption consistent with Supreme Court authority. The argument being advanced by defendant, while not a model of clarity, seems to be along the following lines: (1) Supreme Court precedent establishes, and the aforementioned provision in § 471(1) recognizes, that the state may not tax on-reservation sales to Native Americans for personal consumption, (2) that exception should be read into § 2341(2)'s definition of contraband cigarettes which reads "if the State or local government requires a stamp," and (3) so read, the exemption, in effect, is found, albeit indirectly, in the definition of contraband cigarettes, rather than in the statutory listing of

114

exempt persons and entities, thus rendering the exemption status of purchasers an element of the crime charged rather than an affirmative defense. But does the determination of an exempt transaction as either an element of the crime charged or as an affirmative defense turn upon the statutory placement of the subject language?

It is undisputed that both (a) on-reservation sales to Native Americans for their own consumption, and (b) possession, for instance, by a "common carrier" (§ 2341(2)(B)) represent "exempt[ions]." (Def.'s Mem. of Law in Supp. at 59.) Placing the onus on a defendant to come forward in the first instance, thereby putting the exemption issue in play, "does not offend due process." <u>Murray</u>, 618 F.2d at 901. Moreover, treating the exemption as an affirmative defense dovetails with the language of § 471(1) which provides in relevant part that "[i]t shall be presumed that all cigarettes within the state are subject to tax until the contrary is established, and the burden of proof that any cigarettes are not taxable hereunder shall be upon the person in possession thereof." And finally, <u>McKelvey</u> instructs that exempting language gives rise to an affirmative defense whether found in "a proviso or other distinct clause whether in the same section or elsewhere." <u>McKelvey</u>, 260 U.S. at 357.

In sum, since there was no evidence placed before the jury to suggest that any of the purchasers may have been Native

Americans, and given that the onus of at least initially broaching the subject to the jury rested with defendant for the reasons indicated, the Court concludes that it properly instructed the jury concerning the CCTA portion of the charge. Defendant has furnished no authority suggesting a contrary conclusion. Defendant's motion to vacate the conviction on Count Two on this ground is denied.

      C.    Defendant's Motion for a New Trial on Count Two
            Based on Court's Refusal to Instruct the Jury
            on the Defenses of Entrapment by Estoppel and
            <u>Public Authority, and on Specific Intent, is Denied</u>

Defendant maintains that the Court erred in "declin[ing] to instruct the jury regarding the defenses of entrapment by estoppel, public authority, or lack of specific intent." (Def.'s Mem. of Law in Supp. at 60.)

Proceeding in reverse order, the issue of "specific intent" was addressed by the Court earlier in this opinion. By way of a recapitulation, the Court did charge the jury that the government was required to prove beyond a reasonable doubt that the defendant knowingly and intentionally joined the RICO conspiracy alleged, with knowledge of its goals and with the specific intent to advance those goals; the Court, however, declined, for the reasons indicated previously, to graft onto the government's burden of proof an additional element to the effect that the government must prove either that the defendant knew the goal of the conspiracy was unlawful or, at the very least, had a

116

"general understanding" that the goal was "wrongful". (Def.'s Mem. of Law in Supp. at 48.)

With respect to proffered defenses of entrapment by estoppel and public authority, I provided a bench decision on those subjects during the trial, which decision is hereby incorporated by reference. (Tr. at 11701-28.) With the hope of not being unduly repetitive, I will explain briefly, but in a more structured format, the reasons that the jury was not instructed as to either of the subject defenses. Before doing so, reference is made to the following prefatory statement made during the bench decision:

> Firstly, I recognize that if there is any evidence in the record, inferentially [or] otherwise, and construing all the evidence most favorably to the defendant to support a defense, then the defense must be presented to the jury for their determination.

(Id. at 11702.)

1. <u>Entrapment by Estoppel</u>

a. <u>Applicable Law</u>

As explained by the Second Circuit in <u>United States v. Corso</u>:

> Entrapment by estoppel applies when an authorized government official tells the defendant that certain conduct is legal and the defendant believes the official. To invoke the entrapment by estoppel defense, the defendant must show that he relied on the official's statement and that his reliance was reasonable in that a person sincerely desirous of obeying the law would have accepted the information as true and would

> not have been put on notice to make further
> inquiries. .... Judicial decisions indicate
> great caution should be exercised when it
> comes to the application of the defense.

20 F.3d 521, 528 (2d Cir. 1994)(internal quotation marks and

citations deleted).

   b.   Evidence Defendant Sought to Place
        Before the Jury as a Factual Predicate for
        the Entrapment by Estoppel Defense

The defendant sought to lay a factual predicate for an

entrapment by estoppel defense through testimony of Eric Facer

("Facer").

   c.   Government's Objections to Defendant's
        Proffer

When the government was advised that the defense sought

to call a tax attorney for various Native American tribes, viz.

Facer, to establish the defense of entrapment by estoppel, it

understandably objected on a number of grounds, including that

the proposed witness was not a government official.  Since the

subject defense requires that the claimed misrepresentation of

law be made by such an official directly to the defendant, the

prosecution insisted that testimony from Facer necessarily could

not satisfy that standard.

   d.   Court Held That Defense Could Try to
        Establish the Defense Under a Conduit Theory
        Whereby the Purported Misrepresentations of
        Law by the Governor or Other Public Officials
        Could be Relayed Through Facer

I declined to grant the government's request to

preclude the defense from endeavoring to present evidence in support of the subject defense.  Instead, I took the position that it was "appropriate that the defense have an opportunity to try to develop [the] point," noting that "[t]hey may or may not be successful."  (Tr. at 11133.)  The rule governing their efforts, however, was clearly established at the outset:

> THE COURT [addressing defense counsel]
>
> You know as well as I do what entrapment by estoppel is, and you know it is a very limited defense.  And I have never seen a case in which anyone has permitted what I'm permitting here.[49]
>
> The only reason I'm doing it is because this is an unusual situation.[50]  So I'm permitting you basically to have this witness relay without editorial comment what the governor said about these different issues.

---

[49]   In the sentence about "what I'm permitting here," my reference point was 1 L. Sand, J. Siffert, W. Loughlin & S. Reiss, Modern Federal Jury Instructions (Criminal), Introduction 8-7.1 and authorities cited in the accompanying Comment.  A juxtapositioning of defendant's proffer vis-a-vis Facer's anticipated testimony with the Sand Instruction indicates the lack of a precise fit.  Nonetheless, I concluded it was important to provide defendant with an opportunity to lay a foundation for the entrapment by estoppel defense and, accordingly, leeway was provided.

[50]   "Unusual" in the sense that to the extent decisions typically speak of direct communications between a government official and an accused, it was highly unlikely that the Governor would have had personal contact with the defendant.  Under the circumstances, it seemed to me that the Governor's statement could be communicated in other ways, including through an intermediary, even if the intermediary was unauthorized, if the statement, as relayed, was shown to be accurate and materially complete.

(<u>Id.</u> at 11095; <u>see also</u> <u>id.</u> at 11096.)  Defense counsel seemingly understood the ground rules.  (<u>Id.</u> at 11093.)

        e.    <u>Facer's Trial Testimony</u>

            i.    Meetings and Conference Calls in 1996 and Early 1997 Regarding Governor's Intention to Enforce the <u>Milhelm Attea</u> Regulations, i.e. to Attempt to Collect Taxes Due for On-Reservation Sales to <u>Non-Native Americans</u>

Eric Facer is a tax attorney with professed expertise in matters pertaining to on-reservation cigarette sales.  His experience included past service as a "lobbyist" for the Oneida Nation (Tr. at 11189), as well as being that tribe's counsel "concern[ing] cigarette taxation in the State of New York."  (<u>Id.</u> at 11087.)  Additional tax clients included "other Indian tribes outside of the State of New York."  (<u>Id.</u> at 11190.)

In late February 1996, while traveling with "leaders of the Oneida Indian Nation" to a meeting scheduled to be held on "February 23rd [and] 24th, in Buffalo, New York," Facer met the defendant.  (<u>Id.</u> at 11097.)  Those invited to the Buffalo meeting were "virtually everyone in Indian country in the State of New York with an interest" in then-Governor Pataki's recent announcement that he intended to abandon the forbearance policy and implement the <u>Milhelm Attea</u> regulations to collect the cigarette taxes due for on-reservation cigarette sales to non-Native Americans.  (<u>Id.</u>)  Approximately "150" people attended the meeting, one of whom was the defendant.  (<u>Id.</u> at 11100.)

Facer was one of "several [tax] attorneys" who spoke about the Governor's stated intentions (id. at 11101), along with possible responsive "[p]olitical . . . and business strategies" to be utilized by on-reservation retailers. (Id. at 11104.)

"[T]he Long Island . . . Shinnecocks and the Poospatucks," with defendant as one of the hosts, held a meeting on Long Island on March 2, 1996 with "virtually" the same agenda as the "meeting [in Buffalo] . . . one week earlier." (Id. at 11105.)

        ii.   Governor's May 22, 1997 Press Release Indicating he was not Going to Enforce the Milhelm Attea Regulations

Facer testified that on May 22, 1997, the Governor: (1) "announced his intention to abandon the efforts to revoke the forbearance policy" and (2) "indicated [that] the regulations of the Tax Department [which the Department] had been attempt[ing] to implement for purposes of collecting cigarettes taxes on reservations, would be repealed." (Tr. at 11146.) That information, Facer indicated, was relayed to Mr. Morrison along with "many others." (Id.) On April 29, 1998, consistent with the statement Governor Pataki issued on May 22, 1997, the Milhelm Attea Regulations were repealed by the Department of Taxation and Finance. (Id. at 11153.)

Facer acknowledged that the Governor had said during the course of his statement on May 22, 1997 that he was going to

recommend to the state legislature "that cigarettes sold by Native American retailers could be sold in unlimited quantities without collection of taxes by the state" (id. 11219) and that he "imagine[d]" that he "did not" relay that information to defendant "because [he] did not consider that the most important statement in the governor's press release." (Id. at 11223.)

After the Milhelm Attea regulations were repealed on April 29, 1998 (consistent with the Governor's representation on May 22, 1997), Facer explained the meaning of the repeal to defendant. (Id. at 11167.) Incidentally, Facer was not asked, however, whether part of that explanation included the fact, as per Facer, that the DTF indicated that, notwithstanding the repeal, on-reservation sales to non-Native Americans remained taxable events. (Id.)

> f.   Facer did not Serve as a Conduit
>      for the Governor's May 22, 1997
>      Statement for Purposes of the
>      Entrapment by Estoppel Defense

It is undisputed that the Governor's statement of May 22, 1997 had three major parts: (1) he was forgoing his efforts to enforce the Milhelm Attea regulations, thus continuing the policy of forbearance (2) he would seek the repeal of those regulations, which did come about on April 29, 1998, and (3) he would seek an amendment to § 471 of the Tax Law so that, if enacted, on-reservation retailers could sell unlimited quantities of unstamped cigarettes to non-Native Americans. The last of

those three items was obviously important.  It meant that, absent

the amendment, such on-reservation sales remained illegal.

However that significant portion of the announcement was not

relayed.  Accordingly, Facer could not be deemed the equivalent

of an authorized state official for the purposes of entrapment by

estoppel under a conduit theory given that what he told defendant

about the Governor's statement was materially incomplete.  And,

given that Facer failed in that conduit function, the question of

whether the defendant reasonably relied on the Governor's

statement is not reached.[51]

---

[51]  Parenthetically on the non-issue of reasonable reliance,
defendant claims the Court said that "nobody could reasonably
rely on the Governor's decision not to <u>collect</u> taxes which were
due under the tax law."  (Def.'s Mem. of Law in Supp. at
62)(emphasis in original).)  That statement is not presently
germane for the reason indicated in the text, but beyond that, it
is incomplete to the extent that were it relevant, it would
fundamentally alter — notwithstanding the reference to § 471 —
the import of what was said.  The full statement as reflected at
page 11726 of the transcript reads as follows:

> As a matter of law, nobody can reasonably
> rely on the governor's decision not to
> collect taxes which were due under the tax
> law, <u>and conclude from that that the</u>
> <u>obligation wasn't due</u>.  As a matter of fact,
> what the governor said indicates to the
> contrary.  He said if I can get the
> legislature to do this, quotes, you will have
> the right to sell tax-free gasoline and
> cigarettes free from interference from New
> York State (emphasis added, indicating
> portion of sentence quoted by the defense
> that was omitted).

    And as a final aside on the non-issue of reasonable
reliance, the undisputed evidence shows that defendant was making

123

For the reasons stated, the entrapment by estoppel defense was not charged to the jury.

Attention will now be directed to the public authority defense.

### 2. Public Authority Defense

The following excerpt from Unites States v. Giffen explains the public authority defense:

> Under Second Circuit law, an actual public authority defense exists where a defendant has in fact been authorized by the government to engage in what would otherwise be illegal activity. That is, the defendant's conduct was, in fact, legitimized by government action.

473 F.3d 30, 39 (2d. Cir. 2006).

A juxtapositioning of the requirements to establish a public authority defense with the facts at hand indicates that it would have been inappropriate for the Court to charge the public authority defense as requested by defendant. Simply put, there is no factual predicate, construing all the evidence most favorably to the defense, which would permit a reasonable trier

---

on-reservation sales of unstamped cigarettes to non-Native Americans well before he met Facer, thus — if the issue was reached — presumably triggering the question of how Morrison's conduct was induced by purported later misrepresentations of the law by the Governor.

It also warrants mention that absent from Facer's testimony was any indication that the Governor misrepresented the law which is the essence of the entrapment by estoppel defense.

of fact to conclude that the defendant was in fact authorized by a state official to sell unstamped cigarettes at Peace Pipe and via Smokers.com to non-Native Americans in contravention of § 471 of the New York Tax Law.

### III. Defendant's Motion to Dismiss or for a New Trial as to Count Eight (Felon In Possession Count) is Denied

Defendant was convicted under Count Eight of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), to wit a Glock model 26 9mm semi-automatic pistol, bearing Serial Number DFC-566US.  He was acquitted, however, of the same charge under Count Nine pertaining to another Glock model 26 9mm semi-automatic pistol with Serial Number DFB-265US.

Defendant maintains that "[w]hatever the jury's reason for convicting under Count Eight and not under Count Nine, there was no evidence from which the jury could find that the gun which the jury concluded Mr. Morrison possessed under whatever factual scenario it accepted in fact was the gun with this serial number." (Def.'s Mem. of Law in Supp. at 65.)  The government's response is twofold: (1) that abundant evidence was presented to the jury to support its conclusion that defendant possessed the weapon charged in Count Eight, and (2) that the cases cited by defendant in support of the relief requested are irrelevant.

Notwithstanding protestations by defendant to the contrary, the evidence presented to the jury was more than sufficient to satisfy the prosecution's burden of proof with

respect to the specific weapon listed in Count Eight, particularly when viewed, as it must be, in the light most favorable to the government.  <u>United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000).  Included within that body of evidence are the following:

A.  <u>Testimony of Allison Stewart ("Allison" or "Stewart")</u>

Stewart purchased the specific firearm identified in Count Eight on September 2, 1999 in her name, but for the defendant at his expense and at his direction.  (<u>See, e.g.</u>, Tr. at 3251, 3259-62; <u>see also</u> Gov't's Ex. ["Gx"] 284(a) and Gx 306.) After Stewart purchased that Glock for defendant, it was brought back to the Peace Pipe and was placed in defendant's desk drawer. (Tr. at 3260-62.)  Thereafter she saw <u>a</u> Glock in defendant's desk drawer many times.[52]  (<u>Id.</u> at 3281-83.)

B.  <u>Testimony of Wynette Randall ("Randall")</u>

Randall testified that, at the defendant's direction, she typed a letter to Stewart (Gx 306B-1) and placed the letter, dated September 9, 2003, in an envelope upon which she wrote "Allison" (Gx 306B-2).  (Tr. at 7497-98.)  In that letter, defendant states in pertinent part: "Thank you very much for all that you have done for me, I do appreciate it.  I am returning

_____

[52]  Stewart testified that she also purchased the Glock charged in Count Nine for defendant at his direction and expense several weeks after the acquisition of the Glock charged in Count Eight.  (Tr. at 3275-79.)  These were the only two weapons Stewart purchased for defendant.  (<u>Id.</u> at 3277.)

these items to you, I have made other pr[o]visions and I am no longer in need of them."  (Gx 306B-1.)

The items referenced by the defendant in Gx 306B-1, Randall explained, were the two handguns which she, at defendant's direction, retrieved, one from a Peace Pipe safe and the other apparently — although her testimony as to where she found the second weapon is somewhat muddled — from an office desk draw.  (Tr. at 7499-7501.)  Those weapons, together with gun boxes (Gx 307) were placed in a UPS Box (Gx 306A), which box was addressed by Randall to Stewart, sealed, and placed in a Peace Pipe safe, all at the direction of defendant.  (<u>Id.</u> at 7499-7503.)

C.    Testimony of Suffolk County Police
      <u>Detective George Herring ("Herring")</u>

Herring was a member of the team which executed the search warrant at the Peace Pipe on August 4, 2004, which team included other members of his department as well as FBI and IRS Agents.  (<u>Id.</u> at 4261-62.)  In that capacity, he took "custody of two .9 millimeter Glock pistols and some paperwork associated with the pistols, a FedEx box [later identified by the witness as the UPS box, <u>id.</u> at 4293] and some stationary."  (<u>Id.</u> at 4261.)  One of the two weapons was the Glock which is the subject of Count Nine, (<u>id.</u> at 4262-63) and the other the subject of Count Eight, that being the Glock bearing Serial Number DFC-566US received into evidence as government's exhibit 306.  (<u>Id.</u> at

4265-67.)

The UPS box, Gx 306A, — containing the gun boxes which, in turn, housed the two Glocks, Exs 306 and 308 — were found in a Peace Pipe safe (Tr. at, e.g., 4289, 4293, 4310; see also Gx 140 (a photo of the safe's interior)), consistent with the testimony of Randall.  Also recovered during the search of the Peace Pipe was the letter to Allison Stewart, Gx 306B-1, and accompanying envelope, Gx 306B-2, again consistent with Randall's testimony. Moreover, as is evident from a perusal of Stewart's and Herring's testimony as previously outlined, "the serial numbers from the two weapons seized from Peace Pipe on [that date] by Detective Herring and others, Gxs 306 and 308, matched the serial numbers from the two Glock semi-automatic handguns purchased by Allison Stewart from the Tee-Dee Gun Shop on September 2 and 16, 1999." (Gov't's Mem. in Opp'n at 32.)

D.    Defendant's September 18, 2003 Telephone
      Conversation With Stewart Regarding the two Glocks

The government introduced a consensually recorded conversation between the defendant and Stewart, which took place on September 18, 2003, wherein the defendant again admitted, in essence, constructive possession of the two Glocks.  Defendant's language during that conversation largely tracks the letter Randall typed for him approximately a week earlier, i.e. on September 9th.  Specifically, the defendant explains to Stewart on September 18th: "I'm trying to return these two black things

128

back to you, I've made other provisions if you could just get these as soon as possible." (Gx 309b at 3.) During that same conversation, defendant suggested that he return "these two black things back" to Stewart by leaving them at her "mom's house," explaining, again consistent with Randall's testimony, that he has them "all taped up . . . in a UPS box." (Id. at 3.)

Based on the above evidence, the jury could, as it did, legitimately conclude that the defendant had constructive possession of the specific weapon charged in Count Eight. In urging a contrary conclusion, the defense cites two cases, United States v. Wozniak, 126 F.3d 105 (2d Cir. 1997) and United States v. Leichtnam, 948 F.2d 370 (7th Cir. 1991). Neither case, however, is germane for present purposes.

The defendant in Wozniak was indicted for conspiracy to possess with intent to distribute a controlled substance containing cocaine and methamphetamine, possession with intent to distribute a controlled substance containing cocaine, and using communication devices to facilitate commission of the conspiracy to distribute cocaine and methamphetamine. At the trial, however, the government's proof included evidence involving Wozniak's distribution and use of marijuana and the trial court instructed the jury that "it could find guilt on the basis of transactions involving any controlled substance regardless of which illegal substance was involved." United States v. Wozniak,

126 F.3d at 106. Wozniak contended on appeal that he was the victim of a constructive amendment of the indictment in that he was required to stand trial, not only with respect to cocaine and methamphetamine transactions as charged by the grand jury, but also on uncharged conduct regarding marijuana. The Circuit agreed, resulting in the vacatur of the conviction and a remand for a new trial.

In <u>Leichtnam</u>, the defendant's home was searched at which time drugs, along with a rifle and two handguns were seized. In the resulting indictment, he was charged with various drug offenses as well as knowingly possessing the rifle during and in relation to drug trafficking in violation of 21 U.S.C. § 924(c). Nonetheless, evidence was placed before the jury concerning all three of the weapons that were seized during the course of the search. Consistent with the testimony, the court charged that the possession of either the rifle as alleged in the indictment or of either of the handguns discovered during the search would be sufficient for conviction, assuming the other elements of the § 924(c) count were established by the government beyond a reasonable doubt. This broadening of the indictment was found to be reversible error.

As explained in <u>Leichtnam</u>, "[t]he grand jury clause of the Constitution requires that proof and jury instructions must be for crimes that were 'clearly and fully set out in the

indictment' as returned by the grand jury." <u>Leichtnam</u>, 948 F.2d at 379. Yet Wozniak and Leichtnam stood trial for both charged and uncharged crimes as victims of impermissible constructive amendments. As a result, their convictions were set aside given the inability to determine the predicate conduct for those convictions. Here, in contrast to <u>Wozniak</u> and <u>Leichtnam</u>, no constructive amendment of the accusatory instrument occurred. Instead, Counts Eight and Nine each charged defendant with the illegal possession of a specific firearm, thus precluding the possibility of a conviction for a non-charged offense. And it is axiomatic that the conviction under Count Eight is not invalidated via the jury's verdict of not guilty with respect to Count Nine. <u>See</u> <u>United States v. Powell</u>, 469 U.S. 57, 62-69 (1984); <u>United States v. Acosta</u>, 17 F.3d 538, 545 (2d Cir. 1994).

In sum, for the reasons indicated, defendant's Rule 29 motion is denied as to Count Eight.

Although the caption to Point III in the Table of Contents portion of the defendant's brief refers to the Court granting a new trial pursuant to Rule 33 should defendant's dismissal motion be denied, that point is not otherwise mentioned in his submissions. In any event, a juxtapositioning of the evidence in this case against the standard for granting a new

trial[53] indicates that such relief clearly would not be appropriate with respect to Count Eight. Accordingly, to the extent a new trial is being sought as an alternative form of relief, it is denied.

CONCLUSION

For all of the above reasons, defendant's motion to dismiss Counts Two and Eight of the indictment or for a new trial is DENIED.

SO ORDERED.

Dated: Central Islip, New York
     February 6, 2009           /s_____
                                 Denis R. Hurley,
                                 United States District Judge

---

[53] See United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)("The test is whether it would be a manifest injustice to let the guilty verdict stand.") (internal quotation marks and citation omitted).