UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
UNITED STATES OF AMERICA,

        -against-

RODNEY ARNOLDO MORRISON,

           Defendant.
--------------------------------X

<u>MEMORANDUM AND ORDER</u>
04-CR-699 (DRH)(S-2)

A P P E A R A N C E S:

For the Government:
    Benton J. Campbell
    United States Attorney
    Eastern District of New York
    610 Federal Plaza
    Central Islip, New York 11722
        By: James M. Miskiewicz, A.U.S.A.
           John Joseph Durham, A.U.S.A.
           Diane C. Leonardo-Beckman, A.U.S.A.

For Defendant:
    William H. Murphy, Jr. & Associates
    12 West Madison Street
    Baltimore, MD 21201
        By: William H. Murphy, Jr., Esq.
           Kenneth W. Ravenell, Esq.

    Law Offices of Peter Smith & Associates
    389 Fort Salonga Road
    Northport, New York 11768
        By: Peter Smith, Esq.

    Daniel Nobel, Esq.
    401 Broadway - 25th Floor
    New York, New York 10013

    Levitt & Kaizer, Esqs.
    148 E. 78th Street
    New York, New York 10075
        By: Richard Levitt, Esq.

HURLEY, Senior District Judge

      The defendant Rodney Arnoldo Morrison ("defendant" or

"Morrison") stands convicted of conspiracy under the Racketeer

Influenced and Corrupt Organizations Act ("RICO") pursuant to 18 U.S.C. § 1962(d) as charged in Count Two of the second superseding indictment ("indictment"). More specifically, the jury found that he conspired to conduct the affairs of the Peace Pipe Smoke Shop (the "Enterprise" or "Peace Pipe")[1] through a pattern of racketeering via the sale of contraband cigarettes in violation of 18 U.S.C. § 2342(a).[2]

The government now seeks forfeiture in the form of a personal "money judgment . . . against the defendant" under Count Two "in accordance with 18 U.S.C. §§ 1963(a)(1) and (a)(3)('RICO forfeiture')." (Gov't's Mar. 6, 2009 Mem. of Law Regarding Certain Forfeiture Issues ("Gov't's Mar. 6, 2009 Mem.") at 1.) As a result, the Court is required to "determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1). That determination is the subject of this opinion.

BACKGROUND

Familiarity with the facts and procedural background of

---

[1]  The grand jury charged (indictment ¶ 3), and the trial evidence established that the Enterprise included not only the Peace Pipe but also smokersden.com, as well as the employees and associates of both entities and the defendant. Smokersden.com is the internet marketing component of Peace Pipe. For simplicity sake, I will, as indicated in the text, identify the Enterprise either by that term or simply as the Peace Pipe.

[2]  The defendant was also convicted of illegal possession of a firearm in violation of 18 U.S.C. § 922(g)(1) as charged in Count Eight of the indictment.

this case is presumed.  Thus, the Court states only those facts necessary for disposition of the instant matter.  The Peace Pipe is a retail and wholesale marketer of untaxed cigarettes operating on the Poospatuck Indian Reservation located in Mastic, Suffolk County, New York.  Although the business is owned by defendant's spouse Charolette Morrison (Gov't's Ex. 238 ¶¶ 4, 5; <u>see also</u> Gov't's Ex. 159b),[3] it has been operated and otherwise solely controlled by the defendant during the relevant time period.

The racketeering acts underlying Morrison's RICO conspiracy conviction entail the knowing and intentional sale of "contraband cigarettes . . . lacking valid New York State tax stamps, in violation of Title 18, United States Code, Sections 2342(a) and 2" from January 8, 1997 to August 2, 2004. (Indictment ¶ 21.) 18 U.S.C. § 2342(a) is part of the Contraband Cigarettes Trafficking Act ("CCTA"), 18 U.S.C. §§ 2341 et seq., and provides:

> It shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes or contraband smokeless tobacco.

18 U.S.C. § 2342(a).  Contraband cigarettes are defined in

---

[3]  The language in the indictment, as well as the government's brief indicating that defendant was an "owner" of the Peace Pipe (indictment ¶ 2 and, e.g., Gov't's June 15, 2009 Reply Mem. of Law Regarding Certain Forfeiture Issues at 2), is inconsistent with the trial and hearing evidence.

§ 2341 as follows:

> a quantity in excess of 60,000[4] cigarettes,
> which bear no evidence of the payment of
> applicable State or local cigarette taxes in
> the State or locality where such cigarettes
> are found, if the State or local government
> requires a stamp, impression, or other
> indication to be placed on packages or other
> containers of cigarettes to evidence payment
> of cigarette taxes, and which are in the
> possession of any person other than [setting
> forth exempted persons]

Id. § 2341(2).

Article 20 of the New York State Tax Law imposes "a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax" or on certain sales to the United States. N.Y. Tax Law § 471(1). Federal law forbids the collection of these taxes on cigarettes sold on Native American reservations to enrolled tribal members for their personal consumption. See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463 (1976). However, when cigarettes are sold on the

---

[4] At the time of the acts alleged in the indictment, "contraband cigarettes" was defined to mean a quantity in excess of 60,000 cigarettes which bore no evidence of the payment of state cigarette taxes. The statute was amended in March 2006 and the number required to trigger the provisions of the CCTA was reduced to 10,000.

Parenthetically, there are 20 cigarettes in a pack and 10 packs in a carton; thus, 60,000 cigarettes equates to 300 cartons.

reservation to non-Native Americans, the taxes may be collected.

See Washington v. Confederated Tribes of Colville Indian
Reservation, 447 U.S. 134 (1980).

In sum, a sale of unstamped cigarettes (with the
exception of on-reservation sales to a Native American for his or
her own consumption[5] and other exceptions not presently
relevant), is violative of New York Tax Law § 471(1) and, to the
extent such a sale exceeds 60,000 cigarettes, it violates §
2342(a). Conversely, a sale of unstamped cigarettes in a lesser
amount is not a matter of federal concern in the sense it does
not run afoul of federal law.

Positions of Parties

1. Government's Position

The government seeks "a money judgment from the
Defendant for the gross proceeds of the RICO enterprise, or
approximately $172,000,000." (Gov't's Mar. 13, 2009 Letter Br.
at 1; see also Gov't's June 8, 2009 Supplemental Mem. of Law
Regarding Certain Forfeiture Issues ("Gov't's June 8, 2009 Suppl.
Mem.") at 7 and Gov't's June 15, 2009 Reply Mem. of Law Regarding
Certain Forfeiture Issues ("Gov't's June 15, 2009 Reply Mem.") at
9.) This sum represents the "total amount of the gross sales of

---

[5] For a discussion of this exemption vis-a-vis the
defendant's obligation at trial to come forward with evidence
suggesting its applicability and the concomitant issue of the
ultimate burden of proof, see this Court's February 26, 2009 Am.
Memorandum and Order at 110-16.

the enterprise for [the period from January 1, 2000 through August 4, 2004]"[6] as evidenced by government's exhibit 228. (Gov't's June 8, 2009 Suppl. Mem. at 3.)

While steadfastly adhering to the position that $172,000,000 represents the appropriate number for forfeiture purposes, the government also presented information at the forfeiture hearing pertaining to an alternate theory of recovery. That alternate theory is based, not on the total cigarette sales for the relevant period, but on the CCTA sales which the government estimates to be $33,503,139.86. (See Gov't's Ex. 231.)[7] The 33 million plus figure is the result of the government reviewing the Peace Pipe sales records for 6 of the 40

_____

[6] Although the indictment charges that the Count Two racketeering conspiracy extended from "[i]n or about and between October 1996 and September 2004," the government's proof concerning the CCTA sales at trial and during the forfeiture hearing was limited essentially to the January 1, 2000 to August 4, 2004 period, i.e. from the first full year reflected in Peace Pipe's "software accounting program . . . record[ing] sales [and] purchases" installed in "late . . . 1999" (May 28, 2009 Tr. at 9-10), until the execution of the search warrant on August 4, 2004.

[7] In its June 15, 2009 Reply Memorandum, the government states that the "approximate amount of CCTA sales is $50,000,000," citing government's exhibit 272e. (June 15, 2009 Reply Mem. at 6.) However reference to government exhibit 272e, viewed in conjunction with government's exhibit 231, indicates the $50,000,000 figure represents the <u>total</u> cigarette purchases by Peace Pipe's "Big Customers," i.e. those purchasing $10,000 or more of product during the January 1, 2000 to August 4, 2004 period, rather than the amount of CCTA purchases included within that figure. Which is to say, the CCTA amount as per the government should read $33,503,139.86, not $50,000,000. (Gov't's Ex. 231.)

customers who purchased over $100,000 of unstamped cigarettes
from the Enterprise during the previously referenced period, and
determining the percentage of their total purchases which
constituted CCTA purchases, i.e. purchases in excess of 60,000
cigarettes at a time.  That percentage is approximately 66.99%.
(See May 28, 2009 Tr. at 49 and Gov't's Ex. 231.)  The percentage
was then applied by the government to the other 34 entities which
spent in excess of $100,000 as well as to other big customers
which fell within the following categories: "$10,000-$25,000,"
"$25,000-$50,000," and "$50,000-$100,000."  (Gov't's Ex. 231.)
Based on that process, the government estimates the total CCTA
sales to be $33,503,139.86.

        As explained _infra_, defendant maintains that after the
gross amount subject to forfeiture is determined, the cost of
goods sold must be deducted.[8]  In response, the government
contends, in categorizing what it incorrectly perceives to be the
defendant's argument, that "even if net profits were the
appropriate measure,"[9] which it is not, the Defendant, not the
Government, bears the burden of proving costs" which burden he

_____

        [8] The cost of goods sold deduction sought by the defense
from the gross proceeds generated by CCTA sales is limited to
Peace Pipe's direct costs, viz. what it paid to its suppliers for
the cigarettes involved.

        [9] Defendant argues that "gross profits," not net profits,
are the appropriate measure.  (Def.'s June 8, 2009 Letter Br. at
4.)

has not met.  (Gov't's June 15, 2009 Reply Mem. at 8.)

2.   Defendant's Position

        Defendant maintains that any sum subject to forfeiture

must be related to a CCTA violation and, therefore, the

government's principal argument calling for the forfeiture of all

of the sales proceeds arising from Peace Pipe's marketing of

unstamped cigarettes, whether constituting CCTA violations or

otherwise, necessarily suffers from overbreadth.

        As to the government's fall-back position, defendant

contends:

        The government's estimate that CCTA sales totaled
    $33,503,139.86 is grossly inaccurate, for two principal
    reasons.  First, Agent Wanderer's[10] average figure of
    66.99% was calculated without regard to the 0% figure
    for Tin Tin — even though Agent Wanderer testified,
    inaccurately, that "by including him in there, he
    actually pulled the rest of the percentages down" (Tr.
    53 ["Tr." references are to the May 28, 2009 transcript
    unless otherwise noted]).  Had the government in fact
    included Tin Tin in the averaging process — and there
    was no reason to not do so — then Agent Wanderer's
    inaccurate 66.99% figure is reduced to 55.67%.

        The government's percentage estimate is inaccurate
    for the additional reason that it assumes that the
    purchases of the smallest purchasers were as likely to
    be in CCTA quantities as purchases of the largest
    purchasers.  Not only is this counter-intuitive, but
    also Agent Wanderer's own Exhibit 231 suggests
    otherwise.  Taken from Exhibit 231, the six "large
    customers" analyzed by Agent Wanderer had the following
    Total Purchases, CCTA Purchases and resulting "CCTA

    _____

        [10]  Robert Wanderer, a United States Internal Revenue Service
    Agent with "approximately 36½ years" experience was the sole
    witness at the May 28, 2009 forfeiture hearing.  (May 28, 2009
    Tr. at 7.)

purchases as a % to total purchases," in descending order of total purchases:

| Customer | Total Purchases | CCTA Purchases | % CCTA |
|---|---|---|---|
| Rueben | $857,659.30 | $674,763.50 | 78.68 |
| Alz Alz | $531,209.00 | $445,337.00 | 83.83 |
| Ms Tiny | $497,499.60 | $323,338.10 | 64.99 |
| Chike Ramsay | $368,530.90 | $196,821.45 | 53.41 |
| Sand | $228,581.35 | $121,425.25 | 53.12 |
| Tin Tin | $146,339.00 | $0.00 | 0 |
| Totals | $2,629,819.15 | $1,761,685.30 | 55.67 |

The numbers in the table reflect a clear downward trend in the ratio of CCTA purchases to total purchases as the total purchases by customer decreases, and logically this trend would continue, or even accelerate, as other customers, with even smaller total purchases, are considered; after all, the largest customers would likely make a larger percentage of large wholesale purchases (as in fact is reflected in the table). Yet rather than attempting to factor this trend into its calculations the government simply assumes the same (inaccurate) percentage of CCTA purchases was made by the smallest of the "big" customers (i.e. those 2,113 customers each spending a total of $10,000-25,000 [see Exhibit 232]) as those 40 customers each spending in excess of $100,000 (see Exhibit 232).

(Def.'s June 8, 2009 Letter Br. at 2-3 (footnote omitted).)

Defendant opines that the total amount of CCTA sales should be determined by focusing solely on purchases made by those big customers who spent $100,000 or more. Purchases by that group totaled $9,136,092.53. (Gov't's Ex. 232.) That sum multiplied by defendant's 55.67% produces a CCTA revenue figure of $5,086,092. From that, the argument continues, the cost of goods sold — which defendant estimates to be approximately 85% —

should be deducted, producing a forfeitable amount of $767,909.30 representing the gross profit realized by the Peace Pipe from its CCTA sales.

And finally, on the issue of burden of proof, the defendant insists that the cost of goods sold represents part of the government's burden of proof, particularly, in his view, given that both the government and the defense have access to the same information, i.e. the defendant's financial records seized during the execution of the search warrant on August 4, 2004.

<u>Issues to be Resolved</u>

1.    Is the government entitled to a money judgment equal to the total gross receipts received by the Peace Pipe from all cigarette sales during the relevant time period, or only those receipts attributable to CCTA sales?

2.    Once the nature of the proceeds subject to forfeiture is determined, should a deduction be made from the resulting gross figure for cost of goods sold?

3.    If so, does the defendant have the burden of going forward on the issue, if not the burden of proof, or is it the government's burden to prove, not only the gross receipts, but also the amounts to be deducted therefrom as cost of goods sold?

<u>DISCUSSION</u>

1.  Proceeds Subject to Forfeiture are Limited to Those
    Derived From CCTA Sales

     As noted, the government maintains that it is entitled

to a monetary judgment commensurate with the $172,000,000 gross

revenues generated by the Peace Pipe from the sale of cigarettes

not bearing tax stamps as required by New York Tax Law § 471(1).

The theory underlying that demand is that since <u>Russello v.</u>

<u>United States</u>, 464 U.S. 16 (1983) instructs that "proceeds" are

an "interest" for purposes of § 1963(a)(1), and given that a

defendant's interest in an enterprise is forfeitable <u>in</u> <u>toto</u>,

<u>ergo</u> so are the proceeds generated by the enterprise even if, as

here, some portion of those proceeds were derived from activities

which did not violate federal law per se nor constitute

racketeering activity under § 1961(1).

     While a defendant's "entire interest in [a] RICO

enterprise [is forfeitable, independent] of the enterprise's

[degree] of criminal taint," <u>United States v. Walsh</u>, 700 F.2d

846, 857 (2d Cir. 1983), it does not follow that Morrison may be

legitimately saddled with a personal judgment based on sales not

derived from racketeering activities.  Which is to say, the

"indivisib[ility]" rule applicable to a defendant's interest in a

RICO enterprise, <u>id.</u>, is not applicable for present purposes.

     The government's request was initially identified as

premised on "§§ 1963(a)(1) and (a)(3)."  (Gov't's Mar. 6, 2009

-11-

Mem. at 1.)  However, elsewhere in its submissions references to
§ 1963(a)(2) appear.  (<u>See</u> Gov't's June 15, 2009 at 2.)  Before
discussing those three subdivisions of § 1963(a), it is important
to focus on precisely what the government is seeking and not
seeking by way of forfeiture.

While Morrison is not an owner of Peace Pipe, he, with
his spouse, is a partner in its operation.  (Gov't's Ex. 159a.)
As such, he presumably has an "interest" in the Enterprise for
purposes of § 1963(a).  Yet, the prosecution has not asked for a
money judgment matching the value of that interest (whatever it
may be), as distinct from a money judgment based on the gross
sales, i.e. "proceeds" generated by the Enterprise.  With that
recognition in mind, attention is now directed to subdivisions
(a)(1), (a)(2), and (a)(3) insofar as each relates to the
government's specific request.

18 U.S.C. § 1963(a) provides that a defendant who
violates any provision of section 1962 shall forfeit:

> (1)  any interest the person has acquired or
>      maintained in violation of section 1962;
>
> (2)  any–
>
>      (A)  interest in;
>      (B)  security of;
>      (c)  claim against; or
>      (D)  property or contractual right of any
>           kind affording a source of influence
>           over;
>
>      any enterprise which the person has
>      established, operated, controlled, conducted,

> or participated in the conduct of, in
> violation of section 1962; and
>
> (3) any property constituting, or derived from,
> any proceeds which the person obtained,
> directly or indirectly, from racketeering
> activity or unlawful debt collection in
> violation of section 1962. . . .

18 U.S.C. § 1963(a).

The pivotal distinction between the forfeiture of proceeds and the forfeiture of a defendant's interest in an enterprise vis-a-vis linkage to racketeering activity is found in the following excerpt from <u>United States v. Anguilo</u>:

> The types of property interests subject to
> forfeiture under § 1963 can be divided into
> two broad categories: (1) interests <u>in</u> a RICO
> enterprise, and (2) interests <u>outside</u> the
> enterprise.  Any interests <u>in</u> an enterprise,
> including the enterprise itself, are subject
> to forfeiture in their entirety, regardless
> of whether some portion of the enterprise is
> not tainted by the racketeering activity.  As
> the Ninth Circuit stated in <u>United States v.
> Busher</u>, 817 F.2d 1409 (9th Cir. 1987):
> "[F]orfeiture is not limited to those assets
> of a RICO enterprise that are tainted by use
> in connection with racketeering activity, but
> rather extends to the convicted person's
> entire interest in the enterprise."  <u>Id.</u> at
> 1413.
>
> The forfeiture of interests <u>outside</u> the
> enterprise, however, is subject to
> limitations.  It has been held that the
> forfeiture of outside interests is subject to
> a rule of proportionality.  <u>See</u> <u>United States
> v. Porcelli</u>, 865 F.2d 1352, 1362-65 (2d
> Cir.), <u>cert.</u> <u>denied</u>, 493 U.S. 810, 110 S.Ct.
> 53, 107 L.Ed.2d 22 (1989); <u>United States v.
> Horak</u>, 833 F.2d 1235, 1242-43 (7th Cir.
> 1987). Such outside interests include
> proceeds or profits forfeitable under §

1963(a)(1), see, e.g., Horak, 833 F.2d at
1242-43. . . .  This is in contrast to the
treatment of interests in an enterprise,
which are forfeitable regardless of
percentage of taint.

897 F.2d 1169, 1211-12 (1st Cir. 1990).  See also

Porcelli, 865 F.2d at 1364-65 (distinguishing between RICO

enterprise which is "indivisible and is forfeitable in its

entirety" and interests outside the enterprise which are

forfeitable under § 1963(a)(1) only to the extent they were

derived from racketeering activity).

The distinction between subsections (a)(1) and (a)(2)

was further explained in Horak:

Section (a)(1) focuses on the racketeering
activity and divests the convicted defendant
of all interests "acquired or maintained" by
that activity.  It is apparently irrelevant
whether such interests are part of the
charged enterprise.  Section (a)(2), on the
other hand, as discussed below, focuses on
the enterprise, not the specific racketeering
activity, and divests the convicted defendant
of all interests in the enterprise.  It would
therefore seem irrelevant (at least in terms
of the structure of the statute) whether
(a)(2) interests were directly related to the
racketeering activity of which the defendant
was convicted.

833 F.2d at 1243 (emphasis in original).

As to subsection (a)(3), the statutory language, as

well as the legislative history accompanying its enactment,

compels the conclusion that a nexus must exist between the

property sought to be forfeited and one or more racketeering

-14-

acts.  Thus subsection (a)(3) provides in pertinent part that

"any property constituting, or derived from, any proceeds which

the person obtained, directly or indirectly, <u>from racketeering</u>

<u>activity</u> or unlawful debt collection in violation of section

1962" is subject to forfeiture.  18 U.S.C. § 1963(a)(3) (emphasis

added).  And, as noted in subsection (a)(3)'s legislative

history:

> TO COME WITHIN THE SCOPE OF PARAGRAPH (3),
> PROPERTY MUST CONSTITUTE, OR BE DERIVED FROM,
> PROCEEDS THE DEFENDANT OBTAINED <u>THROUGH THE</u>
> <u>RACKETEERING ACTIVITY INVOLVED IN THE RICO</u>
> <u>VIOLATION</u>.  THUS, PROCEEDS ACCRUING TO AN
> ENTERPRISE OR ASSOCIATION INVOLVED IN A RICO
> VIOLATION WILL BE FORFEITABLE ONLY TO THE
> EXTENT THAT THEY ARE DERIVED FROM
> RACKETEERING ACTIVITY OR UNLAWFUL DEBT
> COLLECTION.  FOR EXAMPLE, IF ONLY PART OF A
> CORPORATION'S AFFAIRS WERE CONDUCTED THROUGH
> A PATTERN OF RACKETEERING ACTIVITY, THE GAIN
> PRODUCED THROUGH THIS ACTIVITY WOULD BE
> SUBJECT TO FORFEITURE BUT THE LEGITIMATELY
> PRODUCED PROFITS OF THE CORPORATION WOULD
> NOT.

S. Rep. 98-225, at 199 (1983), <u>reprinted in</u> 1984 U.S.C.C.A.N.

3182, 3382 (footnote omitted) (emphasis added).

Given that the prosecution is seeking a money judgment

based on Peace Pipe's total cigarette sales, its application is

governed by the rules relating to proceeds under subsections

1963(a)(1) and (a)(3).  That does not mean that the government

must establish a specific "nexus between the property and the

offense" since it is not seeking forfeiture of "specific

propert[ies]," Fed. R. Crim. P. 32.2(b)(1); it does mean,

however, the government must demonstrate that the amount of the requested money judgment is commensurate with the proceeds attributable to racketeering activity.[11]  Indeed, the government acknowledges as much in one of its written submissions.  (See Gov't's Mar. 6, 2009 Mem. at 4 ("The Government . . . is entitled to a judgment against the defendant for an amount of money equal to the value of the proceeds of the racketeering activity.").)[12]

Here the "racketeering activity" which is part and parcel of the RICO conspiracy conviction and the lone predicate for RICO forfeiture is found in "sections 2341-2346 (relating to trafficking in contraband cigarettes)." 18 U.S.C. § 1961(1).  To argue, as the government does, that "the Defendant was not convicted of CCTA violations [but] of conducting the affairs of a criminal enterprise" and, thus, the proceeds from all cigarette

---

[11] To the extent the government argues that all of the proceeds of the Peace Pipe are forfeitable because "[a]ll of the Defendant's cigarette sales were unlawful [under N.Y. Tax Law § 471(1)]," (Gov't's June 15, 2009 Reply Mem. at 7), the government conflates illegal activity with racketeering activity which are not necessarily synonymous.  As noted above, only proceeds that are derived from racketeering activity are forfeitable under subsections (a)(1) and (a)(3).

[12] Since RICO forfeiture is a sanction against the individual, in personam, and not against a particular asset, the Government is not obligated to trace the path of illegal proceeds.  See United States v. Robilotto, 828 F.2d 940, 948-49 (2d Cir. 1987).  In other words, it "does not matter whether the government recovers the identical dollars that the defendant received in violation of section 1962, as long as the amount that the defendant acquired in violation of the statute is known." United States v. Ginsburg, 773 F.2d 798, 801 (7th Cir. 1985) (en banc).

sales are subject to forfeiture (Gov't's Apr. 17, 2009 Reply Mem. of Law Regarding Certain Forfeiture Issues at 2), confuses the forfeitability of a defendant's interest in an enterprise with the forfeitability of the proceeds generated by that enterprise; as to the latter, the proceeds must, for the reasons indicated, be tethered to a § 1961(1) racketeering activity to be forfeitable under § 1963(a).  Only a portion of the subject $172,000,000 satisfies that condition.[13]

2.    Peace Pipe's Sales of Contraband Cigarettes
      During the January 1, 2000 - August 4, 2004
      <u>Time Period are Estimated to be $6,120,268.39</u>

      Having determined that the Peace Pipe proceeds are divisible for purposes of forfeiture, the question becomes how much of Peace Pipe's total sales of unstamped cigarettes

---

[13] To the extent the government cites <u>United States v. Fruchter</u>, 411 F.3d 377 (2d Cir. 2005) and <u>United States v. Capoccia</u>, 503 F.3d 103 (2d Cir. 2007) for the proposition that all proceeds generated by the enterprise are forfeitable – including those unrelated to racketeering activity – because defendant was convicted of a RICO conspiracy, the government is mistaken.  <u>Fruchter</u> held that acquitted conduct could form the basis for a forfeiture of "'proceeds' derived from racketeering activity," 411 F.3d at 384 (quoting 18 U.S.C. § 1963(a)(3)), provided that the court finds by a preponderance of the evidence that such activity was reasonably foreseeable to the defendant. <u>See also</u> <u>Capoccia</u>, 503 F.3d at 117-18 ("[W]e have held that a defendant may be required to forfeit all proceeds of the racketeering enterprise forming the basis of his conviction, including <u>proceeds of particular racketeering activities</u> of which the defendant was not convicted.") (emphasis added).  These cases do not hold that all proceeds are forfeitable.  In fact, the quoted language supports the opposite conclusion, viz. only "proceeds derived from racketeering activity" are forfeitable. <u>Fruchter</u>, 411 F.3d at 384 (internal quotation marks and citation omitted).

represented CCTA sales. Primarily it should be noted that the type of analysis now being undertaken does not have to be resolved with certitude; rather a reasonable estimate is permissible. United States v. Lizza Indus., Inc., 775 F.2d 492, 498 (2d Cir. 1985).

The amount forfeitable per the RICO conspiracy conviction is not limited to the CCTA racketeering acts listed in the indictment. See United States v. Capoccia, 503 F.3d 103, 117-18 (2d Cir. 2007). Defendant does not contend otherwise. Instead, he recommends, to partially reiterate, a three step process for appropriately resolving the forfeiture issue. Step one calls for calculating Peace Pipe's total sales to its 40 big customers who purchased over $100,000 of cigarettes during the subject period. That amount, $9,136,092.53, should then be multiplied under step two by defendant's CCTA percentage of 55.67%,[14] resulting in a gross CCTA sales figure for the 40 big customers of $5,086.062. From that sum, the cost of goods sold should be deducted to reflect gross profits of $767,909.30 which, in defendant's view, represents the maximum permissible

---

[14] The government's 66.99% was derived by dividing the total CCTA purchases of the six big customers listed in government's exhibit 231, $1,761,685.30, by the total cigarette purchases of the same six customers, $2,629,819.15. That methodology more accurately portrays the pivotal relationship between the CCTA and non-CCTA cigarette sales at least as to these six customers than the defendant's method of simply averaging the averages independent of the various quantities purchased by the six big customers.

forfeiture award.

Initially, it warrants underscoring that Agent Wanderer ("Wanderer") testified that he could have "asked for [and received] detailed histories" for all of Peace Pipe's big customers providing their respective CCTA purchases, not just for the six listed in government's exhibit 231. (May 28, 2009 Tr. at 65-66; see also id. at 67 (indicating the absence of such information for "the three categories below a hundred thousand; namely categories 50 to 100, . . . 25 to 50, and . . . 10 to 25").)

The government's attempt to fill that void by seeking to apply its 66.99% figure to all of the 2,426 big customers, defined as those spending over $10,000 or more (Gov't's Ex. 232), results in a gross overestimation of Peace Pipe's CCTA sales based on the evidence presented. For example, there is no reason to believe that that percentage pertains to customers who, rather than spending in excess of $100,000, spent between $10,000 and $25,000 in purchases from Peace Pipe during the four year, seven month period given that the government's estimated minimum price for a CCTA purchase is $6,200.[15] For customers in that bottom

_____

[15] The $6,200 CCTA purchase figure was based on the price charged to the largest of the big customers. (May 28, 2009 Tr. at 80.) However, the evidence demonstrates that the corresponding number for lesser customers was, at least in some instances, considerably higher than $6,200. (Id. at 78-82.) Simply put, $6,200 is the "smallest purchase that qualifies as a CCTA purchase." (Id. at 59.)

bracket of the big customer spectrum with average per customer purchases of "13,966.08" (Gov't's Ex. 232), one trip to the Peace Pipe per year, or roughly four trips, would result in average purchases well under the $6,200 threshold. That circumstance, viz. average purchases beneath the CCTA sales threshold is not, of course, incompatible with CCTA sales having occurred but, all other things equal, does significantly lessen the likelihood that the 66.99% figure is applicable to customers within this bracket. Moreover, the above information viewed in conjunction with other evidence in the record, demonstrates that the government has also failed to establish that some lesser percentage is applicable to individuals who spent between $10,000 and $25,000 at the Peace Pipe. Reference to government's exhibit 272f, entitled "BIG CUSTOMERS," shows the "[t]otal [s]ales" for each customer in the $10,000 to $25,000 bracket, together with that customer's "[t]otal [v]isits" to the Peace Pipe. (Gov't's Ex. 272f at 6 to 17.) The lowest number of visits recorded for a customer is 8, with high double and triple digit visits per customer being commonplace. Simply opining, as Wanderer did, that it "is reasonable [to assume] that there could be CCTA [purchases]" in that bracket falls far short of proving, approximately or otherwise, the existence of CCTA sales particularly in view of the frequency with which the individual customers went to the Peace Pipe. (May 28, 2009 Tr. at 64 (emphasis added).)

The same infirmity is found in the $25,000 to $50,000 bracket with 206 customers and an average total expenditure for the period of $33,318.79. (Gov't's Ex. 232.) Six visits during the time frame would bring the average expenditure per visit below the $6,200 CCTA threshold, again lessening the likelihood that the customers involved in fact made CCTA purchases on one or more of their visits. Once again reference to government's exhibit 272f indicates that the vast majority of the number of visits per customer were in double or triple digits with the lowest being "5" with the corresponding total sales figure being "25,702.00," for an average expenditure of $5,140.40. (Gov't's Ex. 272f at 6.) None of the average purchases per visit in this bracket reaches $6,200. Thus, although there may have been some CCTA sales to members in this bracket, the proof fails to demonstrate that to be the fact.

The government's proof as to CCTA sales in the $50,000 to $100,000 bracket is similarly unpersuasive. Again, there is a failure to satisfactorily explain why the 66.99% figure, or any other percentage, is germane to this bracket. While the average purchase per customer during the period is $67,194.89 for the 67 customers involved (Gov't's Ex. 232), the number of visits for each of those customers spans from 3 (Gov't's Ex. 272f at 2) to 1,560 (<u>id.</u> at 1), with most entries being in the mid to high double or triple digit range. With the exception of the average

purchase per visit for the one customer whose visits to the Peace
Pipe were limited to 3, none of the other customers in this
bracket had an average approaching $6,200.

In sum, the proof fails to substantiate the
government's claim that 66.99% of the customers in the $50,000 to
$100,000 bracket, or some meaningful lesser percentage purchased
CCTA amounts — i.e. over 60,000 unstamped cigarettes at a time —
from the Peace Pipe during the relevant time period.  The same,
as explained <u>supra</u>, may be said of the other categories below
that range, viz. the $10,000 to $25,000 and $25,000 to $50,000.[16]

The deficiencies in proof plaguing the above three
categories are not found in the $100,000 plus bracket.  As to
that bracket, the government counted the actual number of CCTA
sales during the relevant time frame for six of the biggest
customers, and then extrapolated the resulting percentage of CCTA
to total cigarette sales to that bracket's other 34 big
customers.  I accept that process as providing a reasonable
estimate of gross proceeds realized by the Peace Pipe from its
CCTA sales to customers in the $100,000 plus category.  In that

---

[16] This conclusion is further bolstered by the fact that, as
defendant points out, "[t]he numbers in [government's exhibit 231
regarding the percentage of CCTA purchases of six big customers]
reflect a clear downward trend in the ratio of CCTA purchases to
total purchases as the total purchases by customer decreases, and
logically this trend would continue, or even accelerate, as other
customers, with even smaller total purchases, are considered . .
. ."  (Def.'s June 8, 2009 Letter Br. at 3.)

regard, it warrants mention that the government's total amount of cigarette sales to the forty customers in that bracket, together with the non-CCTA and CCTA cigarette sales made to each of the aforementioned six customers and concomitant individual percentages between the two types of sales, are all incorporated into the first step of the defendant's forfeiture argument; his objections are confined to the prosecution's combined 66.99% figure, and the application of that, or any other percentage to the other three, lesser categories. The Court has rejected the first of these arguments, and accepted the second. In any event, for the reasons indicated, I find that the total CCTA sales of the Peace Pipe were approximately $6,120,268.39 ($9,136,092.53 x 66.99%).

Attention will next be directed to defendant's position that the cost of the CCTA cigarettes to the Peace Pipe should be deducted from the gross receipts realized from their sale to obtain the amount subject to forfeiture.

3.    ALTHOUGH IT APPEARS THAT IT WOULD BE APPROPRIATE TO
      DEDUCT WHAT PEACE PIPE PAID FOR THE CCTA CIGARETTES
      FROM THE CORRESPONDING GROSS SALES IN DETERMINING THE
      AMOUNT SUBJECT TO FORFEITURE, THE DEFENDANT HAS NOT MET
      HIS BURDEN OF COMING FORWARD WITH SUFFICIENT
      INFORMATION TO PERMIT THE COURT TO MAKE THE REQUESTED
      DEDUCTION

Should the sums paid by the Peace Pipe to its suppliers for the product sold to the CCTA purchasers be deducted from the gross proceeds generated by CCTA sales? While the answer to that

question is not free from doubt, such Second Circuit authority as there is suggests that such a deduction would be appropriate. See Lizza, 775 F.2d at 497-99. Here, I would be prepared to make the deduction if there was adequate evidence before me to do so. However, that is not the case.[17] That brings us to the question of which party suffers the consequences of the subject deficiency.

The government opines that the cost of goods sold is an affirmative defense to be established by defendant. Defendant counters that the burden of proof rests with the government not only as to the gross CCTA sales but also as to the cost of goods sold since, in defendant's view, only gross profits are subject to forfeiture. And, even if, arguendo, the burden of proof rests with the defendant, defendant maintains he met that burden in

---

[17] My initial impression that the amount Peace Pipe paid to its cigarette suppliers should be readily determinable from its financial records was quickly dispelled upon discovering the creative accounting techniques utilized in the business to determine profitability. For example, reference to government's exhibit 224, entitled "Profit and Loss [for the period] January through December 2000" shows sales of $27,730,788.34 but a minus "Net Income" figure of "$1,302,858.75." Among the major unfathomable charges against total sales are such otherwise unexplained items as $3,921,084.90 for "RAM, Sr. Personal," $133,178.07 for "Charolette Morrison Personal," $2,685,105.85 for "Investment," and even "Victoria's Secret $316.50." (Gov't's Ex. 224.) The use of such bizarre deductions in calculating what is identified in the Profit and Loss statement as the business' "Net Income" necessarily undermines the confidence the reader might otherwise be prone to place in such entries on Peace Pipe's financial records as "cost" and "cost of goods sold."

that a number of the schedules received in evidence delineate the cost of the CCTA cigarettes sold by the Peace Pipe.

The government cites United States v. Schlesinger, 396 F. Supp. 2d 267, 278 (E.D.N.Y. 2005), aff'd 514 F.3d 277 (2d Cir. 2008), in support of its position. In Schlesinger, Judge Spatt of this Court held that "[w]hile the government bears the initial burden of proving, by a preponderance of the evidence, the amount forfeited, pursuant to § 981(a)(2)(B) the defendant has 'the burden of proof with respect to the issue of direct costs . . . .'" Id. at 278 (quoting 18 U.S.C. § 981(a)(2)(B). As noted in the above excerpt from Schlesinger, the operative statute expressly places the burden upon the defendant unlike § 1963 which is silent on the subject. Thus, while Schlesinger may provide some support for the government's position, that support is meager. The following excerpt from the Third Circuit's RICO forfeiture decision in United States v. Ofchinick, however, is instructive:

> If direct costs need to be taken into account, it is the defendant who has the burden of going forward on this issue (if not the burden of proof, an issue we do not reach). The government should not have to prove the absence of direct costs in a case in which the defendant has not pointed to costs that might be deductible.

883 F.2d 1172, 1182 (3d Cir. 1989).

Morrison, unlike Ofchinick, did point out proffered direct cost deductions in various exhibits introduced by the

government during the May 28, 2009 forfeiture hearing, although the arguments advanced by defendant as to those exhibits lack merit. By way of example, defense counsel, referencing government's exhibit 228, a Peace Pipe "Profit and Loss" statement for the period from January 1, 2000 through August 4, 2004, argues "that to the extent that [the government relied upon Peace Pipe's] gross receipts figure [of] 170 — something million, . . . I don't think it is appropriate for the government to argue that . . . the court shouldn't rely upon other numbers within the very same document to show what the cost of the goods was." (May 29, 2009 Tr. at 29-30.) The total sales proceeds listed in government's exhibit 228 are $172,202,235.63 with the corresponding "Cost of Goods Sold" being $135,897,186.12, resulting in "Gross Profit" of $36,200,875.03. While defendant's argument might have merit in a different factual context, it doesn't here for the reason mentioned in footnote 17 relating to the atypicality of the business' records. Under the present circumstances, the government is entitled to rely on Peace Pipe's reported total CCTA sales figure in government's exhibit 228 as an admission, while calling into question the legitimacy of the deductions defendant seeks to have made from that sum.

Defense counsel also points to government's exhibit 264 for the proposition that the record supports "an approximate calculation for cost of goods sold." (Def.'s June 8, 2009 Letter

Br. at 4.) That Exhibit provides a detailed purchase history for
one of the six big customers, to wit Alz Alz, including Peace
Pipe's corresponding "Sold Price" and "Cost" per transaction.
While acknowledging that Agent Wanderer testified that he didn't
know what items were included in such terms as "Cost" and "Costs
of Goods Sold," i.e. whether those terms included more than what
Peace Pipe paid for the subject cigarettes (<u>see</u> May 28, 2009 Tr.
at 42, 46, 48), defendant maintains that "[n]othing suggests
[that 'Cost'] means anything other than 'costs of goods sold'"
consistent with defendant's requested deduction. (Def.'s June 8,
2009 Letter Br. at 5 n.4.) In support of this argument,
defendant contends that there are "numerous instances" within
Exhibit 264 "where the 'cost' remains at $20.87 even though the
'sold price' increases from $23.00 and $23.50." (<u>Id.</u>) Defendant
adds "[o]ne would think that if a percentage of other overhead
were included in 'cost' then the cost would increase as the 'sold
price' increases to include an additional portion of overhead."
(<u>Id.</u>)

        The flaw in defendant's argument is that he has
selectively culled cost and sales figures which support his
argument to the exclusion of the remainder of the record.
Although there are examples in Exhibit 264 where "Cost" remains
constant as the "Sold Price" increases (<u>see, e.g.</u>, Gov't's Ex.
264 at 4), there are numerous others where "Cost" increases as

-27-

the "Sold Price" increases (see, e.g., id. at 8, 12), and even instances in which the "Cost" increases as "Sold Price" decreases. (See, e.g., id. at 14.) (Similar anomalies, out of sync with defendant's hypothesis, are found in government exhibits 265 through 269 which represent detailed purchase histories for the other five big customers.)

The defendant argues that to the extent the record is muddled as to the meaning of such pivotal terms in Peace Pipe's records as "cost" and "cost of goods sold" that is the government's problem, not his. While it is true that the government has access to the same raw information as the defense, that does not mean that the government has the same ability to decipher that information. Wanderer could not determine what some of the key terms meant, nor can this Court on the information provided. That I find the evidence concerning the requested deduction for direct costs nondecipherable should come as no surprise to the parties given the questions I asked of the witness and of counsel during the forfeiture hearing. Defendant, as the person who virtually micromanaged every significant aspect of the Peace Pipe's operations, surely could have called the business's accountant, bookkeeper, software programer or other witness that he knew could provide the necessary clarification concerning the deduction he seeks. That observation takes us back to who has the burden of proof. In my judgment, the burden

of coming forward at the very least, if not the burden of proof rested with Morrison. Ofchinick, 883 F.2d at 1182; see generally 2 McCormick on Evidence § 336 (Kenneth S. Broun ed., 6th ed. 2006) (distinguishing burden of coming forward with burden of proof: former is burden "of producing evidence, satisfactory to the judge, of a particular fact in issue"; the latter is "the burden of persuading the trier of fact that the alleged fact is true"). Having failed to discharge the burden of coming forward, Morrison's requested deduction against gross CCTA sales is denied as essentially unknowable based on Peace Pipe's flawed financial records.

CONCLUSION

For the reasons indicated:

(1) the proceeds subject to forfeiture are limited to those derived from Peace Pipe's CCTA sales;

(2) such sales are estimated to be $6,120,268.39; and

(3) no deduction will be made from the $6,120,268.39 figure as requested by the defense given that defendant failed to met his burden of coming forward with sufficient information to permit me to estimate the appropriate amount to be deducted.

Therefore, on the date of, and as part of the defendant's sentence, the government shall be awarded a money

judgment against defendant in the amount of $6,120,268.39 by way of forfeiture pursuant to 18 U.S.C. § 1963(a).

       SO ORDERED.

Dated: September 10, 2009
      Central Islip, New York

_____
DENIS R. HURLEY, U.S.D.J.