```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,
                                        MEMORANDUM AND ORDER
        -against-                       04-CR-699 (DRH)(S-2)

RODNEY ARNOLDO MORRISON,

             Defendant.
----------------------------------X
A P P E A R A N C E S:

For the Government:
    Benton J. Campbell
    United States Attorney
    Eastern District of New York
    100 Federal Plaza
    Central Islip, New York 11722
        By: James M. Miskiewicz, A.U.S.A.
            John Joseph Durham, A.U.S.A.
            Diane C. Leonardo-Beckman, A.U.S.A.

For Defendant:
    William H. Murphy, Jr. & Associates
    12 West Madison Street
    Baltimore, MD 21201
        By: William H. Murphy, Jr., Esq.
            Kenneth W. Ravenell, Esq.

    Law Offices of Peter Smith & Associates
    389 Fort Salonga Road
    Northport, New York 11768
        By: Peter Smith, Esq.

    Daniel Nobel, Esq.
    401 Broadway - 25th Floor
    New York, New York 10013

    Levitt & Kaizer, Esqs.
    148 E. 78th Street
    New York, New York 10075
        By: Richard Levitt, Esq.

HURLEY, Senior District Judge
```

Defendant renewed his earlier motions for bail by letter dated May 21, 2009. That application was the subject of

oral argument on May 29, 2009 and August 11, 2009. On the latter date, the Court found that defendant had established "exceptional reasons why [his continued] detention would not be appropriate," thus satisfying one of the prerequisites for post-verdict release pursuant to 18 U.S.C. § 3145(c).[1] (See Aug. 11, 2009 Tr. at 53-61 which pages are hereby incorporated by reference.)

A movant under § 3145(c) must also establish by clear and convincing evidence that his release from detention would not pose a danger to the safety of any other person or the community or give rise to a risk of flight. In endeavoring to perform that task, defendant indicates that he "is prepared to submit to the monitoring of all non-legal phone calls and e-mails, surrender of cellular phones, electronic monitoring supervised by Pretrial Services and to home detention guaranteed by a private security firm."[2] (Def.'s May 21, 2009 Letter Br. at 4.)

---

[1] In making that determination, I concluded, based on United States v. DiSomma, 951 F.2d 494, 498 (2d Cir. 1991) that § 3145, notwithstanding its caption ("Review and appeal of a release or detention order"), and text, could be utilized by a district judge, i.e. it is not merely a statutory review mechanism available to those sitting at the appellate level. But see the following two well crafted district court decisions holding to the contrary: United States v. Smith, 593 F. Supp. 2d 948, 955-58(E.D. Ky. 2009) (appellate courts alone are authorized to address "exceptional reasons" under § 3145(c)) and United States v. Chen, 257 F. Supp. 2d 656, 657-65 (S.D.N.Y. 2003)(same).

[2] In addition to presenting a detailed home detention package, the defendant has agreed, among other things, to "do whatever the Court says" should that package be found inadequate (August 11, 2009 Tr. at 69), and to waive his right to appeal if

The private security firm proffered by the defense is Suffolk Investigative Protective Services, Inc. ("SIPS"). In its contract proposal to a member of the defense team, it specifies "the terms and conditions [it] would require to implement secure transport and house arrest, a.k.a. home detention [for defendant] subject to review and approval by the . . . District Court." (SIPS' May 4, 2009 Letter to Peter Smith, Esq., at 1.) Those terms and conditions include, inter alia, (1) "five . . . agents present round the clock at [Morrison's] residence plus a minimum of four agents assigned to secure transport when needed" (id.); (2) "an on-call agreement with another firm for technical assistance in installing, maintaining and/or repairing all electronic equipment employed in th[e] assignment" (id.); (3) a request that it be provided with authority in its "discretion [to conduct] a cursory 'pat down'(as the term is commonly used within law enforcement) of the Subject and/or any person/persons accompanying him before he/they enter(s) the transport vehicle" for trips to the courthouse or other authorized sites (Proposal attached to SIPS' May 4, 2009 Letter ("SIPS' Proposal") at 2), and, presumably, with like authority "with respect to [the other six] persons who live at and who have [regular] access to the Rodney A. Morrison residence" (SIPS' Report at page entitled "Person Occupying Residence"), as well as for visitors to that

---

he fails to appear for sentencing.

site; and (4) the erection of a six foot high security fence circumventing the property which is located "not far from the Moriches Bay" (id. at page entitled "Security Fence").

SIPS' "corporate officers are retired Suffolk County New York Police Detectives with over 65 years of police background and experience" (id. at page entitled "Biography of Firm") and I was advised at oral argument that the individuals who would be monitoring Morrison are similarly retired police detectives. SIPS further explains in its proposal that all systems and devices required to monitor Morrison and his activities will be continuously checked by SIPS' personnel who will "immediately report unusual occurrences to proper authority." (SIPS' Proposal at 4.)

When asked by me during oral argument if the defendant's proposal, including the presence of round-the-clock private security guards, adequately addressed the government's concern, A.U.S.A. James Miskiewicz responded:

> No, it does not, and for the following reasons.
>
> No private security service can basically rebuild a detention facility in a residential area or inside someone's residential home which has never been designed to function as a detention facility. And no number of private cameras or alarms or 24 hour monitors or retired law enforcement — who may or may not, by the way, have been corrections-

>       enforcement trained[3] — can supplant a
>       detention facility.
>
>       . . . .
>
>       If somebody is a flight risk such that the
>       conditions that would ensure return would
>       require the creation of a detention facility
>       outside of the detention facility, that is
>       really beyond what 3142 requires, [citing
>       United States v. Orena, 986 F.2d 628 (2d Cir.
>       1993)], and that in that instance perhaps the
>       better practice, and I submit certainly it
>       has been the government's position
>       throughout, the better practice is to keep
>       detention.[4]

(May 29, 2009 Tr. at 55-56.)

The above position articulated by the government finds abundant support in case law. See Orena, 986 F.2d at 632-33; see also United States v. Dono, 275 Fed. Appx. 35, 37-38 (2d Cir. 2008); United States v. Mercedes, 254 F.3d 433, 436-37 (2d Cir. 2001); United States v. Jimenez, 104 F.3d 354, 1996 WL 680763, at *2 (2d Cir. Nov. 22, 1996)(unpublished opinion); United States v. Cinquemani, 100 F.3d 941, 1996 WL 19148, at *1 (2d Cir. Jan. 16,

---

[3] Based on the materials submitted by the defense, it appears that the SIPS personnel to be assigned to the project, though well credentialed in law enforcement matters generally, do not have the type of specialized detention training and experience typically possessed by correction officers who function within correctional facilities.

[4] The above general comments by the prosecutor were supplemented by specific observations pertaining to the defendant, some of which will be discussed in the text infra. In addition, the prosecutor reiterated and, to some extent, supplemented his above quoted comments during oral argument on August 11, 2009. (See Aug. 11, 2009 Tr. at 43-48.)

1996)(unpublished opinion); United States v. Cantarella, 2002 WL 31946862, at *3-4 (E.D.N.Y. Nov. 26, 2002); United States v. Agnello, 101 F. Supp. 2d 108, 114-16 (E.D.N.Y. 2000); United States v. Koltun, 1998 WL 1033063, at *2 (E.D.N.Y. Oct. 19, 1998); United States v. Bellomo, 944 F. Supp. 1160, 1167-68 (S.D.N.Y. 1996); United States v. Masotto, 811 F. Supp. 878, 883-84 (E.D.N.Y. 1993) and United States v. Gotti, 776 F. Supp. 666, 672-73 (E.D.N.Y. 1991).[5]

The conditions of release proposed by defendant bear significant similarities to those put forth by the defendants in such cases as Agnello, 101 F. Supp. 2d at 114 (e.g., electronic monitoring, video surveillance, prohibition of cellular phones and other communication devices, a twenty-four hour guard posted outside the defendant's home, recordation of all telephone conversations) and in Koltun, 1998 WL 1033063, at *2 (Judge Gleeson, in characterizing the defendant's post-verdict home detention proposal indicated that defendant had "proposed to turn a vacant apartment . . . in Brooklyn into a virtual prison, with an electronic bracelet, round the clock guards and telephone monitoring").

In rejecting the proposal in Agnello, Judge Gershon held:

---

[5] All of the cases cited above, except Koltun, involved proposals for pretrial, rather than post-verdict, home detention.

> These measures, albeit elaborate, do not assure the safety of other persons and the community in a manner remotely commensurate to pretrial detention in a government facility. . . .  Although he purportedly would be restricted to one portion of his house, his activities inside the house will not be observed, nor is it reasonable to believe that the defendant could not evade monitoring by obtaining access to communication devices and employing other methods to carry on criminal activity and to endeavor to obstruct justice.  A security guard posted outside, video cameras directed at the outside of the house, and monitoring of telephone lines cannot be relied upon without good faith compliance from the defendant.
>
> . . . .
>
> Orena's concerns are not overcome by the defendant's offer to hire a private security company, no matter how reputable, to provide security guards, electronic surveillance and video surveillance, and to absorb the costs of doing so.  The burden on the government remains substantial, despite the measures proposed by the defendant to lessen that burden.  Government personnel must still review the surveillance tapes and monitor the defendant's compliance with the conditions of his confinement.  As the Second Circuit has instructed, such extraordinary burdens on government resources are not contemplated by the Bail Reform Act in order to allow an individual to be released who otherwise should be detained.

101 F. Supp. 2d at 114-16.

And Judge Gleeson, in rejecting the home detention package proposed by the defendant in Koltun, noted:

> The efficacy of such "home detention centers," United States v. Orena, 986 F.2d 628, 633 (2d Cir. 1993), in assuring safety

> is dubious. Either the home must be equipped
> and staffed like a real prison, or the
> defendant must be trusted to obey the
> conditions of release. I am not required to
> do the former, id., and I cannot trust
> Koltun's promise to leave his wife alone.

1998 WL 1033063, at *2.

I share some of the concerns voiced by Judges Gershon and Gleeson with respect to Morrison, including Judge Gershon's observation that there is a greater likelihood that a defendant could surreptitiously access a cell phone or other communication device if detained in his or her home as distinct from a correctional facility. Similarly germane for present purposes is the observation found in Agnello that the conditions of home detention proffered by the defense "cannot be relied upon without good faith compliance from the defendant," 101 F. Supp. 2d at 115, and in Koltun that the effectiveness of home detention depends upon the defendant "be[ing] trusted to obey the conditions of release" unless "the home [is] equipped and staffed like a real prison." 1998 WL 1033063, at *2.

The above represents my general concerns regarding defendant's proposal. However, I recognize that each case is sui generis. And although a home detention proposal, including the one advanced by Morrison, cannot be expected to provide the same level of security as continued detention, the pivotal question, as succinctly framed by defense counsel, is whether "Mr. Morrison can convince the court by clear and convincing evidence he's not

a flight risk or danger to the community and also recognizing the presumptions that are applicable [as] already discussed." (Aug. 11, 2009 Tr. at 50.)

As noted, the government insists that question calls for a negative answer. In doing so, it cites the defendant's purported danger to the community and to others should he be released, as well as the risk of flight.

In advancing its danger argument, the government relies on (1) its oral arguments and submissions made during defendant's prior unsuccessful bail applications (e.g., Aug. 11, 2009 Tr. at 33-35) and (2) the evidence at trial which it reports "only buttresses the government's continuing assertion that the defendant poses a very substantial danger to the community." (Gov't's May 28, 2009 Opp'n to Def.'s Application for Bail Pending Sentencing and Appeal at 5.)

With respect to the government's incorporation by reference of its pretrial arguments on bail, the landscape has changed between then and now. In the interim, specifically in May of 2008, defendant was acquitted of the arson, robbery and murder charges of which he stood accused. What remains is his conviction under Count Eight for possessing a firearm as a felon which, it is agreed, constitutes a crime of violence for purposes of 18 U.S.C. § 3142(f)(1), see generally United States v. Dillard, 214 F.3d 88 (2d Cir. 2000), and the RICO conspiracy

conviction under Count Two with the underlying predicate acts consisting of the sale of contraband cigarettes in violation of the CCTA. Accordingly, the government's pretrial danger arguments based on the nature of the charges defendant then faced, and the related likely punishment should he be convicted are currently of significantly diminished relevance.

Attention will now be directed to the second predicate for the government's danger argument, viz. the evidence at trial.[6] Based on that evidence, it seems to me that defendant is a cunning individual with dangerous proclivities who typically enlists others to violate the law on his behalf. Consistent with that modus operandi, abundant evidence was presented at trial

---

[6] The government's position that I should consider the trial evidence is advanced absent authority, perhaps under the belief that the legitimacy of doing so is axiomatic. The defense has not addressed the issue presumably for the same reason. Nonetheless, I looked for a case procedurally akin to Morrison's for inclusion in this decision. While that search was unproductive, it is clear that the government's request rests on sound legal footing. Surely such consideration would be appropriate if the subject conduct resulted in a conviction. See, e.g., United States v. Perez, 1998 WL 386484, at *1 (D. Conn. June 10, 1998)(district court, in addressing a post-verdict motion for release pending sentence, relied in part on its determination that "the evidence presented at trial established that Perez has a substantial history of violence"). That Morrison was found not guilty of the arson, robbery, and murder related charges does not, by analogy, require a different result given that acquitted conduct may be considered for purposes of sentence. United States v. Vaughn, 430 F.3d 518, 525-27 (2d Cir. 2005). Here, as at a sentencing, the issue is addressed to the court, not the jury, and the standard of proof is different than that pertaining to a jury's role in deciding guilt or innocence.

causing me to believe that Morrison orchestrated the robbery of Monique's Variety Store and Smoke Shop, the arson of Thomasina Mack's automobile, and set up the scenario which ultimately resulted in Shirwin Henry's murder, with Morrison harboring, at the very least, the intent that Henry be assaulted for endeavoring to divert some of Peace Pipe's customers to his newly created contraband cigarette operation.[7]

The above is not meant to question the verdict returned by the excellent jury in this case. But its role was to decide whether the government had proven each and every element of the various crimes in the indictment beyond a reasonable doubt while mine is to determine whether defendant has demonstrated by clear and convincing evidence that his release from detention — under the bail package proffered or any reasonable permutation or enhancement thereof — would pose neither a danger to the community nor a risk of flight. For the reasons indicated, he has not met his burden as to the danger portion of the analysis.

With respect to the risk of flight, the defendant correctly notes that I recently released Nicholas Cosmo[8] under conditions of home detention considerably less onerous than those

---

[7] In reaching the above conclusions as to defendant's dangerousness, the suppressed admissions said to have been made by defendant during a proffer session with the government were not considered.

[8] United States v. Nicholas Cosmo, 09-CR-255(DRH).

proposed by him. However, Cosmo's situation is markedly different than Morrison's, not only because Cosmo's release was pretrial rather than post-verdict, but also given the absence of evidence suggesting that Cosmo has assets overseas, unlike Morrison who could live his remaining years steeped in luxury abroad should he break home detention and flee.

Although it is now clear that Morrison is a multi-millionaire, the exact, or even approximate extent, and locations, of his vast holdings remain a mystery due to his chronic practice of uttering false, misleading, and/or incomplete statements in an effort to game the system. For example, he told Pretrial Services in August 2004 that he earned approximately $10,000 a month, and lived in Mastic with his wife and children. In fact, and proceeding in reverse order, his wife and children resided for years in one of Morrison's two multi-million dollar homes in Mexico where the children attended school. And as to earnings, one of his then attorneys implicitly acknowledged that the $10,000 figure was a gross underestimate, perhaps attributable, counsel posited, to the mental trauma supposedly triggered by defendant's arrest. (Feb. 16, 2006 Tr. of Bail Application before Magistrate Judge James Orenstein at 25-26.) "On July 12, 2006, the explanation provided to me by defense counsel was that the $10,000 per month figure represents the average amount of 'pocket' money taken by defendant from the

business," (July 21, 2006 Mem. and Order at 18 (quoting July 12, 2006 Tr. of Bail Application before me at 17).) In addition, absent from the "Financial Resources" portion of the Pretrial Services Report is any reference to defendant's extensive overseas assets. However, with each successive bail application more assets surface, including homes and bank accounts in Costa Rico together with other foreign based assets. Defendant does not suggest that the inter-application increases are attributable to appreciation or newly acquired properties enhancing his portfolio, but rather floats incredible explanations along the lines that his awareness of his holdings has been sequentially augmented since 2004.

By the time the last bail application was made in 2006, Morrison identified $56,000,000 of assets. However, even that sum may well understate his wealth. His accountant testified that the source of her information came from the defendant, supplemented, in small measure, by those other assets she was able to uncover from the incomplete records furnished by the defense. In essence, then, the accuracy of the 2006 compilation rests on the completeness of defendant's representations. But given defendant's track record since 2004 in reporting his assets, the Court is unable to accept that the assets reported in 2006 are necessarily coextensive with his actual holdings. In sum, we stand today where we did in 2006, viz. lacking credible

information as to the true extent of defendant's significant wealth, where such assets are located, and in what names. That circumstance, together with the fact defendant faces the prospect of a lengthy period of continued incarceration on the two counts of conviction, raises the likelihood of flight.

With respect to whether the defendant can be "trusted to obey the conditions of release," Koltun, 1998 WL 1033063, at *2, initially it warrants mention that the Court issued an Ex Parte Post-Indictment Retraining Order on July 11, 2006 which, inter alia, directed the defendant, pursuant to 18 U.S.C. § 1963(d)(1), to "repatriate and deposit with the United States Marshals Service" certain described assets located outside the United States within ten days of his receipt of the Order. (July 11, 2006 Restraining Order at 6.) The legitimacy of that Order was unsuccessfully challenged by the defense. Thereafter, clarification of the Order was sought and provided. Nonetheless, the subject assets remain overseas if they, in fact, still exist. However, the Court has been advised that the subject assets will be repatriated should the Court grant the present application and, indeed, would be available for security under the proposed bail package. Simply put, the Court is underwhelmed by the offer, and perceives Morrison's cavalier disregard of the July 11, 2006 direction as one of several considerations rendering problematic the likelihood that he would obey the conditions of

his release were his application granted.

Also of concern to the Court is information about bench warrants being issued for the defendant which are contained in a Suffolk County Probation Department Report pertaining to his state convictions for criminally negligent homicide and criminal possession of a controlled substance in the fourth degree, both of which offenses occurred in 1987. (See Gov't's Ex. 7, received into evidence on Aug. 11, 2009.) The issuance of those bench warrants, viewed in conjunction with government's exhibit 3500-CB-1 — represented to be "the handwritten notes of a former [Morrison] employee named Shavon Brown to whom apparently the defendant dictated what he intended to be his autobiography" (Aug. 11, 2009 Tr. at 43) — runs counter to the position that defendant is an appropriate candidate for home detention. In that regard, Ms. Brown writes:

> [Morrison i]nvolved in shooting. A child was playing behind a shed that was being shot at. . . . Ran from police for 2 months. (Costa Rica). Most wanted man, could never be caught. Sent Charolette back to reservation and went down South.
>
> Got him in N. Carolina. [F]lew him back to N[ew] York — to Riverhead jail. Violation of probation. [N]egligent homicide, controlled substance.

(Gov't's Ex. 3500-CB-1 at unnumbered pages 3 and 4.)

Defense counsel's sole response to the above was that defendant cannot be expected to respond to something that

happened over twenty years ago.  That response is surprising given (1) that the person who was in the best position in the courtroom on August 11, 2009 to comment regarding the bench warrant allegations was the defendant, and (2) that he, not the government carries the burden of proof.  His silence is tantamount to an admission that he did flee to Costa Rico in an unsuccessful effort to avoid the consequences of his criminal actions.  That scenario, albeit from years ago, again counsels against granting his application.

In sum, I find that the defendant has not established by clear and convincing evidence that the proposed modification of his custody status would sufficiently ameliorate the attendant danger to the community and risk of flight as to be warranted. In the final analysis, defendant is a dangerous individual of vast, although seemingly as yet not fully disclosed wealth.  To the extent that wealth far exceeds what he could, absent herculean efforts, spend in his lifetime, his motivation to remain available for subsequent proceedings is dubious.  Plus, even if I accept the often disputed proposition that a defendant's willingness to replicate a jail within his home falls within the ambit of what the Congress intended in enacting Sections 3142 and 3143, defendant has not assuaged my perception that he is one of the presumably few individuals capable, both by way of ability and mind-set, of defeating such replication

measures.

The defendant's application for post-verdict bail is denied for the reasons indicated.

SO ORDERED.

Dated: September 10, 2009
      Central Islip, New York

_____
DENIS R. HURLEY, U.S.D.J.